# Ex. 4

From: **Mike Dolister** mdolister@apollomd.com
Subject: Medicare Coding Changes
Date: May 26, 2011 at 2:56 PM
To:



Colleagues,

Medicare has recently made some changes to their documentation criteria and the e-mail below from one of our coding partners delineates these modifications. The physicians are documenting in line with these revised criteria at the majority of the places ApolloMD provides the emergency medical services, but I just wanted everyone to be familiar with how changes in documentation requirements could affect the coding of your charts and your reimbursement. We are looking at a July 1, 2011 transition date for ensuring these changes are made across all facilities.

Best regards,
Mike

Mike Dolister, MD, FACEP
Chief Medical Officer, Emergency Services
ApolloMD

**From:** Michael Dolister [mailto:michael.dolister@yahoo.com]
**Sent:** Monday, May 23, 2011 9:55 AM
**To:** Mike Dolister
**Subject:** Fw: Go-Live date for ACEP Conference update changes

----- Forwarded Message ----
**From:** Heidi Young <hyoung@pettigrewmedical.com>
**To:** Roger Murray <rmurray@apollomd.com>; Mike Dolister (outside email) <michael.dolister@yahoo.com>
**Sent:** Wed, May 18, 2011 3:48:00 PM
**Subject:** Go-Live date for ACEP Conference update changes

Hi Roger and Mike,
We need to go ahead and implement the documentation criteria that was changed this year. We sent this information to you all in March after our return from the ACEP Conference in Las Vegas. There are a couple of changes that will directly affect the doctors if they do not make the changes in their documentation.

The main changes are:

- MC requires the statement on all CC claims to note "time does not include time spent in separately billable procedure".

- EKG readings by the computer must be over-read by the doctor with a note showing he "agrees with the interpretation" or gives his own interpretation. Simply signing the computerized report is no longer acceptable.

- HPI information must be gathered and documented by the ED physician. We cannot rely on nurse's notes for this information any longer.

- Handwritten signatures need to be legible

The other changes are reflected in the document that was previously sent out. I will include it

again for your reference. We'd like to go ahead and put the go-live date for these changes to be implented as of July 1st as we cannot continue to accept the documentation that is going against these updates. Please make sure your physicians are aware of these changes so that they can adjust their documentation accordingly. Please let me know if you have any questions. Thank you.
--

Heidi Young, CPC
Director of International Coding
Pettigrew Medical Business Services
706-354-5764 ext. 233
706-206-1577 (cell)

```
This e-mail, including attachments, is intended for the exclusive
use of the person or entity to which it is addressed and may contain
confidential or privileged information. If the reader of this e-mail is
not the intended recipient or his or her authorized agent, the reader
is hereby notified that any dissemination, distribution or copying of
this e-mail is prohibited. If you think that you have received this e-mail
in error, please advise the sender by reply e-mail of the error and then
delete this e-mail immediately.

Thank you. PMBS, Inc.
```



2011 ACEP Coding and
Billing Conf...mary[1].doc

Pettigrew Medical Business Services

Summary of the 2011 ACEP Reimbursement and Coding Seminars

    We have just returned from the annual Reimbursement and Coding Seminars hosted by ACEP and we wanted to communicate to you what we found to be the most significant points concerning medical record documentation, coding, and reimbursement. I will attempt to be brief but some of the issues are rather technical. Let me begin by stating that there is still much concern over the current method CMS (The Center for Medicare and Medicaid Services) utilizes for determining the conversion factor which ultimately is responsible for determining the dollar equivalent reimbursement for every RVU in CPT. The methodology has been flawed for some time but despite efforts to move it from its current position it still remains tied to the Sustainable Growth Rate. (for additional information on the SGR and the calculation of the Medicare fee schedule I recommend the FAQ's on the ACEP website. Look under the FAQ on RBRVS). Couple the flawed methodology of the SGR on one hand to the budget neutrality mandate on the other and physician reimbursement is constantly under a fiscal squeeze play that needs major overhauling. In the meantime congress is constantly bailing out physician reimbursement at the last possible moment, but the problem is only being postponed. We are currently under another temporary fix that narrowly forestalled a whopping 25% cut in physician reimbursement from Medicare. (Again, there is a very informative article on the Congressional decision on the ACEP website).

    An outgrowth of the congressional fix is a greater emphasis on auditing. The rationale behind this relationship stems from a congressional reluctance to infuriate constituencies. Many analysts believe that one of the driving forces behind the fix in the Medicare fee schedule was related to the fear that congress would be held accountable for the inability of patients to obtain medical care due to the number of physicians that would bail out of Medicare participation. So they approved the fix with the plan in place to recover greater sums of money on the back end through increased audit programs. Currently the recovery of overpayments is reaping 5 dollars in recoupment for every 1 dollar spent on the audit programs. Clearly there is no disincentive to increasing the audit program to recapture enough money to pay for the fix. This fact brings physician practice compliance onto a front burner. As part of the new healthcare reform bill physician practices are to have and fully execute compliance plans and programs. No longer will piggybacking on a billing company's compliance plan be acceptable.

    With the increase in auditing that is already underway here are some items worth noting.

    Issues that directly impact daily life in the ER.

I.     Documentation.
    A. Legibility of charts and signatures. Legibility of medical records has been on the books for years but very little has been said about it. But with the increased pressure to verify provider's work within the medical record there will be increased scrutiny of legibility. Auditors have been given the freedom to deny claims on handwritten charts that cannot be read. Beyond the entire medical record, a chart with an illegible signature can also be denied for payment. A

medical record should clearly identify the provider of the services rendered for it to be reimbursable. In lieu of an electronic medical record, which has an automatic signature/initial on every added documentation element, ACEP is recommending that ER's that utilize hand written charts or template charts develop a legible mechanism to fully identify the providers within the practices. Some suggestions were for each physician to carry a stamp of their signature over their printed name. Then each record could be affixed with the stamp and then initialed for authentication. Another suggestion was to have the names of all the physicians within the group printed on the chart template. Then the physician documenting the record could circle his/her name and initial the circle to authenticate it. These issues will not impact coding and billing on the front end but could negatively impact the bottom line through audit recovery efforts on the back end.

B. Physician involvement in the HPI. There was added emphasis at this year's conference on the necessity that the HPI portion of the record be accomplished by the provider and not ancillary staff. Historically the taking of the Review of Systems and the Past, Family and Social History portions of the History could have been accomplished by the nurse. The physician could bring the nurse's work into his record by adding a statement that the nurse's notes were reviewed. This allowance for the ROS and the PFSH crept over into the HPI. The documentation guidelines clearly state that the physician or non-physician provider (PA or NP) is to capture the HPI personally. This portion of the document cannot be incorporated into the physician note by a statement of acknowledgment of review of the nurse's note. Failure of the provider to capture a personal HPI will cause a reduction in E&M level due to incomplete documentation.

C. Cloning of Records. EMR Macros. A great deal of time was spent at the conference concerning this new area of concern. It has become a target of auditors and an easy one to identify. As much as computer technology is to aid in the efficiency of record production and storage, it does have certain drawbacks. One of which is the ease with which a record can be formatted through a set of Macros or through the cut and paste function (cloning of records). Examples of cloning were exhibited where the NP's documentation matched the physician's documentation word for word. Either a macro or a cloning process was used to create the record. One auditor took 11 charts from one physician's shift and placed them side by side and could only find differences across the charts in name and final diagnosis and disposition. The ROS and PE were identical. Template charts can also be a problem in that all charts begin to look the same. Each record should show some individuation, which demonstrates that the physician is considering a unique presentation in each patient. There was a distinct warning from several sources of the audit dangers that accompany cloning and the use of macros. Again, this is not something that coders will easily identify as they handle charts from many facilities and physicians, but an auditor researching one physician's practice may pick up on the problem instantly and reject the claims as not identifying individual patient care.

D. Shared Services. Once again this topic had numerous references. A shared service is defined by Medicare and Medicaid as medical care to a single patient that is shared between a physician and a non-physician provider. Documentation requirements state that each provider is to perform and document his/her care and/or evaluation of the patient. So three things are necessary for a physician to

be able to bill Medicare under a shared service arrangement. 1. The physician must perform a portion of one of the three key components of the E&M service (the 3 elements are HPI, the Physical Exam, and the Medical Decision Making). 2. The physician must document the portion of his/her involvement with the patient. 3. The physician must have and document face to face time with the patient. Face to face time has been clearly defined by Medicare that a mere greeting or introduction to the patient does not qualify. Meaningful patient care is the focus of face to face time. Without these three prerequisites in place the visit must be billed out under the name and number of the NPP and be reimbursed at 85% of the physician fee schedule.

E. Critical Care. A couple of points were being emphasized as far a Critical Care. Critical Care is not to be considered a shared service. For Critical Care to be applicable the physician must not include anytime spent on the patient by the non-physician provider. The physician must document his/her own time in excess of the 30 minute threshold to qualify the chart for CC. There is even more scrutiny being placed by auditors on the time statements related to CC. There is an increasing demand that all doubt be removed as to the time in CC be beyond any time spent on additional billable procedures. ACEP is highly recommending adding the phrase "I provided ___ minutes in Critical Care on this patient not including any time spend on otherwise billable procedures" to remove all potential doubt.

F. PFSH. This one is a little nit-picky but nonetheless I want to keep you abreast of what ACEP is identifying as potential audit risk areas. Some physicians are writing in the PFSH sections of their chart that the "PFSH is Noncontributory." Some auditors are interpreting this statement to mean that the physician didn't inquire into PFSH because they deemed it noncontributory, which then removes it from part of the chart and therefore allows them to reduce the level of service. To remove all doubt from the issue, ACEP is recommending that the PFSH be confirmed by stating "PFSH reviewed and noncontributory".

II. Coding Issues

A. Global Days Reduction by Medicare. This topic is a little technical but the basic concept needs to be understood. Fundamentally, it is important to know that every procedure in CPT is assigned a global period by Medicare. There are two global periods of interest to ER departments. They are 10 day global periods and 90 day global periods. Minor procedures, such as a simple laceration, typically carried a 10 day global and major procedures, such as a fracture relocation, carry a 90 day global. The import of global periods is that a patient visit for a recheck to the ER within the global period should result in a no charge because the first Medicare payment for the procedure covered any subsequent care occurring within the global period. Well, in 2011 Medicare reduced the global period for simple lacerations to zero days. We all began the year believing that this was going to provide additional revenue to ER groups because now follow-up or suture removal visits that typically would be written off because of the global period rule could be billed as its own visit. This is the case; however, when Medicare removed the restriction for the global days observance they also lowered the RVU's for the initial procedure. The bottom line is that the reimbursement for the procedure is going down as a result and even if the patient returns to the ER for the suture removal or recheck, the RVU's for the subsequent

visit do not make up for what was lost. Add to that the number of patients that do not return to the ER for wound follow-up care and the loss could be significant. Add to that the fact that patients are used to complimentary suture removal and now it becomes a billable service and there is a public relations issue to address. The bottom line here is that we need you to clarify for us how you would like to code the follow-up visits for these simple laceration repairs. The good news is that not all minor procedures were changed but it may be that Medicare will see this shift as a money-saving proposition and employ it in other procedures.

B. Observation Codes. There has been a change to OBS coding to address the possibility of a patient extending a stay in observation over 2 midnights. An additional "midday" observation code has been added to allow for this eventuality. So a patient that is admitted to OBS before midnight on day 1 and is not discharged from OBS until after midnight on day 3 will receive 3 OBS codes; the initial admission to OBS code, the interim day code and the discharge from OBS code. The only documentation that is necessary for us to catch this type of patient is a clear indication in the chart that the patient stayed in OBS through a full calendar day between the days of admission and discharge. Notes that are made during this interim day should include the date of the evaluation and capture at least 2 of the 3 key elements of an E&M code (again the key elements of E&M codes are HPI, PE and MDM).

C. EKG Interpretations. Charts that have the capacity to incorporate the EKG computer printout into the ER doc's chart will not be counted as interpreted by the ER doc if he/she only initials the printout. The physician must write his **own** interpretation or **write** that he/she agrees with the computerized interpretation in order to receive credit for the interpretation.

We in the coding department at PMBS stand at the ready to help you understand these updates and any other coding and documentation issue. We offer ourselves to you to conduct in-service training at your facilities for all of your physicians. Please let us know when you would like us to come.

Should you have any questions, please don't hesitate to let us know.


Thanks,


Rick Pettigrew, CPC                          Heidi R. Young, CPC

President                                    Director of International Coding