IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* Chionesu Sonyika, Relator, *et al.*, | : : : | |
| Plaintiff, | : : | |
| v. | : : | |
| APOLLOMD, INC., *et al.*, | : : : : | CIVIL ACTION NO. 1:20-CV-03213-AT |
| Defendants. | : | |

## **ORDER**

This matter is before the Court on Defendants'[1] Motion to Dismiss the Amended False Claims Act Complaint [Doc. 60] brought by Relator, Chionesu Sonyika ("Relator" or "Sonyika"), on behalf of the United States and six states.[2]

Relator filed his initial Complaint on January 3, 2017 in the United States District Court for the Southern District of Florida. (Doc. 1.) On July 8, 2019, the

---

[1] Defendants include ApolloMD, Inc., Independent Physicians Resource, Inc., ApolloMD Business Services, LLC, ApolloMD Holdings, LLC, PaymentsMD, LLC, ApolloMD Group Services, LLC, Apollo MD Physician Partners, Inc., ApolloMD Physician Services FL, LLC, and Georgia Emergency Group, LLC. The Court will refer throughout to the collective Defendants as either "Defendants" or "ApolloMD," except when speaking about a specific individual Defendant. Relator describes the Defendants as "a system of affiliated entities" that are collectively "a privately-held, physician-led national group practice that provides staffing and management services to hospitals in the United States, specifically in the areas of emergency medicine, hospital medicine, radiology, and anesthesiology." (Complaint, ¶ 19.)

[2] These states include Florida, Georgia, Indiana, Iowa, Tennessee, and Texas and are referred to as the "Plaintiff States."

United States of America provided notice that it would not intervene in this case. (Notice, Doc. 24.) The State of Texas similarly declined to intervene on July 16, 2019. (Docs. 27.) On October 27, 2019, Relator filed his First Amended Complaint, and Defendants moved to dismiss or transfer the case on November 18, 2019. (Docs. 45, 47.) On August 3, 2020, the District Court for the Southern District of Florida granted the Defendants' motion to transfer the case to this Court. (S.D. Fl. Order, Doc. 56 (also declining to address the merits of Defendants' motion to dismiss the case, in light of its decision to transfer it instead).)

Relator alleges in the Amended Complaint that the ApolloMD Defendants, engaged in a fraudulent scheme through which they would submit claims to the Centers for Medicare and Medicaid Services ("CMS" for payment for services allegedly provided by physicians or physicians in conjunction with Physicians Assistants or Nurse Practitioners (Advanced Professional Practitioners or "APP") and thereby would use the higher physician billing rates authorized by the Government under such specific circumstances. Relator alleges that Defendants routinely submitted false claims because a substantial proportion of billing claims were, in fact, for services rendered solely by Advanced Professional Providers ("APP", also known as "mid-level providers") without any physician face-to-face contact with the patients receiving services through APP staff.  Such face-to-face contact or direct delivery of services by physicians is required for higher billing for services at physician rates under applicable federal standards. The Amended

Complaint asserts claims under the False Claims Act 31 U.S.C. § 3729 *et seq*. and applicable state-law equivalents. For the reasons set forth below, the Court **GRANTS** Defendants' Motion to Dismiss as to Count 3, but **DENIES** the Motion to Dismiss as to Counts 1 and 2.

## I.   STANDARD OF REVIEW

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555–56 (2007); Fed. R. Civ. P. 12(b)(6).  The plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.  *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)); Fed. R. Civ. P. 8(a).  In ruling on a motion to dismiss, the court must accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

A claim is plausible where the plaintiff alleges factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A plaintiff is not required to provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  The plausibility standard requires that a plaintiff allege sufficient facts "to raise a reasonable expectation that

discovery will reveal evidence" that supports the plaintiff's claim.  *Id*. at 556.

Normal standard pleading standards are heightened though for False Claims Act claim cases because a FCA claim is "a fraud statute for purposes of [Federal Rule of Civil Procedure] 9(b)." *U.S. ex rel. Clausen v. Lab'y Corp. of Am*., 290 F.3d 1301, 1310 (11th Cir. 2002) (internal quotation marks omitted). In federal court, plaintiffs must plead fraud with particularity. *See* Fed. R. Civ. P. 9(b).  When a Plaintiff states allegations under the False Claims Act, Plaintiff must plead "facts as to time, place, and substance of the defendant's alleged fraud," specifically "the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *U.S. ex rel. Clausen* 290 F.3d at  1310–11 (quoting *Cooper v. Blue Cross & Blue Shield of Fla., Inc*., 19 F.3d 562, 567–68 (11th Cir. 1994)).  As discussed more fully later in this Order, the pleading requirements under Rule 9(b) for FCA claims have also been alternatively adapted in some circumstances to allow claims in certain cases to move forward where the Complaint allegations and information provide sufficient indicia of reliability regarding the fraud claims asserted.  *See, e.g.*, U.S. ex rel. *Walker v. R&F Props. of Lake County, Inc*., 433 F.3d 1349, 1359–60 (11th Cir. 2005).

## II.   BACKGROUND

Relator, Chionesu Kwesi Sonyika, M.D. ("Relator" or "Sonyika") is a medical doctor who worked from 2010 to 2018 for ApolloMD as an "independent contractor physician" in the emergency departments at the Atlanta Medical Center-South in Atlanta, Georgia, and the Spalding Regional Medical Center in

Griffin, Georgia. (Complaint, ¶ 18.) According to the Amended Complaint, Sonyika is certified by the American Board of Emergency Medicine (ABEM) and specifically residency-trained in emergency medicine. Relator alleges that ApolloMD uses a fraudulent scheme whereby it "systematically submit[s] false claims to the Centers for Medicare and Medicaid Services ("CMS") and Plaintiff State[s'] Medicaid programs for reimbursement for services performed by 'mid-level' healthcare providers (e.g., physician assistants and nurse practitioners) at Apollo emergency rooms." (Complaint, ¶ 1.) Relator alleges that he has "personal knowledge of and non-public information" about this alleged scheme. (Complaint, ¶ 18.)

According to the Amended Complaint, "Apollo is among the nation's most profitable physician practice management companies ("PPMs"), which provide management and human-resources services to hospitals and, in particular, to emergency departments." (Amended Compl., ¶ 44.) Citing Apollo's own website description of its business,[3] the Amended Complaint states that,

> Apollo's revenue-based business model is built on three primary goals: (1) treat and bill more patients by increasing "patient throughput and allowing for volume growth"; implement standard coding and billing procedures to capture as much revenue as possible from CMS and private payers; and (3) align physicians' incentives with hospitals' incentives by compensating physicians based on the number of "patients they treat and the procedures they perform."

(Amended Compl., ¶ 44.)

---

[3] *See* Amended Compl., ¶ 44, n. 16, 17 (citing http://apollomd.com/home/multispecialty-solutions/emergency-medicine/ (and noting "last visited Dec. 10, 2016").

Relator alleges that ApolloMD submits claims for reimbursement that reflect that a patient was seen by both a mid-level provider (i.e., Nurse Practitioners or Physician Assistants) and a physician, even though most patients only ever saw a mid-level provider. (Complaint, ¶ 3.) Relator alleges that each care provider, whether mid-level or physician, has a National Provider Identification number ("NPI") that affects the rates of reimbursement for care from any given provider. (*Id.*) Relator alleges that because claims submitted under mid-level providers' NPIs are reimbursed at only about 85% of the rate of a physician's NPI, ApolloMD directs its physicians to sign charts even for patients they did not see and treat, so that ApolloMD can submit for the 100% reimbursement rate available for physicians. (*Id.* at ¶¶ 3–4.)  As discussed later, Relator also alleges that Defendants used false representations and records for the purpose of getting false claims paid or approved by the Government.

According to the Complaint, ApolloMD's top national executives emailed all ApolloMD emergency department physicians, "explicitly stating that, for Medicare patients, *all* mid-level charts are 'billed under the physician NPI number'—*i.e.* regardless of whether the physicians actually saw the patient." (Amended Compl., ¶ 5 and Ex. 1.) Relator alleges that, "[b]ecause the NPI number is what automatically triggers the reimbursement rate, this fact, which Apollo itself has confirmed, is an admission of fraud and establishes the existence and the national breadth of Apollo's unlawful Scheme." (*Id.*) Relator further alleges that ApolloMD attempts to "cover up" this scheme by "manipulating charts to falsely reflect what

is referred to in the Medicaid regulations as a 'split/shared visit[,]' ... [which is] when a mid-level *and* a supervising physician both treat the same patient, meaning that both the physician and the mid-level actually provide face-to-face services to the patient." (Complaint, ¶ 6.) Relator alleges that when a claim is submitted as a split/shared visit, "CMS reimburses for the mid-level services at the same rate as the physician's services, as if the mid-level were an extension of the physician[,]" and that in the emergency department, "a properly documented split/shared visit is the <u>only</u> circumstance under which mid-level services may be reimbursed at the full physician rate." (*Id.* (emphasis in original).)

Relator alleges that in emergency rooms, actual split/shared visits are "exceedingly rare" and that physicians and mid-levels "rarely, if ever, see patients together." (Complaint, ¶ 7.) This is because "to maximize efficiency and avoid overlap under Apollo's business model, mid-levels independently treat lower-acuity patients and physicians independently treat higher-acuity patients."[4] *Id.,* Relator claims in the Complaint that he "personally performed true split/shared visits in less than 1% of the emergency patients he treated at Apollo[,]" and that this was "customary for all physicians Relator worked with." (*Id.*)

Relator alleges that despite this standard bifurcation of work responsibilities, ApolloMD "requires physicians and mid-levels to indicate in *every*

---

[4]   Similarly, Relator alleges that the standard emergency room floor model used by Apollo partitions physicians and midlevel professionals in different areas of the emergency department to enable the company to maximize revenue and focus Physician Assistants and Nurse Practitioners on separately treating more patients.  *See* Amended Compl., ¶ 45.

mid-level medical chart that the physician provided the services to the patient by demanding that physicians sign *every* mid-level chart and indicate that the physician also treated the patient seen by the mid-level professional so that Apollo can bill for the mid-level professional's services under the physician's NPI at the full physician rate." (Complaint, ¶ 8.) Relator alleges that "every emergency physician is *required* to sign and approve *every* mid-level chart sent to him or her at the end of each shift. A typical 'attestation' will say something like, 'I have consulted with Physician Assistant Smith and concur with the treatment she provided.'" (*Id.* at ¶ 66.) According to Relator, seeking reimbursement under the physician's NPI in such a scenario is a stark violation of the requirements for claims submission to CMS. (*Id.* at ¶ 59 (citing CMS, Medicare Claims Processing Manual, pub 100-04, Ch. 12, § 30.6.1(B) ("[I]f there was no face-to-face encounter between the patient and the physician (e.g., even if the physician participated in the service by only reviewing the patient's medical record) then the service may only be billed under the [mid-level's NPI]")).)[5]

Relator alleges also that ApolloMD paid illegal kickbacks to physicians that were directly tied to the physicians' required participation in the scheme. Relator claims in the Amended Complaint that ApolloMD "credits and pays physicians for

---

[5]  *See also*, Amended Complaint Ex. 4, Doc. 45-4 at  at pp. 5–6, ¶ I.D. memo to ApolloMD management representatives from Heidi Young, CPC, Director of International Coding Pettigrew Medical Business, which provided contractual advisory services to ApolloMD in regard to CMC billing and coding requirements.  The memo makes clear that shared services of a physician and mid-level professionals cannot be billed at the physician's rate unless there is documented physician face-to-face time with the patient that exceeds a mere greeting or introduction and that such time must meet other substantive service delivery requirements as well.

each patient they actually see *and* for each mid-level chart they sign, which substantially increases the physicians' compensation." (Complaint, ¶ 11.) Relator points to his own payment history as alleged proof of the "fraudulent billing and the kickbacks that Apollo paid him under the Scheme." (*Id.* at ¶ 12.) Relator embeds within his Amended Complaint a chart that he claims shows at the Spalding Regional Medical Center "the total number of patients that Relator supposedly treated with a mid-level in a given pay period" and also "the total compensation Relator received in a given pay period for supposedly treating patients with a mid-level[.]" (*Id.*) According to the Amended Complaint, this chart is a screenshot produced directly from ApolloMD's online portal for employee payment information. (Amended Compl., ¶ 12.) Relator alleges that a column in the chart labeled "$ Generated MLP[6] Patients" reflects "illegal kickbacks that Apollo paid Relator under the Scheme—an amount totaling $97,378 in this instance—in just six months." (*Id.*) This column is next to another column labeled "$ Generated Dr Only Pts" that Relator alleges shows the amount of money he was paid for patients who saw Relator – a physician – only, and not also a mid-level provider. (*Id.* at ¶ 13.) Relator claims that the chart further shows that it would be impossible for physicians to actually treat patients in concert with mid-levels at the frequency that ApolloMD allegedly submitted claims for such co-treatment. (*Id.*) Relator alleges that the chart shows that he received credit for treating "as many

---

[6] MLP is an acronym for mid-level professional. The Court understands the Amended Complaint to allege that "$ generated MLP Patients" as used here refers to the amount of money generated by Relator's attestation on charts for patients seen by a mid-level professional.

as 811 patients in the month of January 2016." (*Id.*) However, "[a]s Relator worked approximately 15 days per month at Apollo, that would mean Relator would have to physically treat more than 54 patients each and every shift during that month to reach 811 patients[,]" and that this "is not physically possible." (*Id.*; *see also*, data chart embedded at ¶14 (identifying breakout of patients at Atlanta Medical Center purportedly seen by both a mid-level and physician in connection with Relator's treatment records for 2010–12 at the emergency room at that hospital).)

Relator further alleges that ApolloMD has to submit information to a database maintained by CMS called the Physician Quality Reporting System ("PQRS"). (Amended Compl., ¶¶ 51–53.) According to the allegations in the Amended Complaint, ApolloMD had to submit "Medicare beneficiary data and charts" to the PQRS or it "would receive a penalty reduction in reimbursement." (*Id.* at ¶ 52.) Relator alleges that the data submitted by ApolloMD to the PQRS "was based on ***actual claims submitted*** by Apollo to CMS for services Apollo provided to Medicare beneficiaries under the fee-for-service schedule." (*Id.* at ¶ 53 (emphasis in original).) Relator alleges, with documentary back-up, that after ApolloMD began participating in the PQRS system, it also sent out reports to its physicians showing the result of the quality measures reflected therein. (*Id.*) Relator claims that after review of the reports, some of ApolloMD's physicians "questioned why certain services had been attributed to them when they did not actually perform the services[,]" and that ApolloMD's Chief Operations Officer and Chief Quality Officer answered some of the questions in an email sent on December

2, 2016. (*Id.*) Relator reproduced a portion of the December 2, 2016 email which appears as follows:

> Q: Do the PQRS measures include those patients that are <u>APC charts that I sign,</u> or are they my charts alone?
> A: The charts are a combination of both "physician only" charts and "physician/APC charts". <u>As the charts are billed under the physician NPI number,</u> both will count equally for adjustments by CMS. For this reason, all charts attributed to the physician are included.
>
> Q: Do the CT Reports include those patients that are <u>APC charts that I sign,</u> or are they my charts alone?
> A: Same answer. The CT utilization data is a combination of both "physician only" charts and "physician/APC charts". <u>As the charts are billed under the physician NPI number,</u> we are accountable for the physician as well as the APC charts. As APCs tend to see less acute patients, this can actually make our  CT utilization rate less.  And as above, we are ultimately responsible for APC patients and the quality of the care they deliver to our patients.

(Doc. 45 at 27.)[7]  As stated in the email, the charts reflect claims that had actually been billed, and that had been billed using the physician's NPI number even for claims that should have – according to the Amended Complaint – been billed solely under the mid-level practitioner's NPI, with that practitioner's 85% rate.

Relator points as well to communications from ApolloMD to its network of employees, highlighting several emails that requested physicians sign charts, allegedly in furtherance of the scheme. (*See* Amended Compl. at 6 (Mar. 14, 2013 email from Credentialing Specialist noting, "Physicians please make sure you go through the midlevel charts and attest with your signature that you reviewed the charting etc."); 7 (Dec. 4, 2012 email from Group Coordinator asking recipients to "[p]lease remember to SIGN (or for the midlevels, assign) all of your charts. ... I know the new system makes this difficult, but this is a significant delay in coding

---

[7] "APC" as used in this chart refers to "advanced practice clinicians," which is another term for a mid-level practitioner. (Amended Compl., Doc. 45 at ¶ 53.)

that very negatively affects reimbursement and in turn, our paychecks."); 8 (Dec. 5, 2012 email from Group Coordinator saying, "[p]lease also remember to SIGN every chart on which you document. To be safe, physicians can 'verify' the mid-levels' charts, but still sign them as well. ... For the mid-levels, please remember to assign each chart to a doctor."); 12 (Sept. 25, 2014 email from Group Coordinator stating, "[r]emember physicians, your unsigned charts DIRECTLY affect your paycheck!"); 13 (Sept. 26, 2013 email from Group Coordinator explaining, "[y]our paychecks as well as everyone else's in the company directly relate to how much money is brought in, which is directly tied to charting.").) Relator alleges that these emails corroborate his allegations that ApolloMD incentivized its physicians to falsely attest to having seen patients in concert with mid-level practitioners when in reality those patients only ever saw a mid-level practitioner. Relator alleges that these emails show that ApolloMD aligned the physicians' financial incentives with their participation in the scheme. (Amended Compl., ¶ 47.)

On the basis of these allegations, the Amended Complaint sets forth three claims for relief under the FCA: (1) a so-called "presentment claim" under 31 U.S.C. § 3729(a)(1)(A) (Count One, Doc. 45 at 41); (2) a so-called "use claim" under 31 U.S.C. § 3729(a)(1)(B) (Count Two, Doc. 45 at 41–42); and (3) an anti-kickback claim under 42 U.S.C. § 1320a-7b(g) (Count Three, Doc. 45 at 42–44). Counts four through nine are made under the related acts for fraud under state law for the states of Florida, Georgia, Indiana, Iowa, Tennessee, and Texas, respectively. (Doc. 45 at 44–49.)

## III.   DISCUSSION

The FCA states:

> Any person who ... knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval ... is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person ....

31 U.S.C. § 3729(a). The FCA authorizes private citizens (known in this context as *qui tam* relators) to bring actions on behalf of the United States. 31 U.S.C. § 3730(b). "Recovery under the False Claims Act is not measured by the amount of any actual damage a relator might have sustained personally as a result of a defendant's false claim." *United States v. R&F Properties of Lake Cnty., Inc.*, 433 F.3d 1349, 1355 (11th Cir. 2005). Instead, the relator stands "in the shoes of the United States government," and so can prosecute the lawsuit on the United States' behalf, and recover, for the United States, "the losses attributable to any fraudulent claim and the civil penalty authorized by the statute." *Id.* (citing 31 U.S.C. § 3730).

Relator brings an FCA "presentment claim" under 31 U.S.C. § 3729(a)(1)(A) in Count One, and an FCA "use claim" under 31 U.S.C. § 3729(a)(1)(B) in Count Two. The Court notes here that Defendants appear to be focused solely on whether Relator has sufficiently alleged a presentment claim in Count One, although they move to dismiss both Counts using their arguments relating to the presentment claim. Defendants have not separately addressed the elements of  Relator's use claim in Count Two. Instead, Defendants in effect generically argue that the use

claim simply fails for the same reasons they have argued that the presentment claim fails. While the elements of a presentment claim and a use claim are similar, they are still not identical. To establish a **presentment** claim under 31 U.S.C. § 3729(a)(1)(A), "a relator must prove three elements: (1) a false or fraudulent claim, (2) which was presented, or caused to be presented, for payment or approval, (3) with the knowledge that the claim was false." *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017). But to establish a **use** claim under 31 U.S.C. § 3729(a)(1)(B), "a relator must show that: (1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim." *Id.* In other words, a use claim does not require the Relator to allege that the Defendant ever submitted any claim for payment to the government. *See Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1327 (11th Cir. 2009) *("*We agree that 31 U.S.C. § 3729(a)(2) does not demand proof that the defendant presented or caused to be presented a false claim to the government or that the defendant's false record or statement itself was ever submitted to the government. We conclude, however, that a plaintiff must show that (1) the defendant made a false record or statement for the purpose of getting a false claim paid or approved by the government; and (2) the defendant's false record or statement caused the government to actually pay a false claim, either to the defendant itself, or to a third party."); *see also Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 671 (2008) (holding that the differential verbiage of § 3729(a)(1)(A) and (a)(1)(B) suggests that Congress "did not intend to

include a presentment requirement" in an (a)(1)(B) use claim, and that subsection (1)(B) "is an attempt provision, imposing liability for statements made with the intent to defraud the government, whether or not the government actually pays a false claim."). However, Defendants' argument in the Motion to Dismiss, including as to Count 2, boils down to arguments that Relator has failed to show through particularized evidence that ApolloMD ever **presented** a false or fraudulent claim to Medicare or Medicaid.[8]

As discussed supra, FCA claims are reviewed under Rule 9(b). To meet this Rule's requirements, a relator must therefore "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 703 (11th Cir. 2014) (quoting *United States ex rel. Atkins v. McInteer,* 470 F.3d 1350, 1359 (11th Cir. 2006)). To that end, a complaint under the FCA "satisfies Rule 9(b) if it sets forth facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and

---

[8] In their Reply, Defendants contend that a physician's attestation on a chart did not itself certify that provision of services. (Reply, Doc. 80 at 13–14.) But this is a factual dispute, as the attestation records as described may indeed have verified the physician's role in service or alternatively have been submitted along with other coding and billing documentation to support ApolloMD's alleged scheme to gain reimbursement at the full physician rate instead of the discounted mid-level rate. Relator's specific evidence relating to ApolloMD's focus on obtaining physicians' attestation signatures in connection with chart review in order to boost the company's financial recoupment lends credence to the Amended Complaint's assertion.

who engaged in them." *Mastej,* 591 F. App'x at 703 (quoting *Hopper v. Solvay Pharm., Inc.,* 588 F.3d 1318, 1324 (11th Cir. 2009)). The Eleventh Circuit summarized in *Mastej* the varied ways in which this standard may be met in an FCA presentment claim pursuant to 31 U.S.C. § 3729(a)(1)(A), and its discussion is also relevant to a use claim under § 3729(a)(1)(B),

> This Court evaluates "whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." *Atkins,* 470 F.3d at 1358. Providing exact billing data—name, date, amount, and services rendered-or attaching a representative sample claim is one way a complaint can establish the necessary indicia of reliability that a false claim was actually submitted. *See, e.g., Hopper,* 588 F.3d at 1326; *Atkins,* 470 F.3d at 1358. However, there is no per se rule that an FCA complaint must provide exact billing data or attach a representative sample claim. *See Clausen,* 290 F.3d at 1312 & n. 21 (listing some of the types of information that might help a plaintiff plead the submission of a claim with particularity but cautioning that Rule 9(b) "does not mandate all of this information for any of the alleged claims"); *see also Durham v. Bus. Mgmt. Assocs.,* 847 F.2d 1505, 1512 (11th Cir.1988) ("Allegations of date, time or place satisfy the Rule 9(b) requirement that the *circumstances* of the alleged fraud must be pleaded with particularity, but alternative means are also available to satisfy the rule.").
>
> Under this Court's nuanced, case-by-case approach, other means are available to present the required indicia of reliability that a false claim was actually submitted. Although there are no bright-line rules, our case law has indicated that a relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her employment with the defendants may have a sufficient basis for asserting that the defendants actually submitted false claims. *See U.S. ex rel. Walker v. R & F Properties of Lake County, Inc.,* 433 F.3d 1349, 1360 (11th Cir.2005) (holding that Rule 9(b) was satisfied where the relator was a nurse

> practitioner in the defendant's employ *whose conversations about the defendant's billing practices with the defendant's office manager* formed the basis for the relator's belief that claims were actually submitted to the government) . . . .
>
> At a minimum, a plaintiff-relator must explain the basis for her assertion that fraudulent claims were actually submitted. *See Corsello v. Lincare, Inc.,* 428 F.3d 1008, 1013–14 (11th Cir.2005) (finding insufficient indicia of reliability after noting that the relator "did not explain why he believes fraudulent claims were ultimately submitted").

*Mastej*, at 591 F. App'x. at 704*; see also U.S. ex rel. Matheny*, 671 F.3d 1217, 1230 (11th Cir. 2012) ("As Defendants recognize, we are more tolerant toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct.").

## A.   Counts 1 & 2 – 31 U.S.C. § 3729(a)(1)(A) & (B)

In Count 1 in the Amended Complaint, Relator alleges that Defendants violated 31 U.S.C. § 3729(a)(1)(A) of the False Claims Act. (Count One, Doc. 45, ¶¶ 80–85.) This section of the False Claims Act creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval[.]" 31 U.S.C. § 3729(a)(1)(A). The Amended Complaint alleges that ApolloMD violated this section because they "have submitted false claims for reimbursement for evaluation and management services performed solely by mid-level practitioners in Apollo emergency departments as if they were performed by or in conjunction with a physician." (Complaint, ¶ 83.)

In Count 2 in the Amended Complaint, Relator alleges that Defendants violated 31 U.S.C. § 3729(a)(1)(B) of the False Claims Act. (Count Two, Doc. 45, ¶¶ 86–89.) This section of the False Claims Act creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]" 31 U.S.C. § 3729(a)(1)(B). The Amended Complaint alleges that ApolloMD violated this section because they,

> have made, used, or caused to be made or used false records or statements on medical charts and records regarding the provider of medical services by requiring physicians to sign and attest to mid-level charts for which physicians provided no face-to-face medical treatment and using the falsified charts and records to support claims to CMS for reimbursement at the full physician rate, as if a physician – rather than a mid-level professional – provided the services. As such, through their conduct, Defendants have made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as set forth above, in violation of 31 U.S.C. § 3729(a)(1)(B).

(Complaint, Doc. 45, ¶ 88.)

The Defendants seeks to dismiss these two counts, arguing that the Amended Complaint does not meet the pleading requirements of Rule 9(b) because it "fails to plead with particularity that any false claims were actually presented to or paid for by the government." (Motion to Dismiss, Doc. 60-1 at 9–10.) Defendants contend that Relator "fails to identify a single claim presented to the government[,]" and that he "admits that he has no examples of actual fraud[.]" (*Id*. at 11.) Defendants further argue that the Amended Complaint also lacks "indicia of reliability" because Relator does not have "first-hand knowledge of the

defendants' billing practices" and so he lacks "a sufficient basis for such an allegation." (*Id.* at 13. (quoting *U.S. ex rel Mastej v. Health Mgmt. Assoc., Inc.*, 591 F. App'x 693, 704 (11th Cir. 2014)).)

Defendants are correct that Relator does not identify any single claim that was presented for reimbursement. But Relator is not relying solely on allegations as to his beliefs about the "underlying improper practices alone" to make out his FCA claim. *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir.2005), *reh'g & reh'g en banc denied,* 167 F. App'x 170 (2006), *cert. denied,* 549 U.S. 810, 127 S. Ct. 42, 166 L. Ed. 2d 18).[9] In addition to his first-hand knowledge of the alleged scheme on the practice-side of the equation – that is, Relator has personal knowledge of how the physicians were expected to notate their charts in furtherance of the scheme – Relator also supplies allegations that reflect that claims had indeed been filed pursuant to the scheme. For example, Relator points first to a chart showing his personal reimbursement for care he purportedly provided at ApolloMD's Spalding Regional Medical Center from January 1, 2016 to July 1, 2016. (Doc. 45 at 10.) Relator alleges that the chart shows reimbursement that he received based at least in part on how many charts he fraudulently signed as having seen a patient in concert with a mid-level professional even though he had not actually done so. (*Id.* at ¶¶ 12–13.) Relator alleges that the amounts in the column of the chart titled "$ Generated MLP Patients" reflect money actually paid

---

[9] "Although Corsello worked in sales, his allegations, often based "on information and belief," lacked the "indicia of reliability" required by *Clausen* because they failed to provide an underlying basis for Corsello's assertions." *Corsello v. Lincare, Inc.,* 428 F.3d at 1013–14.

to him – as opposed to money that he could stand to earn – on the basis of such fraudulent claims. (*Id.*) According to the allegations in the Complaint, these payments were a direct flowthrough from the reimbursements actually received by ApolloMD from Medicare and Medicaid for the fraudulently coded claims. (Doc. 45 at ¶¶ 6–8 (discussing emails that allegedly show that physician enhanced reimbursements are based directly on participation in the scheme, and that the claims would be submitted to Medicare or Medicaid).)

As noted above, Relator also alleges that ApolloMD submitted information to the PQRS based on actual claims that had been submitted to CMS for payment. (Complaint, ¶¶ 51–53.) According to the Amended Complaint, the PQRS reports raised questions among ApolloMD physicians as to why some services appeared to have been attributed to them through their NPI's, even though they did not actually perform those services. (Amended Compl., ¶ 53.) Again, as noted above, Relator claims that the email sent out by ApolloMD executives in response to these concerns only confirmed that charts which showed co-treatment by a mid-level and a physician. However, as physicians were required to sign off on a large volume of mid-level professionals' service charts, regardless of whether they had actually conducted face-to-face treatment of the patients according to the Relator, the mid-level professionals' service/billing charts should have been billed under the mid-level's NPI for lower reimbursement. But instead, they were actually billed under the physicians' NPIs for full reimbursement. (*Id.* at ¶¶ 52–54.)

As discussed earlier, a relator can also provide the required indicia of reliability for purposes of satisfying Rule 9(b) "by showing that he personally was in a position to know that actual false claims were submitted to the government and had a factual basis for his alleged personal knowledge." *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 707 (11th Cir. 2014) (quoting *Walker,* 433 F.3d at 1360; *and Hopper,* 588 F.3d at 1326 (indicating that a relator may satisfy Rule 9(b) by alleging "personal knowledge of the defendants' billing practices that g[i]ve[s] rise to a well-founded belief that the defendant submitted actual false or fraudulent claims"); *see also Hill v. Morehouse Med. Assocs., Inc.*, 2003 WL 22019936 at *3 (11th Cir. Aug. 15, 2003) (observing that "Rule 9(b)'s heightened pleading standard may be applied less stringently . . . when specific 'factual information [about the fraud] is peculiarly within the defendant's knowledge or control'" and where plaintiff pled sufficient facts as an employee based on her firsthand witnessing of the fraudulent conduct to provide "the indicia of reliability that is necessary in a complaint alleging a fraudulent billing scheme"); *U.S. ex rel. King v. DSE, Inc.*, No. 8:08-CV-2416-T-23EAJ, 2011 WL 1884012, at *1–3 (M.D. Fla. May 17, 2011) (finding that where relator's knowledge of the falsity of the defendant's certification that defendant's manufactured items complied with contract specifications was based upon his own knowledge and involvement in the manufacturing process, complaint allegations were deemed to afford the requisite reliability to  support  the relator's False Claims Act claims).

The Eleventh Circuit applies a "nuanced, case-by-case approach" to consideration of whether the required indicia of reliability necessary for stating firsthand knowledge of a scheme are present. *Mastej*, 591 F. App'x at 704. A relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her employment with the defendants may have a sufficient basis for asserting that the defendants actually submitted false claims. *Id.* (citing *U.S. ex rel. Walker v. R & F Properties of Lake County, Inc.,* 433 F.3d 1349, 1360 (11th Cir. 2005) (discussed later *infra*).

In *Clausen*, the Eleventh Circuit lists "some of the types of information that might have helped [Relator] state an essential element of his claim with particularity," as including amounts of charges, actual dates of claim submissions, policies about billing "or even second-hand information about billing practices[,]" or copies of a bill or payment provided. *U.S. ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1312 & n. 21 (11th Cir. 2002).

In *United States ex rel. Walker*, the Eleventh Circuit considered a scheme very similar to the one in the instant case. 433 F.3d 1349, 1360 (11th Cir.2005), *reh'g & reh'g en banc denied,* 179 F. App'x 687 (2006), *cert. denied,* 549 U.S. 1027, 127 S. Ct. 554, 166 L.Ed.2d 423. In *Walker*, the scheme involved billing services provided by nurse practitioners as "incident to the service of a physician" even though the services were provided without any physician involvement and should therefore have been reimbursed at a lower rate. *Id.* The relator in that matter pleaded that she "believed [the defendant] submitted false or fraudulent claims for

services," but did not plead with particularity that the defendant had submitted any actual claim. *Id.* The Court of Appeals held that the complaint satisfied Rule 9(b), and contrasted another case where the plaintiff failed to "explain why he believed fraudulent claims were ultimately submitted." *Id.* (quoting *Corsello,* 428 F.3d at 1014 ). The Court found that the relator's allegations in *Walker* were "sufficient to explain why [she] believed" the claims had been submitted to Medicare. Relator there did not have a Medicare identification number and based on a particular conversation with the office manager, learned  that the medical practice never billed separately for nurse practitioner services delivered independently but instead billed these services solely at the higher rate  for services "incident to the service of a physician". *Id.*

*Walker* reaches a different conclusion than some other Eleventh Circuit cases which were deemed to lack sufficient evidentiary indicia of reliability, such as *Corsello*, or *Mitchell v. Beverly Enterprises, Inc.,* 248 F. App'x 73  (11th Cir. 2007) (unpublished), *reh'g & reh'g en banc denied,* 255 F. App'x 504. In *Corsello*, the court held that the relator's position as a sales associate did not provide adequate indicia of reliability that he had firsthand knowledge of the actual submission of false claims. 428 F.3d at 1013. The court held that,

> Although Corsello worked in sales, his allegations, often based "on information and belief," lacked the "indicia of reliability" required by *Clausen* because they failed to provide an underlying basis for Corsello's assertions. Corsello did not explain why he believes fraudulent claims were ultimately submitted. Corsello's contention that he was "aware" of billing practices was neither

> particular to any specific fraudulent claim against the government nor factually supported because Corsello conceded that he "did not have access to company files outside his own offices." Underlying improper practices alone are insufficient to state a claim under the False Claims Act absent allegations that a specific fraudulent claim was in fact submitted to the government.

*Id.* at 1013–14. Similarly, in *Mitchell v. Beverly Enterprises, Inc.*, the court found that although the Complaint included "specific allegations of the defendant's policies" it also contained only conclusory allegations that the policies had "resulted in false charges being submitted to Medicare." 48 F. App'x 73, 75. The result was the same in *U.S. ex rel. Atkins v. McInteer*, where the Eleventh Circuit found that a psychiatrist whose only knowledge of the billing and claims submission process was "rumors from staff and ... records of what he believed to be the shoddy medical and business practices of two psychiatrists" did not suffice to allege firsthand knowledge of the submission of false claims. 470 F.3d 1350, 1358–59 (11th Cir. 2006).

This case is distinguishable from other cases that found a lack of a reliable indicia of reliability. Here, when taking all of the allegations in the Amended Complaint in the light most favorable to Relator, Relator has alleged an adequate factual basis for personal knowledge of the scheme including that claims during the relevant time period had actually been submitted to CMS for reimbursement although they included false or fraudulent coding and sought reimbursements in excess of what was allowed by CMS rules. (*See* Amended Compl., ¶ 8 (citing CMS, MEDICARE CLAIMS PROCESSING MANUAL, pub 100-04, Ch. 12, § 30.6.1(B) ("[I]f there

was no face-to-face encounter between the patient and the physician (e.g., even if the physician participated in the service by only reviewing the patient's medical record) then the service may only be billed under the [mid-level's NPI]").) Relator, through his personal participation in the alleged scheme as an emergency care physician at two different Apollo sites over an eight year period and the documentary evidence embedded within his Amended Complaint, has presented sufficient indicia of reliability to show that he has a factual basis upon which he alleges knowledge that actual false claims were submitted to the government during the relevant period and that ApolloMD had a policy through which physicians were directed to falsely attest to or verify having seen patients that they did not in fact treat. The combination of factors alleged in the Amended Complaint, but particularly his experience and understanding of the service delivery and charting systems used in the ApolloMD emergency model and his close review of reporting of his own billing and payment data provide Relator's complaint with sufficient indicia of reliability for purposes of Rule 9(b) for both the presentment and use claims. Additionally compelling are the examples provided by Relator that show the compensation he allegedly received as a direct throughput from participation in the scheme – examples that Relator allege necessarily required first the payment by Medicare or Medicaid of a falsely submitted claim. Furthermore, the Amended Complaint includes enough details regarding which ApolloMD executives were involved in the alleged scheme, during what specific

period of time, and on a national basis to put the Defendants on notice of the particular allegations against them.

More broadly, Relator has provided sufficient indicia of reliability for proceeding as to ApolloMD's alleged scheme based in part on his personal experience working at emergency rooms in the Georgia ApolloMD facilities and actively participating in the charting and alleged billing "scheme" allegedly maintained by Defendants and observing the company's responses to related concerns raised by physicians.

The Amended Complaint does not, however, present sufficient indicia of reliability at this juncture for Relator's knowledge of ApolloMD's practices in states *other than Georgia*. Relator points to some emails that went out to ApolloMD physicians and employees in various states, but this alone is not enough to allege that ApolloMD in fact had identical charting and claim submission practices or guidelines in each state or as actually implemented, though that certainly is possible given the national model used by ApolloMD.  As each state here has its own department for Medicaid claims processing, it is conceivable that ApolloMD follows modified guidelines in each state – and Relator has not adequately pleaded to the contrary. As the Court discusses further infra, Relator has not laid down an adequate factual basis through the allegations in the Amended Complaint to sustain his State law claims in states other than Georgia at this time.

For the foregoing reasons, the Motion to Dismiss to **DENIED** as to Counts 1 and 2.

**B.      Count 3 – 42 U.S.C. § 1320a-7b(g)**

In Count 3 of the Amended Complaint, Relator alleges that Defendants violated 42 U.S.C. §§ 1320a-7b, the "Anti-Kickback Statute." (Count Two, Doc. 45, ¶¶ 86–89.) This portion of the statute creates criminal liability for any person who "knowingly and willfully makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program," among other similar acts. (Count Three, Doc. 45 at 42–44). Relator claims in the Amended Complaint that "[b]ecause this violation of the Anti-Kickback Statute involves a claim for reimbursement to a federal health care program, and that violation is material to the government's reimbursement decision, Defendants' have submitted false claims for reimbursement that include items or services resulting from a violation of the AKS, which constitute false claims under the FCA. (Complaint, ¶ 96 (citing 42 U.S.C. § 1320a-7b(g)).) The subsection cited by Relator specifies that,

> In addition to the penalties provided for in this section or section 1320a-7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31.

42 U.S.C. § 1320a-7b(g).

In the Motion to Dismiss, Defendants state simply that this "is a criminal statute," for which there is no private right of action, and 'neither the structure of [the Anti-Kickback Statute] nor its legislative history suggests that Congress intended to provide a private remedy.'" (Motion to Dismiss, Doc. 60-1 at 17 (citing

*U.S. ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 37 (D.D.C. 2003)).)  It is true that "neither Stark nor AKS provide private rights of action." *Ameritox, Ltd. v. Millennium Laboratories*, Inc., 803 F.3d 518, 522 (11th Cir. 2015).  However, the Anti-Kickback Statute itself says that a violation of that statute "constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31[,]" which is the False Claims Act. 42 U.S.C. § 1320a-7b(g). *See Mastej*, 591 F. App'x at 698. But Relator fails to state his claim here for a different reason.

Relator does not allege that the violations of the Anti-Kickback Statute themselves formed the basis of liability under the FCA. That is, Relator is not alleging that ApolloMD submitted claims for reimbursement that resulted from a violation of the Anti-Kickback Statute – i.e. their payment claims were not associated with providing kickbacks to obtain additional client referrals. That is the common scenario when a kickback is paid as an inducement to refer a patient to a particular clinic, for example. Relator instead appears to allege what is called a reverse false claim. This type of claim alleges that "defendants owed an obligation to pay money to the United States at the time of the allegedly false statements.*" U.S. ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) (citing *United States v. Pemco Aeroplex, Inc.,* 195 F.3d 1234, 1235–36 (11th Cir.1999). To plead a reverse false claim, "relators must show that the defendants owed an obligation to pay money to the United States at the time of the allegedly false statements." *Id*.; *see also United States ex rel. Heller v. Guardian Pharmacy,*

28

*LLC*, No. 1:18-CV-03728-SDG, 2021 WL 488305, at *5 (N.D. Ga. Feb. 10, 2021) (a claim arises if a defendant "certif[ies] compliance with laws and regulations concerning proper practices for medical providers ... when in fact those claims are for services that were provided in violation of those rules.") (quoting *Barker ex rel. United States v. Columbus Reg'l Healthcare Sys., Inc.*, 977 F. Supp. 2d 1341, 1344 (M.D. Ga. 2013)). The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment[.]" 42 U.S.C. § 3729 (b)(3). In the context of this case, Relator alleges that the physicians knew that their compensation would increase in direct proportion to how many charts they signed attesting to having seen patients that they did not actually see, or who received treatment which should have been billed under the mid-level practitioner's NPI instead. This seems in the end just a variation of Relator's allegations in Counts 1 and II and not an actual "kickback" paid to a third party to obtain referrals or an actual reverse kickback, as it is usually known.

What Relator has pleaded in the Amended Complaint, merely alleges broadly that the Defendants violated the Anti-Kickback Statute, but does not otherwise plead the required elements for a reverse false claim. The Court will not infer from the Complaint that Relator has adequately pleaded the elements of a reverse false claim relating to alleged kickbacks.  In other words, Relator has failed to plead adequately to meet the requirements of Rule 8 or Rule 9 as they pertain

to Count 3, because the Amended Complaint fails to plead with particularity the elements of this claim. The Motion to Dismiss is **GRANTED** as to Count 3.

### C.   Counts 4, 6, 7, 8, 9 – claims under the laws of other states

As the Court noted above in its discussion of Counts 1 and 2, this Order finds only that Relator has adequately pleaded his personal knowledge of the scheme as it relates to ApolloMD's practices in Georgia, where the Relator worked. The Defendants moved generally to dismiss all of the state law claims, apparently incorporating their arguments relating to the purported insufficiency of Counts 1 and 2, but not actually addressing any of the state law claims directly. Regardless, because Relator has not shown an adequate foundation for knowledge of ApolloMD's billing and claims process in states other than Georgia, Counts 4, 6, 7, 8, and 9[10] all must be dismissed.

Count 5 alleges violations of the Georgia State False Medicaid Claims Act (O.C.G.A. § 49-4-168), and is not dismissed for the same reasoning elucidated supra in the discussion relating to Counts 1 and 2.

The Motion to Dismiss is **GRANTED** as to Counts 4, 6, 7, 8, and 9.

### IV.   CONCLUSION

For the reasons expressed in this Order, the Motion to Dismiss is **GRANTED** as to Counts 3, 4, 6, 7, 8, and 9; but **DENIED** as to Counts 1, 2 and

---

[10] Count 4 (Florida False Claims Act, FL. STAT. § 68.081 *et seq*.); Count 6 (Indiana Medicaid False Claims and Whistleblower Protection Act, INC. CODE § 5-11-5.7-1, *et seq*.); Count 7 (Iowa False Claims Act, IOWA CODE §§ 685.1, *et seq*.); Count 8 (Tennessee Medicaid False Claims Act, TENN. CODE ANN. § 71-5-181, *et seq*.); Count 9 (Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE § 36.002, *et seq*.). *See* Amended Compl., Doc. 45 at 45, 46–49.

5.  [Doc. 60.]

In the event that additional evidence is produced within the first 75 days of discovery that Relator believes will warrant the Court's expansion of the scope of this case to emergency room practices and procedures in the five states other than Georgia identified in the Amended Complaint, Relator may seek leave to filed a Second Amended Complaint to re-plead his claims on behalf of the United States under the FCA  relating to those states, provided that the motion for leave is filed within 90 days of the date of the commencement of discovery.[11]

The Parties are **DIRECTED** to file a Joint Preliminary Report and Discovery Plan within 15 days of the date of this Order, and discovery shall commence upon the filing of that proposed scheduling order.

**IT IS SO ORDERED** this 31st  day of March, 2021.

**Amy Totenberg**
**United States District Judge**

---

[11]  The Court advises Relator, though, to be cautious in proceeding to seek to expand this suit and to avoid biting off more than the Relator and his counsel can chew.  This would only waste all parties' and the Court's  time and resources.