IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* Chionesu Sonyika, Relator, *et al.*, | : : : | |
| Plaintiffs, | : : | |
| v. | : : | CIVIL ACTION NO. 1:20-cv-3213-AT |
| APOLLOMD, INC., *et al.*, | : : | |
| Defendants. | : : | |

# ORDER

This matter is before the Court on Defendants'[1] Motion to Dismiss Plaintiff/Relator's Second Amended Complaint [Doc. 115] brought by Relator, Chionesu Sonyika ("Relator"), on behalf of the United States. For the reasons discussed below, Defendants' Motion is **GRANTED IN PART.**

## I. Background

The Court incorporates by reference the facts described in its March 31, 2021 Order granting in part Defendants' first motion to dismiss. (Mar. 31, 2021 Order, Doc. 85.) As explained in that Order, Relator alleges that Defendants engaged in a

---

[1] Defendants include ApolloMD, Inc., Independent Physicians Resource, Inc., ApolloMD Business Services, LLC, ApolloMD Holdings, LLC, PaymentsMD, LLC, ApolloMD Group Services, LLC, Apollo MD Physician Partners, Inc., ApolloMD Physician Services FL, LLC, and Georgia Emergency Group, LLC. The Court will refer throughout to the collective Defendants as either "Defendants" or "ApolloMD." As he did in his initial complaint, Relator describes the Defendants as "a system of affiliated entities" that are collectively "a privately-held, physician-led national group practice that provides staffing and management services to hospitals in the United States, specifically in the areas of emergency medicine, hospital medicine, radiology, and anesthesiology." (Second Am. Compl. ("SAC"), Doc. 113 ¶ 48.)

scheme to defraud the United States by submitting false claims to the Centers for Medicare and Medicaid Services ("CMS") seeking reimbursement for medical services at inflated billing rates. (*Id.* at 2.) The services at issue were supposedly jointly performed by physicians and mid-level providers, such as physician's assistants and nurse practitioners, and billed at a "split/shared" rate as if the mid-level provider had been an extension of the physician. (*Id.* at 6–7.) Relator contends that this practice is permissible as long as the physician performs a substantial portion of the work treating the patient along with the mid-level provider; otherwise, services performed by mid-level providers can only be billed at 85% of the rate that would be reimbursable to a physician. (*Id.*) In spite of these requirements, Relator alleges that Defendants routinely submitted claims at the physician billing rate for services that were only provided by mid-level providers. (SAC ¶¶ 4–6.) By doing so, Relator claims that Defendants are unlawfully claiming a "15 percentage point premium" on services performed by mid-level providers in their emergency departments. (*Id.* ¶ 6.)

In his previous Complaint, Relator raised claims under the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, the Federal "Anti-Kickback Statute" ("AKS"), 42 U.S.C. § 1320a-7b(g), and various state law analogues under the laws of Florida, Georgia, Indiana, Iowa, Tennessee, and Texas. (Doc. 45 ¶¶ 80–138.) After Defendants filed a motion to dismiss, the Court found that Relator had adequately alleged both his Georgia state law claim and his FCA claims to the extent they applied to ApolloMD's facilities in Georgia. (Mar. 31, 2021 Order at 26,

30.) The Court reached that conclusion based on Relator's personal experience working as an emergency room physician at two of Defendants' facilities in Georgia over an eight-year period, his active required participation in Defendants' alleged charting and billing scheme, and his personal observations of the company's responses to concerns raised by physicians. (*Id.* at 25–26.) On the other hand, the Court found that Relator had not adequately alleged that Defendants' alleged scheme applied to ApolloMD's facilities outside of Georgia because Realtor had not provided sufficient evidence that Defendants followed "identical charting and claim submission practices or guidelines in each state." (*Id.* at 26.) The Court also dismissed Relator's AKS claim, which the Court understood to be a "reverse" false claim — *i.e.*, a false claim made to avoid an obligation to pay money to the United States — on the ground that Relator had failed to satisfy the elements of such a claim. (*Id.* at 28–30.) However, the Court added that Relator could seek leave to amend the Complaint if he believed that additional evidence produced in discovery or otherwise available to him warranted an expansion of the scope of the case to the emergency room practices and procedures in the five states other than Georgia that Relator had identified in the prior Complaint. (*Id.* at 31.)

Relator then sought leave to file a Second Amended Complaint ("SAC") on August 19, 2021. (Doc. 100.) Although Relator did not seek to revive his state law claims in states other than Georgia, he included additional allegations seeking to clarify the "nationwide scope" of his Federal claims. (*Id.* at 6.) In addition, Relator sought to replead his AKS claim to clarify that he was not seeking to raise a reverse

3

false claim; instead, his claim was that Defendants paid physicians a kickback of $50 every time they signed a mid-level provider's chart "even when—expressly— 'no MD work' or 'little substantive work' was performed." (*Id.* at 17.) Defendants opposed Relator's motion and explained in detail — through both an opposition and a surreply — why they believed that the proposed amendments would be futile. (*See* Docs. 102, 106-1.) The Court granted Relator's motion for leave to amend on November 12, 2021, (Doc. 112), and Defendants moved to dismiss the SAC on December 10, 2021, (Doc. 115). In their most recent motion to dismiss, which is more properly construed as a "partial" motion to dismiss, Defendants seek to dismiss Relator's AKS claim in its entirety and Relator's FCA claims to the extent they apply to ApolloMD facilities outside of Georgia.

## II.     Legal Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); Fed. R. Civ. P. 12(b)(6). The plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555); Fed. R. Civ. P. 8(a). In ruling on a motion to dismiss, the court must accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

A claim is plausible where the plaintiff alleges factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff is not required to provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The plausibility standard requires that a plaintiff allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" that supports the plaintiff's claim. *Id.* at 556.

Normal standard pleading standards are heightened though for FCA claims because the FCA is "a fraud statute for purposes of [Federal Rule of Civil Procedure] 9(b)." *U.S. ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002) (internal quotation marks omitted). In federal court, plaintiffs must plead fraud with particularity. *See* Fed. R. Civ. P. 9(b). When a plaintiff states allegations under the FCA, the plaintiff must plead "facts as to time, place, and substance of the defendant's alleged fraud," specifically "the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Clausen* 290 F.3d at 1310–11 (quoting *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 567–68 (11th Cir. 1994)). The pleading requirements under Rule 9(b) for FCA claims have also been alternatively adapted in some circumstances to allow claims in certain cases to move forward where the Complaint allegations and information provide sufficient indicia of reliability

5

regarding the fraud claims asserted. *See, e.g., U.S. ex rel. Walker v. R&F Props. of Lake County, Inc.*, 433 F.3d 1349, 1359–60 (11th Cir. 2005).

## III. Discussion

### A. Relator's Anti-Kickback Statute Claim (Count III)

The Court begins with Relator's AKS claim. For this claim, Relator relies on 42 U.S.C.A. § 1320a-7b(b)(2), which states:

> **(2)** Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--
>
> > **(A)** to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> >
> > **(B)** to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

Under Eleventh Circuit case law, "[a] violation of the [AKS] occurs when the defendant (1) knowingly and wilfully, (2) pays money, directly or indirectly, to doctors, (3) *to induce the doctors to refer individuals* to the defendants for the furnishing of medical services, (4) paid for by Medicare." *U.S. ex rel Mastej, v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 698 (11th Cir. 2014) (emphasis in original) (citing *United States v. Vernon,* 723 F.3d 1234, 1252 (11th Cir. 2013).

6

In the SAC, Relator alleges that Defendants' policy of paying physicians $50 for each mid-level chart they signed qualifies as an illegal kickback for purposes of the provision above. (*See* SAC ¶¶ 117, 168–75.) In response, Defendants contend that Relator's AKS claim should be dismissed on three separate grounds. First, Relator did not allege that the physicians received kickbacks in exchange for actionable "referrals" or "ordered services" for purposes of the statute. Second, Relator did not allege that the alleged kickbacks were offered to "induce" physicians to make false attestations. And third, Relator did not plead the alleged kickback scheme with the requisite specificity to satisfy Rule 9(b).

Beginning with the first of these three arguments, Defendants contend that the alleged kickbacks could not have been made in exchange for the "referral" of patients from the physicians to ApolloMD because, at the time of the alleged false statements, the patients at issue were already ApolloMD's patients. Relatedly, Defendants argue that the alleged kickbacks could not have been provided for any "ordered services" by the physicians because the alleged false statements were made by the physicians after the services to those patients had already been rendered. In other words, the alleged false statements on the part of the physicians did not result in any additional patients being referred to ApolloMD or any additional services being ordered for those same patients.

As was the case in the previous iteration of the Complaint, in the SAC "Relator is not alleging that ApolloMD submitted claims for reimbursement that resulted from a violation of the [AKS] – i.e. their payment claims were not

7

associated with providing kickbacks to obtain additional client referrals." (Mar. 31, 2021 Order at 28.) Relator's additional allegation that Defendants paid their physicians $50 every time they signed the mid-level providers' charts does nothing to change that.

In his opposition, Relator cites *United States v. Vernon*, 723 F.3d 1234 (11th Cir. 2013) for the proposition that services to existing patients could still support an AKS claim if the kickbacks were made for purposes of "continuing" referrals. But Relator fails to explain how the supposed referrals in this case actually qualify as continuing referrals. In this case, the purpose of the alleged kickbacks was supposedly to induce physicians to overstate the costs of services that had already been rendered for Defendants' existing patients; not to induce them to order any additional services — or continuing referrals — for those same patients. As Defendants aptly state, "Relator mistakenly conflates 'ordering' services with the concept of 'billing' for services that have already been provided." (Defs.' Reply, Doc. 118 at 9.) As such, Relator has not plausibly alleged that Defendants made kickbacks to their physicians to induce them to "*refer individuals* to the defendants for the furnishing of medical services." *Mastej*, 591 F. App'x at 698. Relator's AKS claim will accordingly be dismissed.[2]

---

[2] Because Relator has failed to satisfy the "referral" element of his AKS claim, the Court need not consider Defendants' alternative arguments that the alleged kickbacks were not offered as an "inducement" for false statements and that Relator has not plead the alleged kickback scheme with the requisite specificity to satisfy Rule 9(b).

### B. Relator's False Claims Act Claims as Applied to Facilities Outside of Georgia (Counts I and II)

In its March 31 Order, the Court found that although Relator had provided sufficient indicia of reliability for his FCA claims insofar as they applied to Defendants' facilities in Georgia, the same could not be said of Defendants' facilities in States other than Georgia. But even though the allegations in the Complaint were insufficient to establish "that ApolloMD in fact had identical charting and claim submission practices or guidelines in each state," the Court noted that it "certainly is possible" that this was the case "given the national model used by ApolloMD." (Mar. 31, 2021 Order at 26.)

In an effort to establish the nationwide scope of his claims through an amended complaint, Relator attached a set of stipulations to his SAC, which the parties agreed to after the Court issued its March 31, 2021 Order. (SAC, Ex. 8.) Defendants state in their response to a Request for Admission that the company "admitted that its documentation, coding and billing policies 'relating to claims for reimbursement for split/shared E/M visits that [it] submitted to Medicare did not vary solely based on the State in which such services were rendered.'" (SAC ¶ 85) (alteration in original). Relator claims these stipulations and admissions establish that, at all relevant times, Defendants' coding and billing practices were uniform in each State and that the alleged scheme, which he saw implemented first hand in Georgia, was thus similarly applied in all of ApolloMD's facilities nationwide. Relator also references a number of emails that he obtained through

9

discovery, which he contends add further credence to his allegations that Defendants executed these identical policies and practices or scheme on a national basis. He argues, in essence, that the Court should allow his nationwide FCA claims to proceed because: (1) the Court has already found Relator adequately plead with the requisite indicia of reliability that Defendants implemented these practices in Georgia, and (2) the additional evidence and admissions now adduced support his allegation that Defendants systemically pursued an identical organizational scheme at a nationwide level. Defendants respond that, at best, Relator has only plead his FCA claims with sufficient reliability insofar as they apply to facilities in the State of Georgia where he actually worked, and that Relator has failed to adequately plead his FCA claims insofar as they apply to facilities in other States in which he never worked.

To start, the Court recognizes that Relator has heeded the Court's advice not to bite off more than he can chew[3] at least to some extent in that he has not sought to revive his state law claims under the laws of Florida, Indiana, Iowa, Tennessee, and Texas. At the same time, Relator's SAC appears to expand the scope of his FCA claims to cover not only Georgia and the five other states where he previously sought to bring state law claims, but the entire nation. Relator's counsel has previously indicated that Relator was only intending to rely on a specific sample of

---

[3] In its March 31, 2021 Order, the Court stated, "The Court advises Relator, though, to be cautious in proceeding to seek to expand this suit and to avoid biting off more than the Relator and his counsel can chew. This would only waste all parties' and the Court's time and resources." (Mar. 31, 2021 Order at 31 n.11.)

medical records in support of his FCA claims, and that the parties were attempting to "arrive at an agreed sampling methodology" to reduce the burden of discovery. (Mar. 4, 2022 Hr'g Tr., Doc. 127 at 9–10.) Still, the Court needs to obtain greater clarity regarding the precise scope of Relator's intended nationwide FCA claims before ruling on this component of the pending motion to dismiss or framing any limits on Relator's nationwide *qui tam* claims.

Further complicating matters, though it appears from the current iteration of the pleadings that ApolloMD's Georgia-based facilities were not a national outlier in terms of their charting band billing practices, Relator is undoubtedly farther removed from the claim submission processes that took place in Defendant's facilities outside of Georgia. This extra layer of removal may correspondingly reduce the indicia of reliability of Relator's allegations to the extent he raises them in relation to these other facilities. Although the Eleventh Circuit is "more tolerant toward complaints that leave out some particularities of the submissions of a false claim" when the Relator "also alleges personal knowledge or participation in the fraudulent conduct," *U.S. ex rel. Matheny*, 671 F.3d 1217, 1230 (11th Cir. 2012), Rule 9(b)'s requirements apply more stringently when the relator either did not observe or did not personally participate in the claim submissions at issue, *see Estate of Hemly v. Bethany Hospice & Palliative Care of Coastal Ga., LLC*, 853 F. App'x 496, 502 (11th Cir. 2021) (finding that relators failed to satisfy Rule 9(b)'s particularity requirement when they "did not

claim to have observed the submission of an actual false claim" or that they "personally participate[d] in the submission of false claims").

The Eleventh Circuit has also cautioned that a Relator cannot satisfy Rule 9(b) simply by "describe[ing] a private scheme in detail" and speculating that false claims "must have been submitted, were likely submitted or should have been submitted to the Government." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012–13 (11th Cir. 2005); *Clausen*, 290 F.3d at 1311. To plead his nationwide claims with the requisite indicia of reliability, Relator must rely on more than just the "mathematical probability" that Defendant "must have submitted a false claim at some point" in these other facilities. *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1277 (11th Cir. 2018).

This Court has already found that Relator can meet that initial burden with respect to the claims submitted through facilities he worked at in Georgia. That determination was based in part on Relator's "close review of reporting of his own billing and payment data" and the evidence he provided of the compensation he received as a "direct throughput" for fraudulently coded claims. (Mar. 31, 2021 Order at 19–20, 25). In addition, the Court found the case to be analogous to *U.S. ex rel. Walker v. R&F Props. of Lake County, Inc.*, 433 F.3d 1349 (11th Cir. 2005), another *qui tam* case involving an alleged fraudulent upcoding scheme much like the one Relator alleges occurred here. The Relator in *Walker* was a nurse practitioner who alleged that during her employment with the defendant, Leesburg Family Medicine ("LFM"), she never had her own Unique Provider Identification

Number and each day she worked she was asked "which doctor she would be billing under." *Id.* at 1360. On top of that, she had at least one personal conversation with LFM's office administrator in which she learned that LFM "had 'never' billed nurse practitioner or physician assistant services in another manner." *Id.* Taken together, the Eleventh Circuit found these allegations "sufficient to explain why [the Relator] believed LFM submitted false or fraudulent claims." *Id.*

Importantly, the Relator in *Walker* was able to point to a specific universe of claims that she believed included fraudulent submissions: claims in which she had done the work but for which a physician had been improperly credited. Even though she could not point to any specific fraudulent claim submissions, she nevertheless had an adequate basis for believing that at least some of the claims within that particular universe were in fact fraudulent. Likewise, Relator in this case has pointed to a specific universe of claims that he believes to include fraudulent submissions: claims that he was credited for but in which he could not possibly have been involved given his own personal time constraints. (*See* SAC ¶ 35) ("As Relator worked approximately 15 days per month at Apollo . . . Relator would have to physically treat more than 54 patients each and every shift during that month to reach 811 patients."). Though Relator has not pointed to which specific billing entries were improperly attributed to him, he nevertheless has an adequate basis for believing that at least some of the claim submissions within that particular universe were fraudulent.

13

The question now is whether Relator has an adequate basis for believing that ApolloMD's uniform charting and billing practices similarly resulted in fraudulent claims being submitted within different universes of claims throughout the nation, and if so, from which particular facilities and from which particular physicians. But it is currently not clear to the Court whether Relator's allegations that ApolloMD had identical charting and billing practices in other States would necessarily mean that false claims were submitted in other States as well, which Relator ultimately must show to satisfy Rule 9(b). *See Carrel*, 898 F.3d at 1277 (finding that relators' allegations lacked sufficient indicia of reliability when "the relators allege[d] a mosaic of circumstances that are perhaps consistent with their accusations that the Foundation made false claims" but "fail[ed] to allege with particularity that these background factors ever converged and produced an actual false claim"); *see also United States v. AseraCare, Inc.*, 938 F.3d 1278, 1305 (11th Cir. 2019) (noting that "on remand the Government must be able to link this evidence of improper certification practices to the specific 123 claims at issue in its case"). The answers to these questions may depend in part on the particular universe of medical records that Relator relies upon in support of his FCA claims, which, as previously noted, has not yet been clarified for the Court.

For all of these reasons, the Court finds that it would be helpful for the parties to address the scope of Relator's FCA claims in an oral argument to assist the Court. The Court will therefore defer ruling on Defendants Motion to Dismiss

insofar as it applies to Relator's nationwide FCA claims pending an oral argument.[4] At the oral argument the parties should address issues relating to determining the precise scope of Relator's asserted national claims; the particular nature of the proof that would be offered to address these claims; and whether Relator has plead those claims at this juncture with sufficient specificity and/or with sufficient indicia of reliability to satisfy Rule 9(b) for purposes of a motion to dismiss.

### IV.  Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff/Relator's Second Amended Complaint [Doc. 115] is **GRANTED IN PART**.  The Court **GRANTS** Defendants' Motion to Dismiss Count III of the Second Amended Complaint.  The Court will defer ruling on the component of Defendants' motion seeking dismissal of Relator's FCA claims (Counts I and II) to the extent they apply to facilities outside of Georgia pending an oral argument.  The Court' Courtroom Deputy will contact counsel regarding the scheduling of this hearing.

**IT IS SO ORDERED** this 30th day of June, 2022.

*/s/ Amy Totenberg*
**AMY TOTENBERG**
**UNITED STATES DISTRICT JUDGE**

---

[4] As earlier held, Relator already has been authorized to proceed with his Georgia-based *qui tam* claim, though not his kickback claim.