IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA, *ex* : 
*rel.* Chionesu Sonyika, Relator, *et al.*, : 
                           : 
    Plaintiffs, : 
                           : 
    v. :      CIVIL ACTION NO.
                           :      1:20-cv-3213-AT
APOLLOMD, INC., *et al.*, : 
                           : 
    Defendants. : 

## **ORDER**

This matter is before the Court on Defendants' Motion to Dismiss Plaintiff/Relator's Second Amended Complaint [Doc. 115], which the Court granted in part and deferred in part earlier this summer.

As this is the third Order the Court has issued addressing one of Defendants' motions to dismiss, the Court will address the facts in this case only briefly.[1] Broadly speaking, Relator alleges that Defendants engaged in a scheme to defraud the United States by seeking reimbursement for medical services at inflated billing rates. Specifically, Relator contends that Defendants unlawfully submitted claims for reimbursement using a physician's billing code when in fact the services at issue were performed only by a mid-level provider and should have been billed at 85% of the physician's billing rate. In the first iteration of the Complaint, Relator raised

---

[1] The Court incorporates by reference the facts from both its March 31, 2021 Order (Doc. 85) and its June 30, 2022 Order (Doc. 134).

claims under the Federal False Claims Act ("FCA"), Anti-Kickback Statute ("AKS"), and state law analogues under Florida, Georgia, Indiana, Iowa, Tennessee, and Texas state law. (Compl., Doc. 1 ¶¶ 64–122.) In its first motion to dismiss Order, the Court found that Relator's FCA claims could proceed to extent they applied to the facilities where he had worked as a physician in the State of Georgia, but the Court dismissed Relator's AKS claim and his state law claims under the laws of every State except for Georgia. (Doc. 85 at 30–31.) The Court subsequently granted Relator leave to amend his Complaint to replead his AKS claim and provide additional allegations in support of his FCA claims to the extent he sought to raise them nationwide. (Doc. 112 at 3–4.) Defendants then moved to dismiss Relator's AKS claim and his FCA claims to the extent they applied to facilities outside of Georgia. (*See* Doc. 15.) On June 30, 2022, the Court granted Defendants' motion to dismiss Relator's AKS claim but deferred ruling on the component of Defendants' motion that applied to Relator's FCA claims pending an oral argument. (Doc. 134 at 15.) The Court then held an oral argument via Video Conference on August 2, 2022. (*See* Minute Entry, Doc. 135.) After the argument, the Court provided the parties with an opportunity to file supplemental briefs including additional authorities for the Court's consideration, which the parties filed on the docket on August 11, 2022. (*See* Docs. 136, 137.)

## I.

As Relator's FCA claims sound in fraud, they are subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements. *See* Fed. R. Civ. P. 9(b)

("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").  When it initially addressed Relator's FCA claims in its first motion to dismiss Order, the Court observed that under Eleventh Circuit case law "whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b)" is an issue to be determined "on a case-by-case basis."  (Doc. 85 at 16) (quoting *U.S. ex rel Mastej, v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 704 (11th Cir. 2014)).  And under that case-by-case approach, "there is no per se rule that an FCA complaint must provide exact billing data or attach a representative sample claim"; "other means are available to present the required indicia of reliability that a false claim was actually submitted."  (*Id.*) (quoting *Mastej*, 591 F. App'x at 704).  Even if the relator fails to identify any specific false claims that were actually submitted by the defendants, "a relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her employment with the defendants" may still be able to satisfy Rule 9(b)'s particularity requirement if she has "*a sufficient basis for asserting* that the defendants actually submitted false claims."  (*Id.*) (emphasis added).

In its first motion to dismiss Order, the Court found that Relator could meet this bar to the extent his FCA claims applied to the facilities where he worked in Georgia based on his personal experiences "working at emergency rooms in the Georgia ApolloMD facilities," "actively participating in the charting and alleged billing 'scheme' allegedly maintained by Defendants," and "observing the

company's responses to related concerns raised by physicians." (Doc. 85 at 26.)
The Court explained,

> Relator, through his personal participation in the alleged scheme as
> an emergency care physician at two different Apollo sites over an eight
> year period and the documentary evidence embedded within his
> Amended Complaint, has presented  sufficient indicia of reliability to
> show that he has a factual basis upon which he  alleges knowledge that
> actual false claims were submitted to the government during the
> relevant period and that ApolloMD had a policy through which
> physicians were directed to falsely attest to or verify having seen
> patients that they  did not in fact treat.

(*Id.* at 25.)  The Court noted that Relator had provided evidence in the form
of personal billing records "that show the compensation he allegedly
received as a direct throughput from  participation in the scheme – examples
that Relator allege necessarily required  first the payment by Medicare or
Medicaid of a falsely submitted claim." (*Id.*)

The Court reached a different conclusion with respect to "Relator's
knowledge of ApolloMD's practices in states *other than Georgia*." (*Id.* at 26)
(emphasis added).  The Court explained that even though Relator had
identified a number of emails that went out to Defendants' employees and
physicians in other States, that alone was "not enough to allege that
ApolloMD in fact had identical charting and claim submission practices or
guidelines in each state or as actually implemented." (*Id.*)  However, the
Court added that this was certainly possible "given the national model used
by ApolloMD." (*Id.*)  The Court concluded,

> In the event that additional evidence is produced within the first 75 days of discovery that Relator believes will warrant the Court's expansion of the scope of this case to emergency room practices and procedures in the five states other than Georgia identified in the Amended Complaint, Relator may seek leave to filed a Second Amended Complaint to re-plead his claims on behalf of the United States under the FCA relating to those states, provided that the motion for leave is filed within 90 days of the date of the commencement of discovery.

(*Id.* at 31.)  At the same time, the Court advised Relator in a footnote "to be cautious in proceeding to seek to expand this suit and to avoid biting off more than the Relator and his counsel can chew," noting that "[t]his would only waste all parties' and the Court's time and resources."  (*Id.* at 31 n.11.)

Relator responded by amending his Complaint to limit his State law claims to Georgia, replead his AKS claim, and provide additional allegations in support of his nationwide Federal FCA claims.  (*See generally* Second Am. Compl. "SAC," Doc. 113.)   In recognition of the Court's observation that Defendants could potentially have "identical charting and claim submission practices or guidelines in each state," Relator attached the following stipulations to his SAC, which the parties agreed to after the Court issued its first motion to dismiss Order:

1. During all relevant times, Defendants' documentation, coding and billing policies, practices, procedures, instructions and processes relating to Defendants' submission of claims for reimbursement for Medicare beneficiaries for split/shared E/M visits were uniformly applied in each state in which Defendants operated, and did not vary by state or location of facility where such visit occurred or claimed services were rendered.
2. During all relevant times CMS's guidance and requirements related to the documentation, coding and billing of split/shared E/M visits were uniform across all states in which Defendants operated. In other words, by virtue of being a federal program, the

relevant Medicare standards did not change state-by-state but at all times were national standards that applied the same in every state in which Defendants operated.

(SAC, Ex. 8.)  In his SAC, Relator also noted that in their response to a Request for Admission Defendants "admitted that its documentation, coding and billing policies 'relating to claims for reimbursement for split/shared E/M visits that [it] submitted to Medicare did not vary solely based on the State in which such services were rendered.'"  (SAC ¶ 85) (alteration in original).  Relator now contends that these stipulations and admissions establish that, at all relevant times, Defendants' coding and billing practices were uniform in each state and that the alleged scheme therefore applied to all of ApolloMD's facilities nationwide.

The SAC also references a number of emails that Relator obtained through discovery, which he claims add further credence to his theory that Defendants executed a nationwide scheme.  For instance, Relator includes an excerpt from a March 12, 2017 email from ApolloMD's President, Yogin Patel, to its Vice President of Operations, Pat Johnson.  (*See id.* ¶ 29.)  In that email, Patel described four categories of billing:  (1) the "**APC Patients**"[2] category in which there was no physician involvement and the claims were billed at the standard 85% rate for mid-level providers; (2) the "**MD Patients**" category in which the physicians treated the patients with no mid-level provider involvement; (3) the "**Shared visit with APC and MD work**" category in which "the APC mostly manages" the patient

---

[2] "APC" is short for "Advanced Practice Clinicians," which is another term for mid-level providers. (SAC ¶ 4.)

"but may require MD to help"; and (4) the "**Shared Visits with no MD work**"
category in which the patients were "managed by the APCs" but "the chart is signed
off or billed under the MD" (*Id.*)  Relator places particular emphasis on the fourth
category identified by Patel.  Relator notes that when describing this category,
Patel admitted that the claims "should not be credited to the MDs as shared visits"
because they perform "little substantive work" in treating the patients in this
category, but some of those visits still "get classified as shared visits" and Apollo
was "paying these to the MD at $50/encounter." (*Id.*)  Relator construes this as an
admission from Patel, as President of ApolloMD, that Defendants had submitted
claims to the Government falsely crediting the mid-level providers' work to
physicians, and that, in these specific instances, Defendants had improperly
claimed reimbursement at the higher billing rate reserved for claims in which the
physician had been substantively involved in the treatment.

In another email Relator references, which Patel allegedly sent to ApolloMD
Physician Todd Gardner on July 27, 2012, Patel advised Gardner that "to ensure
maximal reimbursement" he should "[e]ncourage the docs to put their head into
the MLP patient rooms and document/click the appropriate attestation that
reflects you have laid eyes on the patient." (*Id.* ¶ 123.)  In the same email, Patel
added, "I'm attaching our new Guide to MedHost.  Send to all of your docs/mlps
and have them review (it's a short read but will help them maximize their billing)."
(*Id.*)  The attachment allegedly stated,

In practice, the most efficient thing may be to cruise by the patient's

room and confirm the HPI and select [the attestation] "CASE REVIEWED w/pt face-to-face." If these selections are not made, then the encounter will be billed as a midlevel only encounter and we will be reimbursed at 85 percent of standard rates.

(*Id*. ¶ 23.)  Relator infers from these emails that ApolloMD's upper management encouraged its physicians to find ways to overstate their involvement in treating patients seen by mid-level providers and, consequently, to allow Defendants to claim a higher billing rate for those services.

Relator also references a March 21, 2014 email from ApolloMD's Director of Credentialing, Lisa Murray, to its Chief Operations Officer and Executive Vice President of Operations, Roger Murray.  (*See id*. ¶ 17.)  In that email, Ms. Murray stated, "If you bill a government payor (Medicaid or Medicare) under an extender only you receive 85% rather than 100% of allowables.  If a physician co-signs an extender chart then if can be billed at 100% of allowables." (*Id*.)  Then she added, "For financial reasons alone, I would recommend co-signing." (*Id*.)  Immediately thereafter, Ms. Murray speculated, "Maybe the physicians don't want to co-sign because if there is a lawsuit it would name them too.  Maybe it isn't just work load but a liability issue for them too." (*Id*.)  Relator takes this to mean that Defendants' physicians were aware that signing on to the mid-level providers work would constitute fraud.

As a final example, Relator references a January 26, 2018 email from Adrian Soll, the Assistant Director of International Coding for a coding company that

Defendants utilized to assign billing codes to their medical records.  (*See id.* ¶ 43.)

In his email, Soll allegedly stated to a group of unnamed ApolloMD executives:

> Per our conversation this morning, we will instruct our coders to assign provider credit based on the disposition ***even if the documentation otherwise does not meet CMS criteria to give credit to the physician***. <u>**This is done at Apollo's directive**</u>[.]

(*Id.*) (emphasis in original).  Relator interprets this to mean that ApolloMD instructed its coders to assign the physician billing code to services performed by mid-level providers even when those services did not meet the relevant criteria to give "credit to the physician" for the mid-level provider's work.

 After Relator filed his SAC, Defendants promptly filed a motion to dismiss, seeking to limit Relator's FCA claims to the State of Georgia.  (Doc. 115.)  Though Defendants do not dispute that they stipulated and admitted that their billing policies and practices "applied uniformly in every state," they claim that this does not mean that their "physician supervision and midlevel chart review policies" were uniform nationwide.  (Defs.' Reply, Doc. 118 at 15) (emphasis omitted).  And though Defendants concede that the Court previously allowed Relator's FCA claims to proceed based on Relator's personal knowledge of the scheme, personal experience working in ApolloMD's Georgia facilities, and his personal participation in the alleged scheme, they contend that the emails Relator obtained during discovery are insufficient to establish the nationwide scope of Relator's

claims because they are not reflective of Relator's personal knowledge.[3]   As a consequence, Defendants argue that Relator fails to satisfy Rule 9(b) to the extent he seeks to raise his FCA claims on a nationwide scale.  (*See* Defs.' Mot., Doc. 115-1 at 23) (arguing that "this Circuit sets a high bar for pleading FCA actions under Rule 9(b), and courts readily dismiss such claims unless the relator pleads specific facts establishing personal knowledge of the defendant's billing practices").

After considering these arguments, the Court opined in its second motion to dismiss Order, "though it appears from the current iteration of the pleadings that ApolloMD's Georgia-based facilities were not a national outlier in terms of their charting band billing practices, Relator is undoubtedly farther removed from the claim submission processes that took place in Defendant's facilities outside of Georgia."  (Doc. 134 at 11.)  The Court added, "This extra layer of removal may

---

[3] Additionally, relying on the Eleventh Circuit's unpublished decision in *Bingham v. HCA, Inc.*, 783 F. App'x 868 (11th Cir. 2019), Defendants argue that the emails should not even be considered at the pleading stage — even though they have been incorporated into the text of the SAC — because Relator only learned of them after obtaining them through discovery.  In *Bingham* the Eleventh Circuit recognized, "amendments that include material obtained during discovery, prior to a final decision on the motion to dismiss, *may* not be appropriate in cases to which the heighted pleading standard of Rule 9(b) applies if the amendment would allow the plaintiff to circumvent the purpose of Rule 9(b)" — that is, the purpose of ensuring that the financial incentive to bring FCA claims "does not precipitate the filing of frivolous suits."  783 F. App'x at 876 (emphasis added).  But in this case the Court has already determined that Relator's FCA claims are at the very least nonfrivolous, and that he has plead his claims with a sufficient indicia of reliability, at least insofar as they applied to Defendants' facilities in Georgia.  Although the Court did not find that Relator had plead his claims with a sufficient indicia of reliability to the extent they applied to facilities *outside* of Georgia, the Court recognized that it is certainly possible that Defendants followed "identical charting and claim submission practices or guidelines in each state." (Doc. 85 at 26.)  In light of this possibility, the Court expressly authorized Relator to seek leave to amend the Complaint "[i]n the event that additional evidence is produced within the first 75 days of discovery that Relator believes will warrant the Court's expansion of the scope of this case to emergency room practices and procedures in the five states other than Georgia identified in the Amended Complaint."  (*Id.* at 31.)  Under the circumstances, and now that the Court has granted Relator leave to amend the Complaint, the Court declines to hold that consideration of the new allegations in the SAC would circumvent the purpose of Rule 9(b).

correspondingly reduce the indicia of reliability of Relator's allegations to the extent he raises them in relation to these other facilities." (*Id.*)  The Court went on,

> The question now is whether Relator has an adequate basis for believing that ApolloMD's uniform charting and billing practices similarly resulted in fraudulent claims being submitted within different universes of claims throughout the nation, and if so, from which particular facilities and from which particular physicians.  But it is currently not clear to the Court whether Relator's allegations that ApolloMD had identical charting and billing practices in other States would necessarily mean that false claims were submitted in other States as well, which Relator ultimately must show to satisfy Rule 9(b).

(*Id.* at 14.)  The Court then directed the parties to appear for an oral argument to address that very question.

## II.

At the oral argument, Relator's counsel argued that Relator could satisfy Rule 9(b)'s particularity requirement for his nationwide claims simply by showing (1) that Relator had sufficient indicia of reliability for his FCA claims to the extent they applied to the facilities where he worked in Georgia, which the Court had already found; and (2) that Defendants had uniform charting and billing policies at all of their facilities nationwide, which the additional evidence in the SAC appeared to establish.  Although Relator was able to point to a number of authorities in support of this approach, he primarily relies on cases from out of Circuit that applied a more lenient approach to Rule 9(b) than the standard that applies in the Eleventh Circuit.

For example, Relator principally relies on *U.S. ex rel. Hernandez v. Team Fin., LLC*, No. 2:16-cv-432, 2020 WL 731446 (E.D. Tex. Feb. 13, 2020), a case where the realtors were represented by the same attorneys as the Relator in this case.  The relators in *Hernandez* were a physician and a physician's assistant who worked for the defendants at facilities in Colorado and the U.S. Virgin Islands.  *Id.* at \*1.  And the relators alleged that the defendants there had engaged in a fraudulent billing scheme much like Defendants' alleged scheme in this case.  *See id.* at \*2 ("Under the Mid-Level Scheme, TeamHealth overbills for services provided by 'mid-level' practitioners . . . . triggering the 100% rate when in fact the 85% rate applied.").  Even though they only had personal knowledge of the billing practices in their own facilities, the court found that the relators were able to satisfy Rule 9(b) for purposes of their nationwide claims "by tying their individual experiences in TeamHealth facilities to the nationwide allegations and identifying involvement by people across the country."  *Id.* at \*8.  Relying on Fifth Circuit case law, which applies a "relaxed standard" to Rule 9(b)'s particularity requirement, the court concluded, "Relators need not allege the details of a false claim that was actually submitted, so long as Relators allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'"  *Id.* at \*6, \*9 (quoting *U.S. ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 372 (5th Cir. 2017) (quoting *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190, 191 (5th Cir. 2009))).  To support their nationwide FCA claims, the relators identified several emails in connection with specific claim

submissions that they had received from employees of the defendants located in other States.  *See id.* at *4.  The court ultimately found that these emails "support[ed] an inference that TeamHealth engaged in the alleged fraudulent conduct nationwide."  *Id.* at *8.

Relator cites several other cases from out of Circuit each of which applied a similar "relaxed" standard to Rule 9(b)'s particularity requirement.  For example, Relator cites *United States v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431 (E.D. Pa. 2020).  The relator in that case worked as a director of nursing services at a facility in Kentucky.  *Id.* at 439.  And the court concluded that "under the 'relaxed' Rule 9(b) pleading standard applied in the Third Circuit" the relator's "specific allegations from his time spent at Heritage Manor" was "enough to establish a 'nationwide inference of fraud.'"  *Id.* at 453 (citations omitted).  Similarly, in *U.S. ex rel. Drennen v. Fresenius Med. Care Holdings, Inc.*, No. 09–10179, 2012 WL 8667597  (D. Mass. Mar. 6, 2012), the relator worked as an area manager overseeing the defendant's facilities in Alabama.  The relator claimed that, based on his personal experiences overseeing those facilities, he had personal knowledge that the defendant was submitting claims seeking reimbursement for tests that were not medically necessary.  *Id.* at *1.  The court ultimately permitted the relator's nationwide claims to move forward based on the relator's allegations that "by reason of Fresenius' national billing practices, this billing likely occurred at Fresenius' other facilities throughout the Country."  *Id.* at *2; *see also U.S. ex rel. Carpenter v. Abbott Labs., Inc.*, 723 F. Supp. 2d 395, 409 ( D. Mass. 2010) (noting

that First Circuit precedent "allows suits to proceed on a nationwide basis where specific facts are alleged involving a single representative state"); *cf. U.S. ex. Rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 174–75 (E.D. Pa. 2012) (noting that other Circuits that have applied a "generous" standard to Rule 9(b) "have found that allegations of specific claims in one state or region satisfy Rule 9(b) requirements by establishing a nationwide inference of fraud" (citing *U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 30–31 (1st Cir. 2009), and *Drennen*, 2012 WL 8667597, at \*1–\*2)).

The Court finds this line of cases and the "relaxed" standard they apply to Rule 9(b)'s particularity requirement difficult to fully square with the applicable standard in the Eleventh Circuit, although some of the out-of-circuit cases with comparable facts to those here remain informative.  Unlike the Circuits that apply the more relaxed approach in which "it is the scheme, rather than individual instances of fraudulent claims, that an FCA relator must plead with particularity," *Hernandez*, 2020 WL 731446, at \*6 (quoting *U.S. ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 671 (S.D. Tex. 2013)), the Eleventh Circuit has emphasized, "[b]ecause it is the submission of a fraudulent claim that gives rise to liability under the False Claims Act, that submission must be pleaded with particularity *and not inferred from the circumstances*."  *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013 (11th Cir. 2005) (emphasis added).  And even though the Eleventh Circuit "construe[s] all facts in favor of the plaintiff when reviewing a motion to dismiss," it also "decline[s] to make inferences about the submission of

fraudulent claims" on the theory that "such an assumption would 'strip[ ] all meaning from Rule 9(b)'s requirements of specificity.'" *Id.* (quoting *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1312 n.21 (11th Cir. 2002)); *see Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1277 (11th Cir. 2018) (rejecting FCA claims when "relators allege[d] a mosaic of circumstances that are perhaps consistent with their accusations that the Foundation made false claims" but "fail[ed] to allege with particularity that these background factors ever converged and produced an actual false claim").  Notably, Defendants cite cases from within the Eleventh Circuit, and other Circuits applying a similar "strict" approach to Rule 9(b), where courts rejected relators' efforts to bring nationwide FCA claims when they only had personal knowledge of the defendants' practices in one State.[4]

---

[4] *See, e.g.*, *U.S. ex rel. Fox RX, Inc. v. Omnicare, Inc.*, No. 1:11-cv-962, 2013 WL 2303768, at *7 (N.D. Ga. May 17, 2013) (finding that "Relator's contention, that Defendants' 'nationwide' conduct should be inferred from the conduct for which Relator alleges actual information, is exactly what is proscribed by Rule 9(b)"); *U.S. ex rel. George v. Fresenius Med. Care Holdings, Inc.*, No. 2:12-cv-877, 2014 WL 12607797 (N.D. Ala. Mar. 31, 2014) (stating that "[r]elators' contentions and their knowledge deal primarily with conduct they witnessed in Alabama or in the geographic area George oversaw as Area Manager" and that relators had  "failed to provide sufficient indicia of reliability regarding a nationwide scheme to satisfy Rule 9(b) and survive a motion to dismiss"); *U.S. ex rel. Suarez v. AbbVie, Inc.*, 503 F. Supp. 3d 711 (N.D. Ill. 2020) (noting that relator "need not allege the 'where' of 'every single submission of a false claim' to sufficiently allege nationwide fraud," but "must provide more than a single representative example of alleged fraud in one state"); *U.S. ex rel. Kroening v. Forest Pharmaceuticals, Inc.*, 155 F. Supp. 3d 882 (E.D. Wis. 2016) (rejecting nationwide FCA claims based on "the lack of any specific allegations directed towards fraudulent conduct occurring in any state other than Wisconsin"); *U.S. ex rel. Hernandez-Gil v. Dental Dreams, LLC*, No. Civ. 13-1141, 2016 WL 9777254 (D.N.M. Sept. 26, 2016) (dismissing nationwide FCA claims on the ground that relator "has not alleged enough non-conclusory facts to plausibly indicate that the purportedly false claims in the New Mexico clinics are representative samples of a broader class of claims for any or all clinics operated by Defendants in other states").

The closest Relator comes to offering on point in Circuit authority are his citations to *U.S. ex rel. Bibby v. Wells Fargo Bank, N.A.*, 165 F. Supp. 3d 1340 (N.D. Ga. 2015) and *U.S. ex rel. Vainer v. Davita, Inc.*, No. 1:07-cv-2509, 2012 WL 12832381 (N.D. Ga. Mar. 2, 2012).  The relators in *Bibby* were mortgage brokers who operated in seven States in the Southeastern United States, and were familiar with the defendant's alleged practice of overcharging veterans who sought to refinance their mortgages by virtue of their roles as mortgage brokers in those specific States.  *Id.* at 1342–44.  In addition to "specifically describe[ing] an example loan" involving the defendant, the relators also occupied a "quasi-insider status" that gave them particular insight into the defendant's allegedly fraudulent practices based on their role in dealing with the mortgage paperwork that allegedly led to the submission of false claims.  *Id.* at 1343–44.  The Court therefore concluded,

> The specific facts of this case — where quasi-insiders played a critical role in the VA mortgage closing process that allowed them to observe and examine Defendant's alleged fraud for almost a decade, across a large swath of the country, and where they allegedly were directed by mortgage industry defendants as to how to perpetrate that fraud — require the Court to reject dismissal.

*Id.* at 1346–47.  Although the relators operated in seven States instead of nationwide, the Court opined, "Far from viewing Relators' experiences as a mortgage broker in 'only' seven states as a negative, the Court views that experience as a positive indicator that Relators have knowledge sufficient to lend their allegations the 'indicia of reliability' needed to infer the existence of a

nationwide scheme." *Id.* at 1348.  The Court found that "[t]he reasonable inference to draw here is that if the alleged violations of a national VA fee ban were occurring in seven states — including four of the ten most populous states in the nation in Texas, Florida, Georgia, and North Carolina — such conduct is likely to have occurred nationwide." *Id.*

The situation in *Bibby*, the Relator in this case did not operate in seven States — he only worked in one.  And at this juncture, Relator has not alleged he was familiar with Apollo medical practitioners in other States who shared his experience  That said, Relator was a physician who received billing instructions and submission policies as well as related Apollo billing memoranda and directives that were distributed and used on a national basis.  Relator thus was in a position to glean at least some measure of real understanding of Defendants' national medical billing submission policies and practices as well as how they were subject to fraudulent misuse based on his own experience.

The situation in *Vainer* is somewhat more analogous to the instant case.  In *Vainer*, the relators were a medical director and clinic director at facilities located in Georgia, and they alleged that the defendants engaged in multiple schemes to maximize billing by increasing medical wastage.  2012 WL 12832381, at *1–*3.  The relators included "several examples of claims actually submitted to the Government for payment" in their complaint, *id.* at *7, but the defendants argued that "these examples are too narrow to support a nationwide claim because they focus on a handful of patients of two clinics in Georgia over a period of less than

two years," *id.* at *8.  The court rejected that argument on the ground that "relators are not required to plead with specificity each and every claim they allege was false." *Id.*  Instead, the court found that "to proceed with discovery, the claims that are pled with specificity must be characteristic examples illustrative of the class of claims covered by the fraudulent scheme." *Id.* (citing *U.S. ex rel. Bledsoe v. Community Health Systems*, 501 F.3d 493, 510–11 (6th Cir. 2007)).  The court found that the examples the relator had included were "sufficiently illustrative of the schemes they represent -- and of the overall scheme to maximize billing for waste." *Id.*  As the Court previously acknowledged, Relator has provided evidence from his personal pay records and eight years of experience as an ApolloMD physician that indicates that he had been regularly credited for treating more patients than he could have possibly seen in a single day.  In Relator's view, that "impossible day" evidence is proof that he was credited for treating at least some patients whom he never actually saw, and that Defendants submitted false claims to the Government fraudulently seeking reimbursement for services that he never actually performed.  (*See* SAC ¶¶ 34–35.)  Relator has also made a colorable showing through selective corporate memoranda that ApolloMD actively promoted these billing practices and through the parties' stipulations, that the company's billing policies were the same across ApolloMD's national market.  In this context, it is certainly conceivable that physicians in other facilities were similarly being credited for treating more patients than they could have possibly seen in a single day.  Still, Relator at this point has provided minimal concrete

evidence via allegations other than that described above to support his contention that fraudulent practices were occurring on a nation-wide basis.  *Cf. Mastej*, 591 F. App'x at 708 ("Importantly here, during 2007 Mastej was not a corporate outsider who only speculated that the Defendants must have submitted or paid claims to the government. . . . As Vice President, he had direct information about both Pine Ridge and Collier Boulevard's billings, revenues and payor mix, and he was in the very meetings where Medicare patients and the submission of claims to Medicare were discussed."); *Bibby*, 165 F. Supp. 3d at 1346–47 (noting that relators were in a position to observe and examine Defendant's alleged fraudulent practices for almost a decade based on their ongoing involvement with the Defendant MIC's VA mortgage closing process).

At the same time, Relator's counsel made a compelling case at oral argument that there would be no point in limiting Relator's FCA claims to Georgia now that the parties have essentially completed all of their nationwide discovery.  Under the Court's most recent Scheduling Order, which the Court entered based on a joint motion of the parties, fact discovery is scheduled to conclude on September 15, 2022 — just a few weeks from now — and dispositive motions are due before the end of the year.  (*See* Docs. 128, 129.)  In that respect, the situation here is analogous to the one in *Bibby* where the defendant sought to limit the relators' FCA claims to the seven States where the relators had operated after the parties had already spent years engaging in nationwide discovery.  Like the defendant in

*Bibby*, at this point Defendants are effectively "[seeking] to shut the stable door after the horses have already bolted."  165 F. Supp. 3d at 1344.

Moreover, as the court noted in *Vainer*, Rule 9(b) is simply a pleading stage hurdle that *qui tam* relators have to get past in order to "proceed with discovery." *See* 2012 WL 12832381, at *8 (stating that "*to proceed with discovery*, the claims that are pled with specificity must be characteristic examples illustrative of the class of claims covered by the fraudulent scheme" and finding that "the examples pled with specificity are sufficiently illustrative . . . *to warrant discovery*") (emphasis added).  Now that Defendants have notice of the scope of Relator's nationwide claims and the parties have already completed nationwide discovery based on that mutual understanding, it appears that the "core purpose" of Rule 9(b) has already been satisfied. *Bibby*, 165 F. Supp. 3d at 1348 ("The parties themselves were obviously aware of the Complaint's scope, as they began engaging in nationwide discovery after this Court first denied dismissal. Thus the core purpose of Rule 9(b) — to give Wells Fargo fair notice of the nature and contours of Relators' claims — was met.").  At oral argument, the parties appeared to agree that at this point there are no remaining questions about the scope of discovery, and the only question about the scope of FCA claims is whether the Court should look to Defendants' claim submissions from facilities outside of Georgia for purposes of calculating damages.  But as Relator's counsel pointed out, that is an issue that should be addressed on the merits either at summary judgment or at trial instead of at the pleading stage.

Therefore, under these specific circumstances, the Court finds that the proper course at this stage is to allow Relator's claims to proceed as currently plead.

### III.

The Court recognizes that Defendants could have potentially avoided the obligation to produce written discovery from a number of its facilities if they had waited until today's Order before commencing nationwide discovery.[5] That said, the Court understands why, based on the Court's prior Orders, Defendants may have considered it more prudent and efficient to proceed with nationwide discovery while their partial motion to dismiss was pending. Additionally, the Court notes that Defendants down the road may have a strong argument on the merits that their efforts to bill as many of their claims as possible under physicians' billing codes was simply "good business," and that, contrary to Relators' assertions, their efforts to maximize their billing revenue never crossed the line between savvy business practice and fraud. Or, alternatively, the evidence may indicate that they did not cross that line as often as Relator suggests. Moving forward, Relator will face a heavy burden to show that certain improper upcoding on the part of Defendants was a fraudulent billing practice rather than simply an effort to push the envelope in terms of which claims could be properly submitted under a physician's billing code. But that determination is for another day. Defendants'

---

[5] The Court understands that the nationwide discovery that has already taken place consists primarily of sample claims data from various facilities where Defendants operated during the relevant timeframe, and that Relator would have sought to depose the same individuals within Defendants' organization regardless of whether or not his claims were limited to the facilities where he had worked in Georgia.

Motion to Dismiss Plaintiff/Relator's Second Amended Complaint [Doc. 115] is therefore **DENIED** as to Counts I and II.  For the time being, Relator may proceed with his FCA claims on a nationwide basis.

      **IT IS SO ORDERED** this 29th day of August, 2022.

**AMY TOTENBERG**
**UNITED STATES DISTRICT JUDGE**