# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | § | |
| Chionesu Sonyika, Relator, | § | |
| | § | |
| STATE OF GEORGIA, *ex rel.* | § | |
| Chionesu Sonyika, Relator, | § | |
| | § | |
| *Plaintiffs*, | § | Civil Action No. 1:20-CV-3213-AT |
| v. | § | |
| | § | **THIRD AMENDED** |
| ApolloMD, Inc., Independent Physicians | § | **COMPLAINT FOR DAMAGES** |
| Resource, Inc., ApolloMD Business | § | **UNDER THE FEDERAL FALSE** |
| Services, LLC, Apollo MD Holdings, | § | **CLAIMS ACT AND VARIOUS** |
| LLC, PaymentsMD, LLC, ApolloMD | § | **STATE FALSE CLAIMS ACTS** |
| Group Services, LLC, ApolloMD | § | **AND DEMAND FOR JURY** |
| Physician Partners, Inc., ApolloMD | § | **TRIAL** |
| Physician Services FL, LLC, and Georgia | § | |
| Emergency Group, LLC, | § | |
| | § | |
| *Defendants*. | § | |

## RELATOR'S THIRD AMENDED COMPLAINT

Relator Chionesu Sonyika, M.D., ("Relator" or "Dr. Sonyika") in the above-styled action files this Third Amended Complaint on behalf of the United States of America (the "United States") and the State of Georgia against Defendants ApolloMD, Inc., Independent Physicians Resource, Inc., ApolloMD Business Services, LLC, ApolloMD Holdings, LLC, PaymentsMD, LLC, ApolloMD Group Services, LLC, ApolloMD Physician Partners, Inc., ApolloMD Physician Services FL, LLC, Georgia Emergency Group, LLC, and their related parents, affiliates, subsidiaries, successors and predecessors (collectively "Defendants" or "Apollo").

1.      Before filing this case, Relator possessed sufficient knowledge and evidence to satisfy Rule 9(b) on a national basis. Specifically, as alleged herein, even before discovery began, Relator possessed  evidence showing that: (1) Apollo executed its fraudulent Medicare fraud Scheme uniformly nationwide; and (2) Apollo fraudulently implemented and applied its specific documentation, coding, and billing policies and practices with respect to split/shared visits uniformly for claims Apollo submitted to Medicare, resulting in actual false claims to Medicare across the country. For example, even before discovery began in this case:

- Relator personally spoke with other Apollo physicians on Apollo's national "travel team"[1] (Drs. Dwayne Greene, Kyung Yoon and Steve Keehn) all of whom confirmed that Apollo required them to co-sign and/or attest to mid-level charts[2] throughout Apollo's facilities[3] across the country, *i.e.*, so that Apollo could improperly bill Medicare at the physician rate—including at Apollo's facilities in **Texas** and **Florida**—even when those physicians did not treat the mid-levels' patients;[4]

- During a physician orientation meeting (in or around 2010) at Apollo's headquarters in Atlanta, Relator was instructed by an **Apollo executive** (Dr. Boykin Robinson) that Relator should sign all mid-level charts and attest to seeing patients even if all Relator did was walk by and wave at the patient, *i.e.*, so that Apollo could improperly bill Medicare at the physician rate for patients only seen by mid-levels;[5]

- **Apollo's executives** (Drs. Michael Lipscomb and Brett Cannon) confirmed to Relator and other physicians during an in-person meeting (at the Apollo facility where Relator worked) that Apollo bills at the physician rate when all the physician does is co-sign a mid-level's chart, *see* Exhibit 39 (transcription of relevant portions of the meeting);[6]

- Relator was instructed by an Apollo Regional Medical Director (Dr. Robert L. Wright) located in **Texas** to co-sign mid-level charts even

---

[1] *See* Exhibit 38 (screenshot of https://apollomd.com/jobs/stat-team/) ("The ApolloMD Travel Team gives you the opportunity to practice in diverse settings across the country alongside an elite group of doctors, and represent ApolloMD during new contract transitions.") (last visited Dec. 9, 2022). Apollo's travel team office is located in **North Carolina**. *Id.*

[2] Within this Complaint, "medical record(s)" is used interchangeably with "chart(s)."

[3] Within this Complaint, "facility" or "facilities" are used interchangeably with "emergency department(s)."

[4] *See* ¶¶17 & 134, below.

[5] *See* ¶¶19 & 136, below.

[6] *See* ¶¶18 & 135, below.

for patients Relator never saw, *see, e.g.*, Exhibit 11[7] (medical record deficiency email from Regional Medical Director, Dr. Robert L. Wright); *see also* Exhibit 3 (Dr. Robert L. Wright instructing mid-levels to "reliably alternate back and forth for the doc to whom you assign pts. *It affects their paycheck*") (emphasis added);[8]

- Relator's billing and payroll data (which Relator accessed through the ApolloMD.net employee portal that **all Apollo physicians** had access to) showed that Apollo submitted actual false claims to Medicare under Relator's billing number for patients that were solely treated by mid-level providers, *see* Exhibits 5 & 6;[9]

- In a January 23, 2013 email to Relator and others, an **Apollo executive** (Dr. Boykin Robin) confirmed that ApolloMD.net reflects how Apollo actually billed physician claims, *see* Exhibit 18;[10]

- Relator received a **company-wide** email from Apollo's Chief Quality Officer (Dr. Michael Lipscomb) on December 1, 2016, regarding "PQRS" wherein Dr. Lipscomb confirmed that Apollo bills all charts, nationally, at the physician rate—even for services provided exclusively by a mid-level provider, *see* Exhibit 1;[11]

- Relator received an email from an **Apollo executive** (Dr. Boykin Robinson) on December 17, 2012 showing that Apollo's facilities in **North Carolina** (Central Carolina Hospital) and **Pennsylvania** (Altoona Hospital) also participated in the "PQRS" program, *i.e.*, the admissions in Exhibit 1 applied ***nationally***, *see* Exhibit 17;[12]

---

[7] Exhibits 1 through 10 attached hereto were previously attached to Relator's Second Amended Complaint (Doc. 113). All other Exhibits attached hereto were not attached to Relator's Second Amended Complaint. Additionally, Relator did not receive the following documents through discovery (but, instead, obtained them while he was working within Apollo's emergency departments): Exhibits 1-6, 11-18, 45-46, 50, 52-53, 58.

[8] *See* ¶¶20, 137 & 138, below.

[9] *See* ¶¶23, 54, 56, 141, 199, 200 & 201, below.

[10] *See* ¶¶23 & 142, below.

[11] *See* ¶¶15, 16 & 125-133, below.

[12] *See* ¶¶16 & 131, below.

- Relator received an email from an **Apollo executive** (Dr. Boykin Robinson) on September 9, 2012, informing Relator and other Apollo physicians that Apollo bills at the physician rate for patients seen by mid-levels when all the physician does is "cruise by the patient's room and confirm the HPI and select 'CASE REVIEWED w/pt face-to-face,'" *see* Exhibit 12 (referring to materials that Apollo physicians in **North Carolina** drafted relying on an electronic medical record system from Carlisle Regional, an Apollo facility in **Pennsylvania**);[13]

- On September 20, 2010, Relator received an email from Apollo executive Dr. Boykin Robinson (sent through an Apollo affiliate located in **South Carolina**) instructing Relator and other physicians to "check the box" within mid-level medical records which, Dr. Robinson noted, would, "as always, get you 100% of the charges," *see* Exhibit 13;[14]

- Within a **company-wide** January 9, 2017 email from Apollo's Chief Financial Officer (Dave Afshar) to all Apollo physicians, including Relator, Mr. Afshar threatened to withhold $100 per chart from individual physician paychecks for every mid-level medical record that physicians failed to sign pursuant to Apollo's national billing Scheme, *see* Exhibit 14; notably, Mr. Afshar's email was sent to all Apollo physicians and referred to Apollo's patients "**in 13 states**;"[15]

- Within a **company-wide** May 26, 2011 email from Apollo's former Chief Medical Officer and current Chief Executive Officer (Dr. Mike Dolister) to Relator and others, Dr. Dolister admitted that Apollo's split/shared billing policy "**across all facilities**" was previously not compliant (as Apollo was finally changing its policy to attempt to comply with what Medicare had *always* required), *see* Exhibit 4;[16]

---

[13] *See* ¶¶21 & 139, below.
[14] *See* ¶¶24 & 143, below.
[15] *See* ¶¶25 & 144, below.
[16] *See* ¶¶22 & 140, below.

- In a January 6, 2017 email from **Apollo executive** Dr. Michael Lipscomb to Relator and other physicians, Dr. Lipscomb improperly instructed that a physician attestation within a mid-level medical record "ensures billing will occur under the physician (rather than the [mid-level]), and giving the physician full (rather than 85% credit) for seeing the patient," *see* Exhibit 15;[17]

- Each time Relator received emails and instructions from Apollo executives, he knew he was receiving company-wide instructions that were not different for any other Apollo facilities and that the instructions applied company-wide regardless of state lines;[18] and

- In a July 14, 2016 email Adrian Dawson, an Apollo Practice Coordinator,[19] reminded Relator and other Apollo providers that they would "be on the naughty list" if they did not complete charts, *i.e.*, sign mid-level medical records; Ms. Dawson further informed the providers that she was "instructed to send reports weekly to **upper management** detailing how many deficiencies each provider has" and that "[i]ncomplete charts *directly and negatively affect revenue*," *see* Exhibit 16 (emphasis added).[20]

2.      Thus, even before discovery began in this case, Relator possessed direct knowledge (because he was in a position to obtain that knowledge) that Apollo

---

[17] *See* ¶¶26 & 145, below.

[18] *See* notes 31 & 94, below.

[19] Apollo hires Practice Coordinators to work within Apollo's emergency departments, nationwide, to pressure Apollo physicians to co-sign mid-level medical records so that Apollo can improperly bill Medicare at the higher physician rate for patients only seen by mid-levels.

[20] *See* ¶¶27 & 146, below.

submitted false claims to Medicare for services rendered throughout Apollo's emergency departments across the country—not just here in Georgia.[21]

3.    Through discovery of Apollo's internal records and key decisionmakers, Relator *confirmed* what he knew based on his personal experience at Apollo—that Apollo carried out its fraudulent Scheme pursuant to which Apollo submitted actual false claims for services rendered within its emergency departments, ***nationwide***,[22] including actual false claims arising from services rendered within Apollo's emergency departments in the States of:

- **Florida;**

- **North Carolina;**

- **Virginia;**

- **South Carolina;**

- **Pennsylvania;**

- **Tennessee;**

- **Alabama;**

- **California;**

- **Delaware; and**

- **Georgia.**

---

[21] Within its March 31, 2021 Order, this Court already concluded that Relator's federal and state False Claims Act claims were sufficiently pled under Rule 9(b) with respect to the State of Georgia. *See* Doc. 85 at 24-26, 30.

[22] Within this Complaint, "nationwide" or "national" means all states wherein Apollo operated, staffed providers and/or contracted with emergency departments.

4.      Examples of **actual false claims**[23] Apollo submitted to Medicare from each of the foregoing states are attached hereto as Exhibits 19 through 35A[24] (medical records and Apollo's corresponding internal billing data showing that all such claims were submitted to Medicare under physician billing numbers even though the underlying medical records do not reflect physician involvement with the patient to bill at the higher physician rate).[25] Several of these false claims are particularly egregious. For example:

- For a patient treated at a **North Carolina** facility, Apollo submitted a false claim to Medicare under a physician's billing number when that same physician clearly indicated within the patient medical record that "I was not specifically asked to see this patient," *see* Exhibit 19 and excerpted below; *see also* Exhibit 19A (Apollo's billing data relating to Exhibit 19);

> Attestation signed by Jonathan K Tackett, MD at 3/15/2021 10:50 PM
>
> I was present in the ED as the supervising physician and am cosigning the note in this role.  I was available for consult.  I was not specifically asked to see this patient.

---

[23] *See* ¶¶65-66 & 187-194, below.

[24] Apollo produced the medical records in Exhibits 19 through 35 before the Court entered its October 31, 2022 Order (Doc. 150).

[25] Exhibits 19 through 35A attached hereto take on the following naming convention: Exhibit 19 (medical record reflecting services rendered by an Apollo mid-level), Exhibit 19A (Apollo's billing data reflecting that Apollo improperly billed the medical record within Exhibit 19 to Medicare under a physician's billing number), etc. The provider listed as the "Rendering Provider" within Apollo's billing data is the billing provider. In compliance with the Court's HIPAA Protective Order (Doc. 95), HIPAA-protected information has been redacted from the medical records and billing data attached to Relator's TAC, and Relator only uses such medical records and billing data for purposes of this litigation.

- For a patient treated at a **Virginia** facility, Apollo submitted a false claim to Medicare under a physician's billing number when that same physician clearly indicated within the patient medical record that the mid-level saw the patient "alone," *see* Exhibit 20, attached hereto and excerpted below; *see also* Exhibit 20A (Apollo's billing data relating to Exhibit 20);

---

**Supervising Physician Note**
 MidLv Saw Pt Alone
I have reviewed the PA/NP's note and plan of care. I was available for consultation as needed at all times during the patient's visit in the emergency department. I agree with the clinical impression, plan and disposition.

Electronically Signed by Gonzalez,Melissa W  NP on 03/31/18 at 1643
Electronically Signed by Chang,Nevan N  MD on 04/01/18 at 0050

---

- For a patient treated at a **Florida** facility, Apollo submitted a false claim to Medicare under a physician's billing number when that same physician clearly indicated within the patient medical record that the "only" thing he did was review the medical record, *see* Exhibit 21, attached hereto and excerpted below; *see also* Exhibit 21A (Apollo's billing data relating to Exhibit 21);

---

Attestation signed by Alberto Marin, MD at 9/17/2017 12:15 PM

I was available for consultation in the emergency department. Chart was reviewed only

---

- For a patient treated at a **Tennessee** facility, Apollo submitted a false claim to Medicare under a physician's billing number when that same physician clearly indicated within the patient medical record that the patient was seen only by the mid-level, *see* Exhibit 22, attached hereto and excerpted below; *see also* Exhibit 22A (Apollo's billing data relating to Exhibit 22); and

---

Signed By:   MAY MD, WILLIAM B (05/07/2019 15:40:11 CDT); BATES PA, RACHEL (05/06/2019 19:35:38 CDT)

Pt seen by APP. A physician was available in real-time to see this pt if desired by APP.

---

- For a patient treated at a **Georgia** facility, Apollo submitted a false claim to Medicare under a physician's billing number when that same physician clearly indicated within the patient medical record that "[t]his patient was not seen or evaluated by me," *see* Exhibit 23, attached hereto and excerpted below; *see also* Exhibit 23A (Apollo's billing data relating to Exhibit 23).

---

**Disposition:**
04/22
08:36 Attestation: I have reviewed the documentation by the NP/PA and agree with the sr4
     diagnosis and plan. This patient was not seen or evaluated by me.

---

5.     Thus, it is clear that the same fraudulent claim submission practices Relator witnessed in Georgia[26] were occurring throughout Apollo's emergency departments nationwide. And this makes sense, especially given that:

- As Apollo admits, "[d]uring all relevant times, Defendants' documentation, coding and billing policies, practices, procedures, instructions and processes relating to Defendants' submission of claims for reimbursement for **Medicare** beneficiaries for split/shared E/M visits were uniformly applied in each state in which Defendants operated, and did not vary by state or location of facility where such visit occurred or claimed services were rendered*, see* Exhibit 8 (Apollo's binding stipulation) (emphasis added); and

- Apollo's corporate representative on coding and medical record documentation, Casey Crane, admitted under oath that Apollo:

---

[26] Apollo admitted under oath (through its corporate representatives) that it improperly submitted claims to Medicare (Exhibits 33 through 35A) under Relator's billing number for patients he never treated when those claims should have been billed under mid-level billing numbers (for 15% less reimbursement dollars).

- o Has ***never*** had a "compliance program aimed at ensuring compliance with split/shared visit documentation";

- o Knows that if it conducted regular chart reviews or audits, it would have been made aware of any improperly submitted claims; and

- o Has ***never*** performed any regular chart reviews or audits to ensure that it is properly submitting claims to Medicare under physician billing numbers as opposed to mid-level billing numbers.

## I.   <u>INTRODUCTION</u>

6.     Apollo is a privately-held, national group practice that provides staffing and management services to hospitals related to emergency medicine, hospital medicine, anesthesia and radiology. Headquartered in Atlanta, Georgia, Apollo has a presence (or has had a presence throughout the relevant time period) in over **135 cities** across the States of **Georgia, Alabama, Mississippi, Florida, Tennessee, Texas, North Carolina, South Carolina, Illinois, Indiana, Ohio, Pennsylvania, Virginia, West Virginia, Louisiana, Arkansas, California, Delaware, Iowa, New Jersey, and Arizona**. *See, e.g.*, Exhibits 9 & 10. Apollo's revenue in 2014 totaled over $400 million.

7.     This case is about Apollo's use of a fraudulent scheme (the "Scheme") to systematically submit false and fraudulent claims to the Centers for Medicare and Medicaid Services ("CMS" or "Medicare") and Georgia Medicaid for

11

reimbursement for services performed by "mid-level" healthcare providers (*e.g.*, physician assistants and nurse practitioners) at Apollo emergency rooms. Apollo knowingly and intentionally carries out its unlawful national Scheme to obtain grossly overpaid reimbursement amounts from CMS and Georgia Medicaid.

8.      Relator brings this action pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. § 3729 *et. seq*. ("FCA"), and the similar *qui tam* provisions of the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et. seq*.

9.      Under the Scheme, Apollo uniformly and systematically overbills CMS and Georgia Medicaid for evaluation and management ("E/M") services that were only provided and documented by "mid-level" practitioners. E/M services refers to the medical decision-making and level of care (*i.e.*, the labor component) provided by a healthcare provider during a patient encounter. The term "mid-level" refers to non-physician healthcare providers, such as Physician Assistants ("PAs") and Nurse Practitioners ("NPs"). Mid-levels are also sometimes referred to as Advance Practice Providers ("APPs"), Advanced Practice Clinicians ("APCs"), Non-Physician Providers ("NPPs"), and "physician extenders."

10.     Apollo knows that, by statute, a mid-level's E/M services are reimbursed at 85% of the standard physician rate, while services rendered by a

physician are reimbursed at 100% of the standard physician rate. *See* 42 U.S.C. § 1395l(a)(1)(O); 42 C.F.R. §§ 405.520(a), 414.52(d), 414.56(c). The State of Georgia has largely adopted these or similar same rates and percentages for reimbursement.

11.     The overwhelming majority of services provided by mid-levels in Apollo emergency departments are carried out with *no physician involvement*. Accordingly, Apollo knows that by statute, these services should be billed under the mid-level's billing number (*i.e.*, National Provider Identifier, or "NPI")[27] in order to be reimbursed at 85% of the physician's rate.[28] *See* 42 U.S.C. § 1395l(a)(1)(O); 42 C.F.R. §§ 405.520(a), 414.52(d), 414.56(c). Yet, under its Scheme, Apollo submits such claims for mid-level services under a physician's NPI, which automatically triggers the physician's higher reimbursement rate. Thus, Apollo is systematically and unlawfully requesting reimbursement for mid-level services at 100% of the physician rate, rather than the proper 85% rate, thereby reaping a 15 percentage-

---

[27] Within this Complaint, "NPI" is used interchangeably with "billing number."
[28] The Medicare statute specifically states, "with respect to services described in 1861(s)(2)(K) [42 U.S.C.S. § 1395x(s)(2)(K)] (relating to services furnished by physician assistants, nurse practitioners, or clinic nurse specialists), the amounts paid shall be equal to 80 percent of (i) the lesser of the actual charge or 85 percent of the fee schedule amount provided under section 1848 [42 U.S.C.S. § 1395w-4], or (ii) in the case of services as an assistant at surgery, the lesser of the actual charge or 85 percent of the amount that would otherwise be recognized if performed by a physician who is serving as an assistant at surgery[.]" 42 U.S.C. § 1395l(a)(1)(O).

point premium for mid-level services performed in its emergency departments. Simply put, Apollo is not truthful when it bills CMS.

12.     Instead, Apollo upcodes[29] claims for reimbursement to misrepresent that it is entitled to payment at physician rates for services performed by mid-levels. Apollo's Scheme deceives CMS in order to increase Apollo's own profits. And by perpetrating the Scheme, Apollo deceptively obtains funds from Medicare and Georgia Medicaid to which it knows it is not entitled.

13.     Similarly, Georgia Medicaid reimburses (or did during the relevant period) for mid-level services at lower rates than for physician services.[30] However, because Apollo submits claims for mid-level services under physicians' NPIs, Apollo unlawfully requests reimbursement from the State of Georgia for mid-level services at 100% of the physician rate, rather than the appropriate mid-level percentage paid by Georgia Medicaid.

---

[29] "Upcoding" is submitting claims for reimbursement at higher rates than the services actually performed and documented justify through codes associated with higher reimbursement amounts. Here, Apollo upcodes mid-level services to physician services by submitting claims for reimbursement to CMS under physician NPIs, instead of mid-level NPIs. The medical records underlying such claims, among other things, do not support billing under the physician NPI as if the physician provided the services and otherwise misrepresent physician involvement.

[30] Apollo admitted under oath that Georgia Medicaid follows the same guidelines as Medicare with respect to split/shared visits. *See* Exhibit 65 (March 31, 2022 30(b)(6) Deposition Transcript of Tennille Lizarraga) at 188:8-11.

14.     Even before discovery in this action began, Relator possessed evidence—based on the personal experience he gained from working in two of Apollo's facilities—showing that Apollo knowingly applied and implemented its uniform (and fraudulent) billing practices and policies for mid-level services on a **nationwide basis**. *See* ¶¶15-28, below; *see also* ¶¶125-147, below.

15.     For one example, Apollo's own chief executives admitted the national scope and uniformity of Apollo's fraudulent practices and policies: on December 2, 2016, Apollo's Chief Operating Officer, Amy Katnik, sent to **all Apollo emergency physicians a nationwide email** on behalf of and written by Apollo's Chief Quality and Patient Safety Officer, Dr. Michael Lipscomb, explicitly stating that, for Medicare patients, *all* mid-level charts are "billed under the physician NPI number"—*i.e.* regardless of whether the physician actually saw or sufficiently documented their involvement with the patient. *See* Exhibit 1 (discussed more fully in ¶¶125-133, below). Because the NPI (the provider billing number) is what automatically triggers the reimbursement rate, this fact, which Apollo itself has confirmed, is an admission of fraud and establishes the existence and the national breadth of Apollo's unlawful Scheme. This email, which is attached hereto as Exhibit 1, is more than reliable indicia of fraud; and it is more than direct, internal evidence of the fraudulent Scheme at issue in this case. It is an admission of liability,

***because the email shown at Exhibit 1 refers to actual claims for reimbursement
that Apollo submitted to Medicare, nationally***. *See* Exhibit 1 (Apollo admitting that
mid-level medical records are "billed under the physician NPI number" for records
where all the physician did was co-sign). There is simply no way under the Medicare
and Medicaid systems at issue to submit claims for reimbursement for mid-level
services under a physician NPI in this manner that is *not* fraudulent. And Apollo
does not have a reasonable excuse or explanation for this practice. Moreover, as
alleged herein, Apollo does it knowingly and intentionally *because* it makes Apollo
more money (which Apollo then shares with its physicians in the form of $50 for
each mid-level medical record they sign).

16.     Relator knew that the email shown at Exhibit 1 revealed Apollo's
fraudulent billing practices on a national basis—not only because Exhibit 1 was sent
to ***all*** Apollo physicians from Apollo executives (including Relator),[31] but also
because Relator knew Apollo participated in the "PQRS" program (the CMS
program discussed within Exhibit 1) on a nationwide basis. *See* Exhibit 17 (email
relating to the PQRS program sent from another Apollo executive to Relator
referring to Apollo's facilities located in North Carolina and Pennsylvania).

---

[31] Each time Relator received emails and instructions from Apollo executives, he knew he was
receiving company-wide instructions that were not different for any other Apollo facilities and that
the instructions applied company-wide regardless of state lines.

17.    As another example, before discovery in this action began, Relator spoke to three different physicians that worked within Apollo's emergency departments across the country on Apollo's national travel team (*see* Exhibit 38): Dr. Dwayne Greene, Dr. Kyung Yoon and Dr. Steve Keehn. All three of these physicians confirmed to Relator that Apollo also required them to co-sign all mid-level medical records assigned to them throughout Apollo's facilities across the country, even when they did not treat the mid-levels' patients—*i.e.*, so that Apollo could improperly bill Medicare at the upcoded physician rate for mid-level services. This included Apollo's emergency departments in at least **Texas** and **Florida**. *See, e.g.*, Exhibit 36 (screenshot of the LinkedIn profile of Dr. Greene, showing Dr. Greene worked within Apollo's emergency department in Houston, Texas); *see also* Exhibit 37 (public article concerning Dr. Keehn showing that Dr. Keehn has lived in South Florida for the past 8 years).

18.    As another example, Apollo's executives (Drs. Michael Lipscomb and Brett Cannon) confirmed to Relator and other physicians during an in-person meeting (at the Apollo facility where Relator worked) that Apollo bills Medicare at the physician rate when all the physician does is co-sign a mid-level's chart.[32] This

---

[32] Relator took an audio recording of this meeting and produced a copy of the recording to Apollo during this litigation. A transcription of relevant portions of the audio file is attached hereto as Exhibit 39.

discussion was not limited to Georgia-only policies or practices. Relator understood that these same billing policies or practices applied across all Apollo's emergency departments, nationwide. Notably, during the meeting, the executives pointed out to Relator and other physicians that: (1) "[i]f you sign a [mid-level] chart, you get credit for it;" (2) it's "good" "if people are billing more, [because] then there's more collections, and there's more money out there;" (3) if a mid-level provider screens the patient but the physician "d[id]n't see the patient," "you [the physician] could potentially earn $13;" and (4) CMS (a national agency) does not audit individual charts. The executives presumably reminded Relator and the other Apollo providers that CMS does not audit individual charts to reassure them that Medicare would not discover Apollo's fraudulent practices. CMS does not have Georgia-only policies or rules. Nor does Apollo.

19.    As another example, when Relator began working for Apollo, he was instructed by an Apollo executive (Dr. Boykin Robinson) during an in-person orientation meeting that occurred in or around 2010 that Relator should sign all mid-level charts and attest to seeing patients in all cases even if all Relator did was walk by and wave at the patient, *i.e.*, so that Apollo could improperly bill Medicare at the physician rate for patients only seen by mid-levels. Relator understood that Apollo carried out these same practices across all its emergency departments, nationwide.

This conversation occurred at Apollo's headquarters in Atlanta, Georgia. That Apollo is based in Georgia does not operate to limit Relator's allegations to the state of Georgia. Rather, it *strengthens* Relator's knowledge base and reliability with respect to the nationwide scope of the Scheme because Relator had direct access to and often spoke with Apollo executives who were running a nation-wide company.

20.    As another example, Relator and other Apollo physicians were regularly instructed by an Apollo medical director located in Texas (Dr. Robert L. Wright) to co-sign mid-level charts even for patients Relator and the other physicians never saw. Dr. Wright was a "fixer" whom Apollo sent to facilities around the country to help increase billing revenue and other metrics. Dr. Wright was not giving Georgia-specific instructions. Again, Relator knew and understood that this co-signing requirement was implemented by Apollo throughout its emergency departments, nationwide, so that Apollo could improperly bill Medicare at the physician rate. Exhibit 3 shows Dr. Wright's instructions to mid-levels to assign their charts to physicians for co-signing *and that the failure to do so affects physician paychecks*. Relator understood that this meant Apollo was improperly billing Medicare under physician billing numbers for services rendered by mid-levels, as Relator knew there was no other way that failing to co-sign *mid-level* medical

records could affect *physician* paychecks. Exhibit 11 confirms that Dr. Wright was located in Texas.

21.    As another example, Relator received an email from an Apollo executive (Dr. Boykin Robinson) on September 9, 2012, informing Relator and other Apollo physicians that Apollo improperly bills at the physician rate for patients seen by mid-levels when all the physician does is "cruise by the patient's room and confirm the HPI and select 'CASE REVIEWED w/pt face-to-face'" (which is not sufficient to bill at the physician rate). *See* Exhibit 12. Relator understood that these instructions applied to all Apollo's emergency departments, nationwide, because the instructions related to Apollo's emergency departments in North Carolina and Pennsylvania (and were also sent to Relator in Georgia). *See id.*

22.    As another example, on May 26, 2011, Relator received an email from Apollo's former Chief Medical Officer and current Chief Executive Officer, Dr. Mike Dolister. In that email, Dr. Dolister admitted that Apollo was changing its split/shared visit billing policy "across all facilities" to finally comply with Medicare's requirements relating to billing for mid-level services at the physician rate. *See* Exhibit 4. Relator understood Dr. Dolister's email to mean that Apollo's billing policy "across all facilities" was previously not compliant with Medicare's requirements, as Medicare's requirements hadn't changed. This comported with

Relator's experience in Georgia, as Relator knew that Apollo was billing under his billing number for services exclusively provided and documented by mid-level providers. *See* ¶23, below.

23.    As another example, Relator's billing and payroll data (which Relator accessed through the ApolloMD.net employee portal to which all Apollo physicians had access) shows that Apollo submitted claims under Relator's billing number for patients that were solely treated by mid-level providers (*i.e.*, Relator's billing data shows that Apollo was submitting actual false claims to Medicare under his billing number). *See* Exhibits 5 & 6. Relator knew that the data he reviewed on ApolloMD.net reflected how Apollo actually billed Medicare using his billing number because an Apollo executive (Dr. Boykin Robinson) previously confirmed this to be the case within a January 23, 2013 email sent to Relator. *See* Exhibit 18 ("a list of all the patients you have taken care of *and how the patient encounters were coded* is located on the apollomd.net site.") (emphasis added).

24.    As another example, Relator received an email from an Apollo executive, Dr. Boykin Robinson, instructing Relator and other physicians that Apollo bills at "100% of the charges" (*i.e.*, submits claims to Medicare under physician billing numbers) when all the physician does is "check the box" within mid-level medical records (to falsely indicate physician involvement with the mid-

levels' patients). *See* Exhibit 13. Relator understood that these admissions applied to all Apollo's emergency departments, nationwide, because (in addition Relator receiving the email in Georgia from an Apollo executive) the email was sent from an Apollo affiliate located in South Carolina. *See id.*

25.     As another example, in a January 9, 2017 email from Apollo's Chief Financial Officer (Dave Afshar) to all Apollo physicians (including Relator), Mr. Afshar indicated that Apollo was implementing a new policy to penalize physicians for not co-signing mid-level medical records at a rate of "$100 per chart from individual physician paychecks for every deficient chart when there are greater than 19 total charts incomplete for at least 30 days." Exhibit 14. Relator understood that this new policy applied throughout all Apollo's emergency departments, nationwide, as it was sent to all Apollo physicians by Apollo's Chief Financial Officer and referred to Apollo's patients "in 13 states." *See id.*

26.     As another example, on January 6, 2017, Relator received an email from Apollo executive, Dr. Michael Lipscomb. The January 6, 2017 email was also sent to all other emergency department physicians "working at Cerner EMR sites." In the email, Dr. Lipscomb admitted that Apollo improperly bills at the physician rate for mid-level services when all the physicians does is document an "attestation" within a mid-level patient's medical record. *See* Exhibit 15 ("Identification of this

statement ensures billing will occur under the physician (rather than the APC), and giving the physician full (rather than 85% credit) for seeing the patient."). Relator understood that this policy applied to all Apollo's emergency departments, nationwide, that used the electronic health record software "Cerner," which Relator believed to be most (if not all) of Apollo's emergency departments across the country.

27.    Finally, as yet another example, in a July 14, 2016 email from Apollo Practice Coordinator (Adrian Dawson) to Relator, Ms. Dawson reminded Relator and other Apollo providers that they would "be on the naughty list" if they did not complete charts, *i.e.*, co-sign mid-level medical records. *See* Exhibit 16. Ms. Dawson also informed Relator that she was "instructed to send reports weekly to upper management detailing how many deficiencies each provider has" and that "[i]ncomplete charts directly and negatively affect revenue." *See id*. This again confirmed for Relator that Apollo's Scheme was being carried out throughout Apollo's emergency departments, nationwide.

28.    As the foregoing demonstrates, before this case was filed and long before discovery began, Relator knew that the fraud he witnessed in Georgia was being implemented by Apollo uniformly throughout all Apollo's emergency departments across the country.

29.     Apollo attempts to cover up its Scheme by mischaracterizing mid-level services as "split/shared" services. Under CMS rules, "split/shared" services occur when **_both_** a mid-level and a physician each personally perform and sufficiently document a **_substantive portion_** of a face-to-face visit with the same patient on the same day, such that the services are split or shared between a mid-level and a physician.[33] "A substantive portion of an E/M visit involves all, or some portion of, the history, exam, or medical decision making (all key components of an E/M visit)."[34] For any E/M visit, whether reimbursable services were performed is determined based on complete, accurate and sufficient documentation in the patient's medical record—as CMS itself explained in a 2013 publication related to split/shared visits: "If it isn't documented, it hasn't been done[.]" _Id._ Thus, complete documentation of a substantive portion of an E/M visit by the physician is a conditional prerequisite to billing and receiving payment for a split/shared visit at the 100% physician rate. And in the emergency department, a properly documented

---

[33]  _See_ MEDICARE CLAIMS PROCESSING MANUAL, Chapter 12 - Physicians/Nonphysician Practitioners, at §§ 30.6.1(B), 30.6.13(H) (2019), available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/clm104c12.pdf (last visited July 29, 2021).

[34]  _See_ https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/MedQtrlyComp-Newsletter-ICN908625.pdf (last visited July 29, 2021) at 4.

split/shared visit is the <u>only</u> circumstance under which mid-level services may be reimbursed at the full physician rate.

30.     However, true split/shared visits are exceedingly rare in Apollo's emergency departments. Physicians and mid-levels rarely, if ever, see patients together. Instead, to maximize efficiency and avoid overlap under Apollo's business model, mid-levels independently treat lower-acuity patients and physicians independently treat higher-acuity patients. Relator personally performed true split/shared visits in less than 1% of the emergency patients he treated at Apollo. This was customary for all physicians Relator worked with.

31.     Apollo's President has even recognized that Apollo physicians and mid-levels do not treat patients together, making it clear that Apollo is not entitled to the reimbursement dollars it received for the claims it submitted to CMS under physician NPIs for purported split/shared visits. For example, in a March 22, 2017 email, Apollo President, Yogin Patel, pointed out that "[a]s both the APC and MD should mostly have their own patients, ***we should have few shared encounters***." Notwithstanding this recognition, Patel then succinctly summed up Apollo's Scheme in the same March 22, 2017 email: "**<u>we try to bill under the MD whenever possible</u>**."

32.     Apollo carries out its Scheme uniformly across all of its facilities, nationwide, in at least five ways. ***First***, Apollo requires[35] all of its mid-levels across all of its facilities, nationwide, to indicate on their medical records that a physician was involved in patient encounters when, in fact, a physician never saw or sufficiently documented their involvement with the mid-level's patient. Apollo often refers to this as a mid-level "assigning" their charts to a "supervising physician." Relator witnessed and experienced this requirement being implemented in both of the Apollo emergency departments at which he worked in Georgia.

33.     Moreover, Relator confirmed through discovery in this action that Apollo uniformly implemented this same requirement across all if its facilities, nationwide. For example, as shown in the following August 8, 2013 email from Apollo Carolinas (*i.e.*, North and South Carolina) Regional Manager, Brandi Raikes Paris, to Apollo Chief Operations Officer and Executive Vice President of Operations, Roger Murray, Paris discussed Apollo's requirement (in the context of a facility located in Marion, North Carolina) that mid-levels assign their charts under

---

[35] As used throughout this Complaint whenever referencing what Apollo "requires," the term "require" means that Apollo has made the issue concerned a protocol, business practice, policy, procedure, matter of training and/or something that can be, and is, used to threaten or impose consequences if there is no compliance.

a supervising physician's name even though such physicians never saw (much less documented their involvement with) the mid-level's patient:

| | |
|---|---|
| **From**: | Brandi Paris [/O=OFFICE/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=BRAIKES] |
| **Sent**: | 8/8/2013 7:24:07 PM |
| **To**: | Roger Murray [rmurray@apollomd.com] |
| **CC**: | James Dale [jdale@apollomd.com] |
| **Subject**: | RE: Remaining 18 "problem" locations |

Anson- I have tried to reach Terri.  Dr. Wynn has 92 deficient charts and is up for suspension because of this.  I never know when she will be in the office since she works for the hospital as well.  Melanie Lehman has also been trying to reach her because the hospital has called her about the deficient charts.

Betsy Johnson- Dr. Rana has the majority of my deficiencies, and I am meeting him at BJ tonight to get him to complete the charts so that I can process them in the morning.

Bluefield- ProMed is unable to send us the missing July charts.  I have asked Dianna to go to Medical Records to get them printed so she can scan them in.  I would assume we will probably get a lot more deficiencies from this.

Marion- 125 of the July deficiencies are unassigned in the deficiency list.  I have asked Willette to go through them individually so we can list them under the provider's names.  It seems that the midlevels are not assigning the charts under a supervising physician's name, so the co-signatures are not there.  If we can get this corrected, July will be in much better shape.  I am going to be on the phone with Willette tomorrow morning to see how far she got in the list of deficiencies.  Medical Records has been printing the ProMed charts for her to scan in.  The providers will need to complete these manually because ProMed has been taken off of the hospital computers.

Lenoir- Hannah cleared around 300 deficiencies yesterday.  Most of her charts are just lacking a signature.  She will be trying to clear more of them tomorrow.

Union/Waxhaw- Pam has been working with LightSpeed and hospital IT trying to resolve the issue with the 29th-31st of July.

**Brandi Raikes Paris**
**ApolloMD**
**Carolinas Emergency Group**
**Carolinas Regional Manager**
**Betsy Johnson Hospital**
braikes@apollomd.com
910-892-1000 Ext 4193
910-527-6174 Cell
www.apollomd.com

This is also what Relator witnessed in Georgia.

34.   ***Second***, Apollo requires all of its physicians across all of its facilities, nationwide, to sign[36] mid-level medical records, again falsely suggesting that the physician treated the patient so that Apollo can submit claims to CMS based on such medical records at the full physician rate. Apollo implemented this requirement in both of the Apollo emergency departments at which Relator worked. However, Apollo admitted under oath that it knows that it "is against CMS guidelines to send charts back asking for documentation that would suggest [a provider] participated in the care of the patient if it was not initially indicated," and that Apollo "cannot prompt documentation that would suggest an increase in compensation."[37] But this is exactly what Apollo is doing by requiring physicians to co-sign mid-level medical records for patients the physicians never saw.

35.   Relator also confirmed through discovery in this action that Apollo uniformly implemented this same physician co-signing requirement across all if its facilities, nationwide and regardless of payer, to fraudulently bill for mid-level services at the full 100% physician rate. For example, in the a March 12, 2017 email

---

[36] To "sign" mid-level charts as Apollo required, physicians like Relator simply had to click the "sign" button within the EMR (electronic medical record) software. Clicking that button placed the physician's signature on all mid-level charts assigned to the physician.

[37] *See* Exhibit 63 (November 7, 2022 30(b)(6) Deposition Transcript of Casey Crane) at 99:19-100:21.

from Apollo President, Dr. Yogin Patel, to Apollo Vice President of Operations, Pat

Johnson, Dr. Patel blatantly admits Apollo's fraud at the corporate level:

> **From:** Yogin Patel [mailto:yletap@gmail.com]
> **Sent:** Sunday, March 12, 2017 3:34 PM
> **To:** Arun Mohan <amohan@apollomd.com>; Pat Johnson <pjohnson@apollomd.com>; James Dale <jdale@apollomd.com>; Sunil Pandya <spandya@apollomd.com>; Casey Crane <ccrane@apollomd.com>
> **Subject:** Fwd: SHR payroll summary Sept16-Feb17
>
> Thanks Pat.
>
> Guys, Follow up on TM payroll. We have an issue with APC encounters getting flagged as "shared visits" when there is minimal MD involvement. In these cases, we would be paying both the APC (as salary) and the MD (per encounter), even thought the visit is not really a true shared visit. As both the APC and MD should mostly have their own patients, we should have few shared encounters - however, since we try to bill under the MD whenever possible, this is confusing the issue. Pat put together a spreadsheet of our payments and patient counts to date. This is still difficult to track and impossible to tick and tie. My concern is that we really have 4 categories of patients:

> (1) **APC Patients** - No physician involvement, typically billed at 85%, and paid for by salary to APC. No incremental cost.
> (2) **MD Patients** - No APC involvement. MD does these encounters (typically H&PS or complex follow ups). These are billed under the MD and paid out as $50/encounter.
> (3) **Shared visit with APC and MD work** - These are complex patients that the APC mostly manages but may require MD to help. Both would document on these cases. This should be rare and we would pay the MD for their consultative work. The APC still needs to see 12 patients outside of these shared visits per work day. The docs likely need to document that they were asked to "assume care of this patient".
> (4) **Shared Visits with no MD work**- These are patients managed by APCs, but where the chart is signed off or billed under the MD. Since the signing MDs have little substantive work, these should not be credited to the MDs as shared visits. Currently, some of these get classified as shared visits and we have been paying these to the MD at $50/encounter.

Exhibit 40. As shown, Dr. Patel admits that Apollo uniformly submits claims for

split/shared visits to CMS under physician NPIs where the only physician

documentation contained within the mid-level's chart is a physician signature or

where "the signing MDs" otherwise "ha[d] little substantive work" or "no [] work"

with the mid-level's patients. Apollo's President knew such claims "should not be

credited to the MDs as shared visits" for physician compensation purposes, yet

Apollo billed—and fraudulently procured overpayment from—CMS as if they were.

Even worse, Dr. Patel acknowledged that Apollo pays its physicians illegal kickbacks at the rate of "$50/encounter" for merely signing mid-level charts so that Apollo could (fraudulently) submit claims based on those mid-level charts to CMS for reimbursement at the full physician rate.

36.     Further demonstrating the national uniformity of the policies Apollo used to execute its Scheme, on March 21, 2014, Apollo Chief Operations Officer and Executive Vice President of Operations, Roger Murray, confirmed to Apollo Chief Executive Officer, Mike Dolister, that Apollo has "**always required physician signatures on ED [emergency department] charts when working with mid-levels—maybe for billing, mostly**."  Exhibit 41. The subject of this email was "NP Charts in *__Arizona__*," as is shown below:

> **From:** Roger Murray
> **Sent:** Friday, March 21, 2014 1:44 PM
> **To:** Mike Dolister
> **Subject:** NP Charts in Arizona
>
> Mike, need your clinical insight on something... We're getting some resistance at Valley View re: docs supervising and signing NP charts. As I understand things, there's a fairly new NP there, Jurgen Hall, and both he and the docs are pushing back, saying that AZ doesn't require physician co-signatures. We've queued up the charts as deficient, for the physicians to sign, but seem to be at a bit of an impasse. Heidi has checked the state regulations, and while there's language about NPs being able to practice on their own (within their scope of practice), there's nothing specific to ED work, and such language often/generally pertains to in-hospital, clinic practices. And we've always required physician signatures on ED charts when working with mid-levels—maybe for billing, mostly, but I always thought there were clinical quality objectives, as well. Clinically speaking, do you feel that this is important?

Notably, Apollo's corporate representative and Executive Vice President of Clinical Support, Casey Crane, indicated under oath that she understood Mr. Murray was "referring to *__billing out__* *__under the physician instead of the nurse practitioner__*." Exhibit 62 (November 7, 2022 30(b)(6) Deposition Transcript of Casey Crane) at

117:14-23. **This amounts to an admission of fraud**—*i.e.*, Apollo has always required physician signatures on mid-level emergency department charts so that Apollo can fraudulently bill at the physician rate instead of the mid-level rate. *See* Exhibit 41.

37.    Apollo imposed this co-signing requirement at all of its facilities nationwide for "*financial reasons*" alone. Indeed, Lisa Murray, Apollo's Director of Credentialing, admitted as much to Apollo's Chief Operations Officer and Executive Vice President of Operations, Roger Murray, in March of 2014:



Exhibit 41. Apollo's policy, as stated by Lisa Murray, is entirely noncompliant, as a mid-level's services are only properly "billed at 100% of allowables"—*i.e.*, at the physician rate—when a physician performed and sufficiently documented a substantive portion of a face-to-face visit with the same patient as the mid-level (*not*

when a physician merely co-signs a mid-level chart). A co-signature is never enough to support a split/shared visit. CMS's own literature clearly explains this.[38]

38.     Fraudulently billing CMS to make more money is the only reason Apollo would do this. There is no supervisory or regulatory requirement that Apollo mandate that all of its physician sign mid-level charts in this way.[39] Instead, Apollo's *only* reason for imposing this requirement is "financial" and "for billing"—*i.e.*, to bill for the mid-levels' services "at 100% of allowables" instead of the proper 85% mid-level rate. Apollo thus submits false and fraudulent claims to government payors because Apollo bills under a physician's NPI "at 100% of allowables" *even when the signing physician never saw or sufficiently documented their involvement with the mid-level's patient.*

---

[38] *See* https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/MedQtrlyComp-Newsletter-ICN908625.pdf at 4 ("A split/shared E&M claim was submitted for payment. While the submitted documentation contained a physician's signature on the NPP's clinical note, no other documentation was made by the physician supporting that the physician performed a substantive portion of the split/shared E&M service. This claim was scored an improper payment . . . .").

[39] Indeed, Apollo admitted that it knows that "Medicare doesn't require that a physician sign a midlevel's chart for billing purposes" and that "Georgia Medicaid does not require a physician's signature on a midlevel chart." Exhibit 62 (November 7, 2022 30(b)(6) Deposition Transcript of Casey Crane) at 115:15-116:9. Relator is also unaware of any state requirement for physicians to co-sign mid-level charts. Thus, the *only* reason Apollo imposes its physician co-signing requirement is to falsely indicate physician involvement within mid-level medical records so that it can fraudulently bill Medicare and Georgia Medicaid at the upcoded physician rate for services exclusively rendered and documented by mid-level providers.

39.    ***Third***, Apollo requires all of its physicians across all of its facilities, nationwide, to use "attestations" or "macros" that misrepresent and otherwise wholly fail to sufficiently document physician involvement with the care of a mid-level's patient. "Attestations" or "macros" are pre-written statements that providers quickly add to patient medical records by simply checking a box. Apollo required Relator to use deficient attestations at the two Apollo emergency departments where he worked. And through discovery in this action, Relator confirmed that Apollo fraudulently required all its providers to check these deficient attestation boxes so that Apollo could submit split/shared claims to CMS under physician NPIs as well. Examples of such attestations Apollo uses include:

- "Case reviewed w/pt face-to-face."

- "I have performed the medical decision making for this patient and have asked the MLP to document the results."

- "I have personally seen the patient, I have performed the mdm for this patient and have asked the PA to document the results."

- "I have personally seen and examined this patient. I have fully participated in the care of this patient. I have reviewed all pertinent clinical information, including history, physical exam and plan."

- "I have performed the medical decision making for this patient, including assessing all of the patient's diagnostic testing and I have instructed the mid-level provider to document the results. I have fully participated in the care of this patient. I have

> reviewed all pertinent clinical information, including history,
> physical exam and plan with the mid-level provider."

40.     Apollo required all of its physicians to use such attestations (regardless of payer and across all Apollo facilities). In fact, these attestations came from the top down. For example, Apollo Chief Executive Officer, Dr. Michael Dolister, took part in personally developing the last two insufficient attestations identified above.[40] However, each of the above examples of Apollo's bare-bones attestations misrepresents the attesting physician's involvement with the mid-levels' patients and violates CMS requirements that the physician document a "substantive portion of the E/M visit" in order to bill and obtain payment from CMS at the 100% physician rate for a split/shared visit. Yet, Apollo required physicians to sign and attest within mid-level charts on a regular basis through the insufficient attestations quoted above or materially similar (and equally insufficient and misrepresentative) versions thereof. In fact, Apollo's goal was that *every* mid-level chart include a physician signature and/or some form of attestation. However, as Apollo's corporate representative and Executive Vice President of Clinical Support, Casey Crane,

---

[40] According to an April 5, 2012 email from Kim LeBlanc to Apollo CEO, Mike Dolister, and others. Exhibit 42.

admitted under oath, Apollo hasn't done ***anything*** to make sure that any canned text or prewritten attestations are being used appropriately by Apollo's physicians.[41]

41.     ***Fourth***, Apollo requires all of its coders and billers across all of its facilities, nationwide, to code and submit claims to Medicare and Georgia Medicaid for payment for split/shared services at the 100% physician rate based on patient medical records that Apollo knows do not sufficiently document a physician's involvement with the patient and/or misrepresent a physician's involvement with the patient. As Apollo's COO admits, these medical records are "billed under the physician NPI number," which is consistent with the admission of Apollo's President that Apollo "tr[ies] to bill under the MD whenever possible."

42.     Examples of Apollo's insufficient attestations are quoted in ¶39, above. These attestations (or substantially similar versions thereof) are all that Apollo requires a physician to document within a mid-level's medical record to bill the mid-level's services under the physician's NPI—single conclusory sentences with no supporting physician documentation of patient-specific information.

43.     In fact, Apollo even instructed <u>all</u> of its physicians, nationwide, that:

In practice, the most efficient thing may be to cruise by the patient's room and confirm the HPI and select [the attestation] "CASE REVIEWED w/pt face-to-face." If these selections are not made, then

---

[41] *See* Exhibit 62 (November 7, 2022 30(b)(6) Deposition Transcript of Casey Crane) at 164:4-9.

> the encounter will be billed as a midlevel only encounter and we will
> be reimbursed at 85 percent of standard rates.

Exhibit 43. This instruction was attached to a July 27, 2012 email from Apollo President, Dr. Yogin Patel, to Apollo physician Todd Gardner, wherein Dr. Patel also instructed Gardner to send such instructions "to all your docs/mlps and have them review…[to] ***maximize their billing***." *Id*; *see also* Exhibit 12.

44.    By submitting claims under physician NPIs to CMS when Apollo's deficient physician attestations or signatures are the only physician documentation present in the mid-level's medical record, Apollo misrepresents the physician's involvement with the patient and the services provided to CMS. These are not true split/shared visits. Apollo also knowingly violates CMS requirements that the physician perform and sufficiently document "all or some portion of the history, exam or medical decision making key components of an E/M service."[42]

---

[42] *See* MEDICARE CLAIMS PROCESSING MANUAL, Chapter 12 - Physicians/Nonphysician Practitioners, at § 30.6.13(H) (2019), available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/clm104c12.pdf (last visited July 29, 2021). Moreover, CMS made clear in a March 15, 2013 Transmittal that "physician attestations by themselves do NOT provide sufficient documentation of medical necessity, even if signed by the ordering physician." *See* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R455PI.pdf (last visited July 31, 2021) (emphasis added); *see also* MEDICARE PROGRAM INTEGRITY MANUAL, Chapter 3 – Verifying Potential Errors and Taking Corrective Actions, at § 3.3.2.1.1 (2020), available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/pim83c03.pdf (last visited July 31, 2021).

45.     Through its policies, requirements, instructions, and direct control over its coders, including Georgia Medical Business Services, Inc. (d/b/a Pettigrew Medical Business Services) (referred to herein as "Pettigrew"),[43] Apollo systematically submits claims for payment to CMS that expressly misrepresent the identity of the provider of the services and expressly and impliedly misrepresent that CMS' clear requirements and conditions for payment for split/shared services at the 100% physician rate are satisfied by the associated and supposedly supporting documentation and medical records.

46.     Apollo cannot deny that it knew it receives funds from CMS to which it is not entitled by submitting claims for reimbursement to CMS under physician NPIs pursuant to its Scheme. For example, as discussed more fully in § V.B, *infra*, Apollo received express warnings that its split/shared visit billing policies misrepresented physician involvement with the care of patients treated by mid-levels and otherwise did not comply with clear CMS requirements—including express warnings that the physician attestations relied on by Apollo to submit split/shared claims to CMS (referenced above) did not support CMS' payment of claims for split/shared services at the 100% physician rate. Nonetheless, Apollo made—and continues to make—a collective business decision to consciously ignore and

---

[43] Pettigrew has offices in Texas, Florida and North and/or South Carolina.

disregard these warnings, thereby fraudulently capturing the full 100% physician rate for mid-level services.

47.     Finally acknowledging the warnings and bringing its policies closer to what has been required by CMS since 2002, Apollo altered its split/shared visit documentation, coding, and billing policies on or around May 15, 2012. The new policy *purported* to require that physicians personally see the patient *and* perform and document a substantive part of the service, meaning the physician must perform and document a substantial portion of the history, physical examination, or medical decision making (again, what Medicare has always required). However, as explained below, nothing changed on the ground. Apollo continued to carry out its fraudulent Scheme.

48.     Still, Apollo's half-hearted attempt at a policy change amounts to an admission that its policies did not satisfy CMS requirements and otherwise misrepresented physician involvement—and that Apollo knew it all along. In fact, after Apollo discussed implementing a policy change, Apollo President, Dr. Yogin Patel, noted in a July 30, 2012 email that the number of medical records billed out under physician billing numbers decreased significantly at one facility, resulting in what Dr. Patel called a "15% paycut on those charts." Exhibit 44. Prior to the

purported policy change, Apollo was improperly reaping a 15% pay increase on mid-level charts. This 15% paycut was more than Apollo could stomach.

49.     After its purported policy change, Apollo continued to submit false and fraudulent claims under the Scheme. For example, as discussed above, in a March 12, 2017 email from Apollo President, Dr. Yogin Patel, to Apollo Vice President of Operations, Pat Johnson, Patel blatantly admits that Apollo still (even after discussions regarding a purported 2012 policy change) uniformly submits claims for split/shared visits to CMS under physician NPIs where the only physician documentation contained within the mid-level's chart is a physician signature or where the chart otherwise contained "***no MD work***."

> (1) **APC Patients** - No physician involvement, typically billed at 85%, and paid for by salary to APC. No incremental cost.
> (2) **MD Patients** - No APC involvement. MD does these encounters (typically H&PS or complex follow ups). These are billed under the MD and paid out as $50/encounter.
> (3) **Shared visit with APC and MD work** - These are complex patients that the APC mostly manages but may require MD to help. Both would document on these cases. This should be rare and we would pay the MD for their consultative work. The APC still needs to see 12 patients outside of these shared visits per work day. The docs likely need to document that they were asked to "assume care of this patient".
> (4) **Shared Visits with no MD work**- These are patients managed by APCs, but where the chart is signed off or billed under the MD. Since the signing MDs have little substantive work, these should not be credited to the MDs as shared visits. Currently, some of these get classified as shared visits and we have been paying these to the MD at $50/encounter.

Exhibit 40.

50.     Thus, the purported 2012 policy change was nothing more than a momentary correction of the years long Scheme that demonstrated the Scheme was too valuable for Apollo to give it up.

51.   **Last**, Apollo also perpetuates the Scheme by paying all of its physicians across all of its facilities, nationwide, kickbacks to sign and attest within mid-level medical records, regardless of whether the physicians participated in and sufficiently documented "all or some portion of the history, exam or medical decision making key components of an E/M service,"[44] as is required to code and bill a claim for mid-level services under a physician billing number. Relator experienced this first hand while working for Apollo and, through discovery in this action, confirmed that Apollo implements such practices across all of its facilities.

52.   Apollo intentionally obtains more money than it should through the fraudulent Scheme and then pays a small portion of the ill-gotten proceeds to its physicians.  This encourages Apollo's physicians to keep cool and continue co-signing and attesting to mid-level charts, which leads to more false claims, which leads to more kickbacks, and so on. The kickback arrangement here clearly perpetuates the Scheme, and the evidence proves it.

53.   For example, the March 12, 2017 email from Apollo President, Dr. Yogin Patel, depicted above, shows that Apollo illegally pays <u>all</u> its physicians,

---

[44] *See* MEDICARE CLAIMS PROCESSING MANUAL, Chapter 12 - Physicians/Nonphysician Practitioners, at § 30.6.13(H) (2019), available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/clm104c12.pdf (last visited July 29, 2021).

nationwide, $50 for each mid-level chart the physicians sign or in which they check the box for a (deficient and misrepresentative) attestation. Apollo uses these kickbacks to induce physicians to sign and attest within medical records, allowing Apollo to then improperly submit claims for reimbursement to CMS based on mid-level charts at the full physician rate. Thus, Apollo is inducing physicians to order services reimbursed by Medicare—namely, physician E/M services—that are not actually occurring or are otherwise unsupported by the underlying medical records.

54.    Relator's own payment history also directly reflects the fraudulent billing and the kickbacks that Apollo paid him under the Scheme. The screenshot below (from Relator's internal employee payment portal at ApolloMD.net, which all Apollo physicians across the country use) reflects the total number of patients that Relator supposedly treated with a mid-level in a given pay period at Apollo's Spalding Regional Medical Center (column labeled "Pts w/ MLP," which refers to mid-level providers). Exhibit 5. The chart also reflects the total compensation Relator received in a given pay period for supposedly treating patients with a mid-level (column labeled "$ Generated MLP Patients"). *Id.* However, Relator did not actually see a significant majority of the patients with a mid-level because physicians at Apollo facilities rarely treat patients "with a mid-level provider." Instead, Apollo simply required Relator to sign and attest to the charts prepared by mid-levels so

Apollo could bill the chart under Relator's physician NPI. Then, with the extra dollars obtained through the fraud, Apollo pays physicians a kickback. Thus, all amounts under the column labeled "$ Generated MLP Patients" on the chart below are **_proceeds from actual false claims submitted to Medicare_**, as well as illegal kickbacks that Apollo paid Relator under the Scheme—an amount totaling $97,378 in this instance—in just six months.

| Facility | Payroll Period | Pts Dr Only | Pts w/ MLP | Pts Total | % Current MOS Pts | Current MOS Pts/Hour | Dr Hours Worked | Pts/Dr Hour, Dr Only | Pts/Dr Hour, Total (Incl MLP) | $ Generated Dr Only Pts | $ Generated MLP Patients | $ Generated Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Spalding Regional Medical Center | 7/1/16 | 321 | 274 | 595 | 97.8% | 4.23 | 137.50 | 2.33 | 4.33 | $22,158 | $12,632 | $34,790 |
| Spalding Regional Medical Center | 6/1/16 | 286 | 244 | 530 | 99.8% | 4.11 | 128.50 | 2.23 | 4.12 | $18,778 | $10,603 | $29,381 |
| Spalding Regional Medical Center | 5/1/16 | 305 | 237 | 542 | 96.5% | 4.32 | 121.00 | 2.52 | 4.48 | $20,330 | $10,052 | $30,381 |
| Spalding Regional Medical Center | 4/1/16 | 372 | 314 | 686 | 99.0% | 4.28 | 158.50 | 2.35 | 4.33 | $25,673 | $13,926 | $39,599 |
| Spalding Regional Medical Center | 3/1/16 | 381 | 351 | 732 | 99.9% | 4.40 | 166.00 | 2.30 | 4.41 | $26,141 | $15,979 | $42,120 |
| Spalding Regional Medical Center | 2/1/16 | 392 | 357 | 749 | 99.3% | 4.65 | 160.00 | 2.45 | 4.68 | $26,230 | $15,723 | $41,953 |
| Spalding Regional Medical Center | 1/1/16 | 382 | 429 | 811 | 97.2% | 4.92 | 160.00 | 2.39 | 5.07 | $26,288 | $18,463 | $44,752 |

Exhibit 5.

55.    The above chart also demonstrates the impossibility of physicians *actually* treating patients with a mid-level at the frequency Apollo would like CMS to believe. Indeed, the sum of the number of patients treated by a "Dr. only" and the

number of patients treated "w/ MLP" adds up to an impossible number of patients to be seen by a single physician each month—as many as 811 patients in the month of January 2016. As Relator worked approximately 15 days per month at Apollo, that would mean Relator would have to physically treat more than 54 patients each and every shift during that month to reach 811 patients. That is not physically possible. This is called an "impossible day" analysis, a technique that auditors employ to discover or confirm billing fraud.

56.    The graphical depiction below also falsely shows that Relator often treated patients with mid-levels at Apollo's Atlanta Medical Center-South. However, Relator only treated patients with or in conjunction with a mid-level in less than 1% of cases.



Exhibit 6.

57. Apollo does not hide the fact that it pays these kickbacks. In fact, Apollo regularly acknowledges that physician chart signing is *directly* tied to compensation. For example, Apollo President, Dr. Yogin Patel, admitted in the March 12, 2017 email (excerpted below) that Apollo uniformly pays all Apollo physicians "$50" for each mid-level chart they sign, even though such physicians either did "no [] work" or "little substantive work" on the mid-level's patient.

> (1) **APC Patients** - No physician involvement, typically billed at 85%, and paid for by salary to APC. No
> incremental cost.
> (2) **MD Patients** - No APC involvement. MD does these encounters (typically H&PS or complex follow ups).
> These are billed under the MD and paid out as $50/encounter.
> (3) **Shared visit with APC and MD work** - These are complex patients that the APC mostly manages but may
> require MD to help. Both would document on these cases. This should be rare and we would pay the MD for
> their consultative work. The APC still needs to see 12 patients outside of these shared visits per work day. The
> docs likely need to document that they were asked to "assume care of this patient".
> (4) **Shared Visits with no MD work**- These are patients managed by APCs, but where the chart is signed off or
> billed under the MD. Since the signing MDs have little substantive work, these should not be credited to the
> MDs as shared visits. Currently, some of these get classified as shared visits and we have been paying these to
> the MD at $50/encounter.

Exhibit 40.

58.    As another example, in the September 25, 2014 email below from
Adrian Dawson to numerous healthcare providers, Dawson again reminds Apollo
physicians that not signing charts directly affects their paychecks (instructions Ms.
Dawson received from Apollo's Chief Operating Officer). The only reason unsigned
*mid-level* charts would affect *physician* paychecks is because Apollo was improperly
billing Medicare for the mid-level charts at the physician rate.

From: **Dawson, Adrian** ADRIAN.DAWSON@tenethealth.com
Subject: end of month/charts/closing
Date: September 25, 2014 at 10:53 AM
To: Alice Fray amfray@aol.com, Camille Miller cam79miller@gmail.com, Chionesu Sonyika drsonyika@yahoo.com, Dana Woodhall danawoodhall@yahoo.com, Demetrios Tavoulareas demtav@gmail.com, Dmowski, Andrzej a.dmowski@tenethealth.com, Dr Dmowski flerdoc@gmail.com, Dwayne Greene dgreenemd@gmail.com, Fun Fong fun.fong.jr@gmail.com, Jehangir Pirzada pirzaday@gmail.com, Jennifer Host jhostmd@gmail.com, Manish Vig manishvig@hotmail.com, Richisa Johnson-Hamilton richisa@aol.com, Robert Cox rjcox01@aol.com, Robert Hull rhullmd@yahoo.com, Swetang Desai spd4977@yahoo.com, Tony Polk tonepolk@yahoo.com, Trushnaa Patel tpatel27f@gmail.com, Wesley Leigh wesleyleigh@aol.com, Chris Pitts chrispittspac@hotmail.com, Dawn Adams daadams66@comcast.net, Dennis Short shrtdnns@aol.com, Duffy, Andrew medduff444duff@gmail.com, Greg Mccollum mccollumhugh@aol.com, Jennifer Leimbach jennifer.leimbach@msnet.edu, Mildenberger, Jason jm2848@nova.edu, Pohl, Melanie unvmel12@hotmail.com, Pryor, Anita anitapryor@att.net, Satchell, Tiffany tsatchellpac@gmail.com, Tonya Ogletree tonyaogletree@gmail.com, Young, Daniel1 danyoungpac@gmail.com

Good morning, everyone. Once again, our closing this month will be very tight and Apollo expects ALL providers to get their deficiencies and unsigned charts under control **now** and to stay that way. We currently have 300 unsigned or deficient charts, which puts us at 92%--FAR from goal! Please make sure you finish the lists I give you and clear out your message center and saved documents right away. Remember physicians, your unsigned charts DIRECTLY affect your paycheck!

Most of you are very good about this so I'm not speaking to you—THANK YOU for staying on top of things! If your list is routinely larger than a sticky note, please become better about completing your lists promptly and signing ALL of your charts at the end of your shift or at the start of your next shift. Nearly two years after going live with Cerner, we are expected to be the example for the facilities that have just switched to it….and we are not setting a very good one.

Please let me know if there is any reason you cannot complete your charts before the end of the month, as I must report that to ApolloMD.

Thank you,
Adrian Dawson
ApolloMD Group Coordinator
Spalding Regional Hospital
601 S. 8th St
Griffin, Georgia 30224
Office: 770.228.2721, x2150
Fax: 770.467.6138
adrian.dawson@tenethealth.com

Exhibit 45. And Ms. Dawson further instructed numerous healthcare providers on September 26, 2013 that charting affects *everyone's* paychecks and reminded the providers that she reports back "to ApolloMD" if they do not obey Apollo's instructions.

From: **Dawson, Adrian** ADRIAN.DAWSON@tenethealth.com
Subject: **Month end closing**
Date: September 26, 2013 at 12:34 PM
To: Alice Fray amfray@aol.com, Boykin Robinson brobinson@apollomd.com, Camille Miller cam79miller@gmail.com,
Charles Chandler chrlschandler@yahoo.com, Chionesu Sonyika drsonyika@yahoo.com, Denis Kim denisjkim@yahoo.com,
Fun Fong fun.fong.jr@gmail.com, Jennifer Host jhostmd@gmail.com, Lynn Flowers lflowers@apollomd.com, Marlon Fisher
mfisher6@hotmail.com, Mike Webb mwebbkay@aol.com, Richisa Johnson-Hamilton richisa@aol.com, Robert Cox
rjcox01@aol.com, Robert Hull rhullmd@yahoo.com, Shannon Howell showell727@yahoo.com, Swetang Desai
spd4977@yahoo.com, Theltonia Howard thelhoward@yahoo.com, Tony Polk tonepolk@yahoo.com, Trushnaa Patel
tpatel27@gmail.com, Wesley Leigh wesleyleigh@aol.com, Chris Pitts chrispittspac@hotmail.com, Dawn Adams
daadams66@comcast.net, Kacie Jones kacieleigh1@aol.com, Leimbach, Jennifer jennifer.leimbach@lmunet.edu, Pohl, Melanie
unvmel12@hotmail.com, Pryor, Anita anitapryor@att.net, Satchell, Tiffany tsatchellpac@gmail.com, Scott Anderson
seapac65@yahoo.com, Short, Dennis shrtdnns@aol.com, Stephanie Jackson stephanieb.jackson@yahoo.com, Tonya Ogletree
tonyaogletree@gmail.com, Young, Daniel1 danyoungpac@gmail.com

---

Good afternoon, everyone. I was on a conference call this morning with the Group Coordinator supervisors and Roger Murray, ApolloMD's COO. They all stressed that this month-end closing will be particularly tight due to the way the dates fall. ==Your paychecks as well as everyone else's in the company directly relate to how much money is brought in, which is directly tied to charting.== Therefore, it is *extremely* important that we get all September charts completed and coded as soon as possible, and EVERY chart should be complete before next Wednesday, October 2nd, so the coders have time to code them. Please check your message center and saved documents before you leave each shift, and complete any lists I give you the day I give them to you. Most of you are very good about this, and I appreciate it! For those of you with longer lists, please work on completing them NOW so the coders are not deluged at the last minute, and work to keep your charts current between now and the end of the month.

Thank you,
**Adrian Dawson**
ApolloMD Group Coordinator
Spalding Regional Hospital
601 S. 8th St
Griffin, Georgia 30224
Office: 770.228.2721, x2150
Fax: 770.467.6138
adrian.dawson@tenethealth.com

Exhibit 46.

59.   If Apollo followed all applicable rules and requirements, it would not require physicians to sign mid-level charts for patients only substantively seen by mid-levels. Indeed, this carelessly and unnecessarily exposes physicians to litigation risk that might arise from the mid-level services over which the physicians had no control or input. This fact was even recognized by Apollo Director of Credentialing,

Lisa Murray. For example, in a March 21, 2014 email, Lisa Murray pointed out that "[m]aybe the physicians don't want to co-sign because if there is a lawsuit it would name them too. Maybe it isn't just work load but a liability issue for them too." Exhibit 41.

60.    However, Apollo would only receive 85% of the physician's rate in reimbursement from CMS if it abided by CMS requirements. *See, e.g.*, 42 U.S.C. § 1395l(a)(1)(O); 42 C.F.R. §§ 405.520(a), 414.52(d), 414.56(c). Knowing that, Apollo chooses profits over following the law and protecting its physicians.

61.    For example, in a November 18, 2014 email from John Snyder, Apollo Assistant Revenue Cycle Director, Snyder recommended continuing a certain private payer billing practice because "we are actually being reimbursed more than our contracted rate." Exhibit 47. Apollo Credentialing Specialist, Michelle Krueger, then responded to Snyder's email on the same day, further demonstrating Apollo's profit-driven culture, by stating "I agree that **we want to bill in a way that will be the most profitable**." *Id*. Notably, Apollo's corporate representative and Vice President of Revenue Cycle admitted under oath that it would be *inappropriate* for Apollo to bill in a way that will be the most profitable.[45]

---

[45] Exhibit 65 (March 31, 2022 30(b)(6) Deposition Transcript of Tennille Lizarraga) at 167:12-16.

62.     Thus, Apollo intentionally and/or knowingly submits false claims to government payors under the Scheme because it intends to receive this additional 15% by falsely indicating that split/shared visits occurred—which it falsely indicates by requiring physicians to sign and/or attest within *all* mid-level charts. Then, fueling the Scheme, Apollo uses part of this 15% in ill-gotten gains to pay its physicians the illegal kickbacks referenced above, incentivizing the chart-signing and attesting and arguably appeasing any physicians concerned with the increased risk exposure. Importantly, Apollo would not be paying its physicians these kickbacks unless Apollo itself was receiving the fraudulently-obtained 15% in split/shared visit reimbursements under the Scheme.

63.     To appear compliant and to enable Apollo to feign ignorance regarding how its medical records are coded, Apollo uses supposed "outside" coders such as Pettigrew to code its medical records.[46] However, Apollo instructed such coders to fraudulently code Apollo medical records to guarantee that Apollo received the highest reimbursement amounts from CMS. For example, in a January 26, 2018

---

[46] For example, apparently attempting to remove itself from its own fraudulent Scheme, Apollo represented to the Court that "Defendants utilize a professional third party, Pettigrew [*sic*] Medical Business Services, to review physician and APP charts and assign the appropriate billing codes, including whether to submit the claim under the physician's or APP's NPI." Doc. 88 at 6. Pettigrew had offices in Texas, Florida and North and/or South Carolina.

email from Adrian Soll, Pettigrew Assistant Director of International Coding, Soll reported the following to Apollo executives:

> Per our conversation this morning, we will instruct our coders to assign provider credit based on the disposition ***even if the documentation otherwise does not meet CMS criteria to give credit to the physician***. **This is done at Apollo's directive.**

Exhibit 48.

64.    Although Apollo would like to pass the blame to its outside coders, Apollo knows that it is responsible for any false claims it submitted, especially considering that: (1) ***Apollo*** (not its vendor(s)) ultimately submits all claims for reimbursement to Medicare and Georgia Medicaid; and (2) Apollo admitted under oath that it ***never*** implemented any sort of compliance program to ensure that the split/shared claims it submitted to Medicare and Georgia Medicaid complied with all CMS requirements.[47] Apollo even agreed under oath, through its corporate representative on coding, that "if something is done wrong with the coding or the reimbursement amounts, then the buck stops with ApolloMD."[48] Moreover, Apollo

---

[47] *See* Exhibit 62 (November 7, 2022 30(b)(6) Deposition Transcript of Casey Crane) at 86:11-18, 153:7-154:21, 160:17-161:4.
[48] *See* Exhibit 62 (November 7, 2022 30(b)(6) Deposition Transcript of Casey Crane) at 107:19-23.

admitted under oath that (1) it instructs its coders how to code;[49] and (2) Pettigrew (its coding company) is Apollo's agent.[50]

65.    It could not be clearer that Apollo coded and billed all claims for reimbursement it submitted to CMS (*i.e.*, Medicare and the Medicaid system of the State of Georgia) under physician NPIs across all of its facilities despite the fact that the underlying medical records "d[id] not meet CMS criteria to give credit to the physician."[51] In fact, Relator confirmed that Apollo submitted **actual false claims** to Medicare for services purportedly rendered within Apollo's emergency departments in the States of Florida, North Carolina, Virginia, South Carolina, Pennsylvania, Tennessee, Alabama, California, Delaware, and Georgia. Below are screenshots of Apollo's internal claims data reflecting these false claims. For example, Apollo improperly submitted each of the claims below to Medicare under physician NPIs/billing numbers (the "Rendering Provider" within the claims data reflects the provider whose billing number Apollo submitted on the actual claim form to Medicare), as follows:

---

[49] *See* Exhibit 65 (March 31, 2022 30(b)(6) Deposition Transcript of Tennille Lizarraga) at 172:16-24, 189:14-17.
[50] Exhibit 66 (October 12, 2022 30(b)(6) Deposition Transcript of Tim Stowe) at 36:18-20; *see also id.* at 38:4-9.
[51] Apollo submits claims for reimbursement to Medicare and state Medicaid systems itself.

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NOVANT HEALTH THOMASVILLE MEDICAL CENTER (ER) | MEDICARE-NC (MEDICARE) | ▓ | ▓ | 99285 | 1407203888 | MD | TACKETT, JONATHAN | 1477594554 | PA | WASHINGTON, GREGORY | 3/12/21 | 1400 | 140.92 |

Exhibit 19A (showing how Apollo billed North Carolina Medicare for the mid-level services reflected within the medical record in Exhibit 19).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CHIPPENHAM HOSPITAL (ER) | MEDICARE-VA (MEDICARE) | ▓ | ▓ | 99283 | 1720185549 | MD | CHANG, NEVAN | 1770019523 | | GONZALEZ, MELISSA | 3/31/18 | 505 | 48.97 |

Exhibit 20A (showing how Apollo billed Virginia Medicare for the mid-level services reflected within the medical record in Exhibit 20).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LEHIGH REGIONAL MEDICAL CENTER (ER) | MEDICARE-FL (MEDICARE) | ▓ | J▓ | 99283 | 1063458214 | MD | MARIN, ALBERTO | 1689910036 | PA | CHAN, TONY | 9/17/17 | 505 | 51.96 |

Exhibit 21A (showing how Apollo billed Florida Medicare for the mid-level services reflected within the medical record in Exhibit 21).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SAINT FRANCIS HOSPITAL - BARTLETT (ER) | MEDICARE-TN (MEDICARE) | T▓ | C▓ | 99283 | 1528382199 | MD | MAY, WILLIAM | 1992121834 | PA | BATES, RACHEL | 5/6/19 | 505 | 47.02 |

Exhibit 22A (showing how Apollo billed Tennessee Medicare for the mid-level services reflected within the medical record in Exhibit 22).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CORNERSTONE MEDICAL CENTER (ED) | MEDICARE-GA (MEDICARE) | P▓ | W▓ | 99283 | 1134480866 | MD | RACKERS, SARAH | 1245535715 | PA | RAY, JULIANNE | 4/21/17 | 505 | 48.38 |

Exhibit 23A (showing how Apollo billed Georgia Medicare for the mid-level services reflected within the medical record in Exhibit 23).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EASTON HOSPITAL (ER) | MEDICARE-PA (MEDICARE) |  | B | 99285 | 1376761163 | MD | ELIJOVICH, MATIAS | 1710930144 | PA | HARRIMAN, WILLIAM | 1/9/18 | 1180 | 136.97 |

Exhibit 24A (showing how Apollo billed Pennsylvania Medicare for the mid-level services reflected within the medical record in Exhibit 24).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JFK MEMORIAL HOSPITAL (ER) | MEDICARE-CA NORTHERN (MEDICARE) |  | G | 99285 | 1669578357 | MD | JOHNSON, MARK | 1447355474 | PA | DERUM, JAMES | 2/28/18 | 1180 | 138.75 |

Exhibit 25A (showing how Apollo billed California Medicare for the mid-level services reflected within the medical record in Exhibit 25).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NANTICOKE MEMORIAL HOSPITAL (ER) | MEDICARE B-DE: NOVITAS SOLUTIONS MEDICARE DELAWARE | A | H | 99284 | 1639392296 | DO | FINNERTY, SEAN | 1518975929 | PA | DAVIDSON, MICHAEL | 3/17/19 | 790 | 95.33 |

Exhibit 26A (showing how Apollo billed Delaware Medicare for the mid-level services reflected within the medical record in Exhibit 26).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PROVIDENCE HEALTH NORTHEAST (ER) | MEDICARE B-SC: PALMETTO GBA | L | G | 99284 | 1235354010 | MD | SHAW, KATHRYN | 1265434088 | NP | ROWLAND, MELISSA | 7/29/19 | 790 | 89.48 |

Exhibit 27A (showing how Apollo billed South Carolina Medicare for the mid-level services reflected within the medical record in Exhibit 27).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SOUTH BALDWIN REGIONAL MEDICAL CENTER (ER) | MEDICARE-AL (MEDICARE) | ███ | W████ | 99285 | 1093769648 | DO | BEAZLEY, WILLIAM | 1942200290 | NP | OUZTS, KATHLEEN | 6/11/20 | 1400 | 136.1 |

Exhibit 28A (showing how Apollo billed Alabama Medicare for the mid-level services reflected within the medical record in Exhibit 28).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LEHIGH REGIONAL MEDICAL CENTER (ER) | MEDICARE-FL (MEDICARE) | C███ | S██ | 99282 | 1265454920 | MD | OBREGON, ALAN | 1184055121 | PA | RAMOS, PEDRO | 12/26/18 | 336 | 34.2 |

Exhibit 29A (showing how Apollo billed Florida Medicare for the mid-level services reflected within the medical record in Exhibit 29).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CAROMONT REG MED CTR - MOUNT HOLLY (ER) | MEDICARE-NC (MEDICARE) | S██ | ███ | 99284 | 1003037359 | MD | COLE, IAN | 1538340641 | | HENDERSON, KIMBERLY | 12/30/19 | 935 | 90.78 |

Exhibit 30A (showing how Apollo billed North Carolina Medicare for the mid-level services reflected within the medical record in Exhibit 30).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LENOIR MEMORIAL HOSPITAL (ER) | MEDICARE-NC (MEDICARE) | J██ | S██ | 99282 | 1134269020 | MD | COTTEN, AARON | 1861931180 | PA | SLONOPAS, ALEXANDER | 2/23/18 | 336 | 31.93 |

Exhibit 31A (showing how Apollo billed North Carolina Medicare for the mid-level services reflected within the medical record in Exhibit 31).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SCOTLAND MEMORIAL HOSPITAL (ER) | MEDICARE-NC (MEDICARE) | ███ | H██ | 99284 | 1053343293 | DO | DUPLER, RONALD | 1750685244 | PA | MCBRYDE, JAMES | 5/7/18 | 790 | 64.09 |

Exhibit 32A (showing how Apollo billed North Carolina Medicare for the mid-level services reflected within the medical record in Exhibit 32).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SPALDING REGIONAL MEDICAL CENTER (ER) | MEDICARE-GA (MEDICARE) | C███ | █████ | 99282 | 1073633657 | MD | SONYIKA, CHIONESU | 1679839500 | PA | DUFFY, ANDREW | 6/20/18 | 336 | 32.59 |

Exhibit 33A (showing how Apollo billed Georgia Medicare for the mid-level services reflected within the medical record in Exhibit 33).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SPALDING REGIONAL MEDICAL CENTER (ER) | MEDICARE-GA (MEDICARE) | L███ | W███ | 99283 | 1073633657 | MD | SONYIKA, CHIONESU | 1285157883 | UNDEFINED | MAKIN, SHANNON | 8/24/18 | 505 | 48.81 |

Exhibit 34A (showing how Apollo billed Georgia Medicare for the mid-level services reflected within the medical record in Exhibit 34).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SPALDING REGIONAL MEDICAL CENTER (ER) | MEDICARE-GA (MEDICARE) | L███ | C███ | 99282 | 1073633657 | MD | SONYIKA, CHIONESU | 1679839500 | PA | DUFFY, ANDREW | 3/12/18 | 336 | 0 |

Exhibit 35A (showing how Apollo billed Georgia Medicare for the mid-level services reflected within the medical record in Exhibit 35).

66.     Apollo submitted all the foregoing claims to Medicare under *physician* billing numbers. However, Apollo *should* have submitted all those claims under *mid-level* billing numbers (**for 15% less money**) because the underlying medical records relating to each of the foregoing claims show that a mid-level—**not a physician**—

performed the substantive portion of the visit with the patient. For several of these claims, a physician expressly indicated within the medical record that he or she *did not see the patient*, yet Apollo billed under the physician anyways. *See* Exhibits 19 through 23A.

67.     Given the foregoing, Apollo cannot reasonably contend that it relied on Pettigrew or any other outside coders to code its medical records in compliance with all applicable laws and requirements. Instead, Apollo specifically instructed  its coders to code its medical records so that Apollo could fraudulently submit claims for reimbursement to CMS at the premium 100% physician rate by misrepresenting physician involvement—thereby obtaining millions of dollars to which it <u>knew</u> it was not entitled. In fact, Apollo admitted under oath that (1) Apollo has ***never*** had a "compliance program aimed at ensuring compliance with split/shared visit documentation;" (2) Apollo knows that if it decided to conduct regular chart reviews or audits, it would be made aware of any improperly submitted claims; and (3) Apollo has never performed any regular chart reviews or audits to ensure that it is properly submitting claims under physician billing numbers as opposed to mid-level billing numbers.[52]

---

[52] *See* Exhibit 62 (November 7, 2022 30(b)(6) Deposition Transcript of Casey Crane) at 86:11-18, 153:7-154:21, 160:17-161:4.

68.     Apollo has been able to successfully operate its Scheme for so many years partly because claims for reimbursement submitted to CMS are submitted on an honor system. For each claim for reimbursement Apollo submits to CMS, the underlying medical record supporting such claim stays locked behind Apollo's doors unless and until CMS audits Apollo's claim for reimbursement by requesting such medical record. However, as Apollo knows[53] and banks on, "among the almost 1 billion claims processed and paid every year, fewer than 3 tenths of 1 percent receive any sort of medical record review. Put another way, 99.7 percent of all FFS Medicare claims are processed and paid within 17 days without any medical record review."[54] CMS has also recently noted that "[c]urrently, we cannot identify through claims that a visit was performed as a split (or shared) visit, which means that we could know that a visit was performed as a split (or shared) visit only through medical

---

[53] For example, Apollo's Director of Revenue Cycle Management and corporate representative, Tim Stowe, agreed under oath Apollo knows that Medicare processes claims based on the honor system in that Medicare does not review each and every claim Apollo submits to ensure they were properly submitted. *See* Exhibit 66 (October 12, 2022 30(b)(6) Deposition Transcript of Tim Stowe) at 72:2-10. Apollo's Vice President of Revenue Cycle Operations and corporate representative, Tennille Lizarraga, similarly agreed under oath that Apollo knows that in many scenarios, Medicare and Georgia Medicaid pay Apollo based on the claim Apollo submits "without reviewing the underlying medical record" for compliance. *See* Exhibit 65 (March 31, 2022 30(b)(6) Deposition Transcript of Tennille Lizarraga) at 114:20-115:1; *see also id.* at 115:2-9.

[54] *See* CMS SOURCES SOUGHT NOTICE – USING ADVANCED TECHNOLOGY IN MEDICAL REVIEW (Jan. 5, 2021), available at https://sam.gov/opp/cb630fc46d0f42fea069ce8a461957bc/view?keywords=&sort=-modifiedDate&index=opp&is_active=true&page=1&organization_id=100075508 (last visited Aug. 1, 2021).

record review."[55] This has been known as the "pay-and-chase" system or "pass-through" claims for reimbursement—and it is the system of secrecy that Apollo relies on to operate its Scheme in the dark.

69.     Apollo's Scheme causes the knowing and/or intentional submission of illegal and false claims for reimbursement pursuant to which claims Apollo receives funds to which it knows it is not entitled. It defrauds federal and state health care programs on a nationwide basis. And, it costs taxpayers significant sums of money each year. In this action, Relator seeks recovery of damages and civil penalties under the federal False Claims Act and similar state laws on behalf of the United States of America and the State of Georgia arising from Apollo's perpetration of the Scheme.

## II.    PARTIES

### A.   RELATOR CHIONESU SONYIKA, M.D.

70.     Relator CHIONESU SONYIKA, M.D., is a citizen of the United States, who currently resides in Georgia. Dr. Sonyika is currently licensed to practice medicine in Georgia and North Carolina. He is certified by the American Board of Emergency Medicine (ABEM) and was residency-trained specifically in emergency medicine. He brings this *qui tam* action based upon direct and unique information

---

[55] *See* CMS CY 2022 MEDICARE PHYSICIAN FEE SCHEDULE PROPOSED RULE (Jan. 5, 2021) at 254, available at https://public-inspection.federalregister.gov/2021-14973.pdf (last visited Aug. 1, 2021).

obtained during his employment in the emergency department at the Atlanta Medical Center-South in Atlanta, Georgia and Spalding Regional Medical Center in Griffin, Georgia, where he worked from 2010 to 2018 as an independent contractor physician for Apollo. Through his work at these Apollo-managed emergency departments, Dr. Sonyika has acquired direct personal knowledge of and non-public information about Apollo's fraudulent billing for reimbursement from federal and state healthcare payers.

## B.   DEFENDANTS

71.    Defendants are a system of affiliated entities controlled by the same individuals and entities, operating out of the same principal office, and collectively referred to herein as "Apollo."[56] Apollo is a privately-held, physician-led national group practice that provides staffing and management services to hospitals in the United States, specifically in the areas of emergency medicine, hospital medicine, radiology, and anesthesiology. Apollo is headquartered in Atlanta, Georgia, and has a presence in at least the States of Georgia, Alabama, Mississippi, Florida, Tennessee, Texas, North Carolina, South Carolina, Illinois, Indiana, Ohio,

---

[56] There is a unity of interest and ownership among all Defendants in this action that makes their separate personalities no longer exist. Further, an inequitable result would flow from treating Defendants separately. Defendants also abused their corporate forms to insulate themselves from False Claims Act violations committed by subsidiaries.

Pennsylvania, Virginia, West Virginia, Louisiana, Iowa, and Arizona. It partners with several major health systems and over 140 individual hospitals and surgery centers nationwide. Apollo employs over 2,000 clinical workers, primarily as independent contractors.

72.    Defendant APOLLOMD BUSINESS SERVICES, LLC, is a Georgia limited liability company that maintains its principal place of business and principal office at 5665 New Northside Drive, Suite 320, Atlanta, Georgia, 30328.

73.    Defendant, INDEPENDENT PHYSICIANS RESOURCE, INC., is a subsidiary of ApolloMD Business Services, LLC, that is incorporated in Georgia and maintains its principal place of business and principal office at 5665 New Northside Drive, Suite 320, Atlanta, Georgia, 30328.

74.    Defendant, APOLLOMD, INC., is a subsidiary of both ApolloMD Business Services, LLC, and Independent Physicians Resource, Inc., that is incorporated in Georgia and maintains its principal place of business and principal office at 5665 New Northside Drive, Suite 320, Atlanta, Georgia, 30328.

75.    Defendant, APOLLOMD HOLDINGS, LLC, is a subsidiary of both ApolloMD Business Services, LLC, and Independent Physicians Resource, Inc., that is organized under the laws of Georgia and maintains its principal place of business at 5665 New Northside Drive, Suite 320, Atlanta, Georgia, 30328.

76.     Defendant, PAYMENTSMD, LLC, is a subsidiary of both ApolloMD Business Services, LLC, and Independent Physicians Resource, Inc., that is organized under the laws of Georgia and maintains its principal place of business and principal office at 5665 New Northside Dr., Suite 320, Atlanta, Georgia, 30328.

77.     Defendant, APOLLOMD GROUP SERVICES, LLC, is a subsidiary of both ApolloMD Business Services, LLC, and Independent Physicians Resource, Inc., that is organized under the laws of Georgia and maintains its principal place of business and principal office at 5665 New Northside Dr., Suite 320, Atlanta, Georgia, 30328.

78.     Defendant, APOLLOMD PHYSICIAN PARTNERS, INC., is a subsidiary of both ApolloMD Business Services, LLC, and Independent Physicians Resource, Inc., that is incorporated in Georgia and maintains its principal place of business and principal office at 5665 New Northside Dr., Suite 320, Atlanta, Georgia, 30328.

79.     Defendant APOLLOMD PHYSICIAN SERVICES FL, LLC, is a subsidiary of both ApolloMD Business Services, LLC, and Independent Physicians Resource, Inc., that is organized under the laws of Florida and maintains its principal place of business and principal office at 5665 New Northside Dr., Suite 320, Atlanta, Georgia, 30328.

80.    Defendant, GEORGIA EMERGENCY GROUP, LLC, is a subsidiary of both ApolloMD Business Services, LLC, and Independent Physicians Resource, Inc., that is organized under the laws of Georgia and maintains its principal place of business and principal office at 5665 New Northside Drive, Suite 320, Atlanta, Georgia, 30328.

81.    Because Apollo is a privately held company that consists of multiple business entities, other Apollo-related entities, including parents, subsidiaries, and affiliates, may also be involved in the fraudulent Scheme alleged herein. However, such involvement of other Apollo-related entities cannot be discerned based on public information or other information available to Relator, absent further discovery.

## III.    VENUE, CONDITIONS PRECEDENT, AND JURISDICTIONAL ALLEGATIONS

82.    This Court has jurisdiction over this action under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331 and 1345 because this civil action arises under the laws of the United States.

83.    Relator brings this action under the FCA, 31 U.S.C. § 3729 *et. seq.*, to recover treble damages, civil penalties, and costs of suit, including reasonable attorneys' fees and expenses. Relator has authority to bring this action and these claims on behalf of the United States pursuant to 31 U.S.C. §§ 3730(b) and

3730(e)(4), and Relator has satisfied all conditions precedent to participate as Relator. Pursuant to <u>31 U.S.C. § 3730(e)(4)(A)</u>, the allegations contained herein have not been publicly disclosed as defined by the FCA, or alternatively, Relator qualifies as an "original source" within the meaning of <u>31 U.S.C. § 3730(e)(4)(A)</u> and <u>(B)</u>. Pursuant to 31 U.S.C. 3730(e)(4)(B), Relator has voluntarily provided in writing to the Attorney General of the United States and the United States Attorney's Office for the Southern District of Florida, prior to filing this complaint, substantially all material evidence and information in Relator's possession upon which these allegations are based. In accordance with <u>31 U.S.C. § 3730(b)(2)</u>, Relator served the United States pursuant to <u>Federal Rule of Civil Procedure 4</u> prior to filing his original complaint.

84.     This Court has jurisdiction over Relator's state law claims pursuant to <u>31 U.S.C. § 3732</u>, as those claims arise from the same transaction or occurrence as Relator's claim under § 3729. Additionally, this Court has supplemental jurisdiction over Relator's state law claims pursuant to <u>28 U.S.C. §1367(a)</u>, as those claims form part of the same case or controversy under Article III of the United States Constitution as Relator's claim under the federal FCA. Relator has complied with all state law procedural requirements, including service upon the appropriate state Attorneys General prior to filing this action.

85.     This Court may exercise personal jurisdiction over Apollo because Apollo voluntarily submitted to this Court's personal jurisdiction by seeking to have and causing venue of this action to be transferred to this Court. Further, Defendants reside within the State of Georgia. *Id.* Moreover, Apollo purposefully directs its services at the State of Georgia, thereby purposefully availing itself of the privilege of conducting business within the State of Georgia and invoking the benefits and protections of its laws. This action arises out of that conduct in addition to Apollo's conduct in all other states in which it operates. This Court's exercise of jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.

86.     Venue is proper in in this District as Defendants have conceded the same by seeking to have and causing venue of this action to be transferred to this District. Further, Apollo can be found in, resides in, transacts, and/or has during the relevant time period transacted substantial business in this judicial District. Additionally, one or more of the Defendants committed acts proscribed by 31 U.S.C. § 3729 in this judicial District by perpetrating the Scheme described herein within this District.

## IV.   <u>MEDICARE AND MEDICAID PROGRAMS</u>

### *The Medicare Program and Federal Administration*

87.    Medicare[57] is a federally funded program administered by CMS[58] that provides "nearly every American 65 years of age and older a broad program of health insurance designed to assist the nation's elderly to meet hospital, medical, and other health costs."[59] As of 2021, 61.5 million Americans were enrolled in Medicare.[60] Medicare is funded in part by taxpayer revenue. In 2018, Medicare spending totaled $750.2 billion and accounted for 21% of the total healthcare spending in the United States.[61] Unfortunately, "[f]raud and systematic overcharging are estimated at roughly $60 billion, or 10 percent, of Medicare's costs every year."[62]

88.    Medicare is comprised of three primary insurance programs—

---

[57] Medicare is the popular name for the Health Insurance for the Aged and Disabled Act, which is title XVIII of the Social Security Act.

[58] CMS is part of the Department of Health and Human Services ("DHHS").

[59] CMS, MEDICARE GENERAL INFORMATION, ELIGIBILITY, AND ENTITLEMENT MANUAL, pub. 100-01, Ch. 1 § 10 (2015), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/ge101c01.pdf (hereinafter "MEDICARE GENERAL INFORMATION MANUAL").

[60] And as of 2021, 14% of Americans enrolled in Medicare were under the age of 65 (as Medicare also covers individuals under the age of 65 that have certain disabilities).

[61] NHE FACT SHEET, https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/nationalhealthexpenddata/nhe-fact-sheet.html (last visited Sept. 11, 2020).

[62] Reed Abelson & Eric Lichtblau, *Pervasive Medicare Fraud Proves Hard to Stop*, N.Y. TIMES, Aug. 15, 2014, http://www.nytimes.com/2014/08/16/business/uncovering-health-care-fraud-proves-elusive.html.

Medicare Parts A, B and D—that cover different types of healthcare needs.[63] Medicare Part A (Hospital Insurance) covers institutional care such as inpatient hospital care, nursing services, drugs and biologicals necessary during an inpatient stay, and other diagnostic or therapeutic services.[64] Medicare Part B (Supplementary Medical Insurance) covers non-institutional care such as physician services, medical equipment and supplies, and services performed by qualified mid-levels under the supervision of a physician.[65] Medicare Part D (Drug Coverage) covers the cost of prescription drugs.[66]

89.     Under Medicare's programs, the federal government reimburses healthcare providers for their labor and medical decision-making on a fee-for-service basis according to predetermined fee schedules, including the Medicare Physician Fee Schedule ("MPFS"), which establishes annual rates for more than 10,000

---

[63] Medicare also includes Medicare Part C (also called Medicare Advantage), which is not a separate benefit, but a program whereby private companies approved by Medicare provide coverage under Medicare Part A and Part B. *See* HOW DO MEDICARE ADVANTAGE PLANS WORK?," https://www.medicare.gov/sign-up-change-plans/medicare-health-plans/medicare-advantage-plans/how-medicare-advantage-plans-work.html (last visited Dec. 12, 2016).

[64] CMS, MEDICARE BENEFIT POLICY MANUAL, pub. 100-02, Ch. 1, Table of Contents (2014), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c01.pdf (hereinafter "MEDICARE BENEFIT POLICY MANUAL").

[65] MEDICARE GENERAL INFORMATION MANUAL at Ch. 1 § 10.3. Medicare Part B also covers emergency department services. *See* MEDICARE.GOV, EMERGENCY DEPARTMENT SERVICES, https://www.medicare.gov/coverage/emergency-dept-services.html (last visited Mar. 10, 2016).

[66] MEDICARE.GOV, DRUG COVERAGE (PART D), https://www.medicare.gov/part-d/ (last visited Mar. 29, 2016).

services provided by physicians and other healthcare professionals.[67] The rates established in the MPFS correspond to specific five-digit codes associated with each medical procedure or service provided. The American Medical Association publishes these Current Procedural Terminology ("CPT") codes annually.

90.    The process by which healthcare services are submitted and reimbursed involves several steps and various entities. First, physicians and mid-levels must clearly and sufficiently document patient encounters in their medical charts. To ensure that documentation is clear and complete, CMS developed specific documentation guidelines that it requires healthcare providers to use—*e.g.*, the 1995 Documentation Guidelines for Evaluation and Management Services and 1997 Document Guidelines for Evaluation and Management Services.[68] Through the Evaluation and Management ("E/M") documentation process, providers document

---

[67] *See* CMS, HOW TO USE THE SEARCHABLE MEDICARE PHYSICIAN FEE SCHEDULE (MPFS) at 1 (Apr. 2014), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/How_to_MPFS_Booklet_ICN901344.pdf. CMS also has fee schedules for ambulance services, clinical laboratory services, and durable medical equipment, prosthetics, orthotics and supplies. FEE SCHEDULES – GENERAL INFORMATION, https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/FeeScheduleGenInfo/index.html?redirect=/feeschedulegeninfo (last visited Dec. 12, 2016).
[68] Providers may use either the 1995 or the 1997 Guidelines, but not a combination of the two.

their medical decision-making and care during a patient encounter so that coders can translate those services into the required CPT codes for billing purposes.[69]

91.    In addition to selecting the appropriate CPT codes, the coder must identify the appropriate provider who provided the services based on the documentation in the medical record such that a claim for reimbursement can be submitted based on that provider's National Provider Identifier ("NPI") and the Provider Transaction Access Number ("PTAN"). The NPI identifies the individual healthcare provider that performed the services to be reimbursed. The PTAN identifies the practice group or company for whom the provider works.

92.    Congress directed the Secretary of Health and Human Services to "prescribe such regulations as may be necessary to carry out the administration of" Medicare, 42 U.S.C. § 1395hh(a)(1), and to "establish a uniform procedure coding system" for reimbursable services. *Id.* at § 1395w-4(c)(5). The Secretary did so by adopting the CPT code set drafted by the American Medical Association. 45 C.F.R. §162.1002. Medicare claims must be submitted through a Medicare Administrative

---

[69] *See* CMS, EVALUATION AND MANAGEMENT SERVICES GUIDE at 3-5 (November 2014), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/eval_mgmt_serv_guide-ICN006764.pdf.

Contractor ("MAC")[70] on a CMS Form 1500[71] (or its electronic equivalent) that includes the provider (NPI) and services rendered (CPT code). Each CPT code corresponds to a different level of service and is used by MACs to reimburse providers the appropriate amount depending on the code submitted. The CPT Code Book adopted by Medicare has always directed those submitting bills to select the code that accurately identifies the service performed and required that all services be adequately documented in the patient's medical record. Thus, the CPT code submitted represents that the provider performed the services associated with that number in the AMA's CPT code set.

93.    CMS reimburses different types of healthcare providers at different rates. For example, as discussed in detail below, CMS reimburses mid-levels at 85% of the full physician rate under federal statute and CMS requirements. *See* 42 U.S.C. § 1395l(a)(1)(O); 42 C.F.R. §§ 405.520(a), 414.52(d), 414.56(c). As such, any claim submitted to CMS must include the appropriate provider's NPI to avoid improper billing, as the NPI triggers the billing rate for any particular E/M service. As referenced above, once the coder has assigned the appropriate CPT codes and

---

[70] MACs are typically private insurance companies that have been contracted by the federal government to process medical claims, and are responsible for the majority of enforcement efforts when it comes to Medicare claims.

[71] *See* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1500.pdf (CMS Form 1500) (last visited Aug. 7, 2021).

NPI for a particular patient encounter, the claim is submitted to a fiscal intermediary called a MAC based on geographical location. The MAC then processes the claims it receives and reimburses the provider according to Medicare's fee schedule.

94.     With each claim Apollo submits to CMS—which it submits on a CMS Form 1500 or its electronic equivalent—Apollo represents at least the following to CMS:

- The identity of the provider who rendered the claimed services, identified by the NPI;

- The "information on this form is true, accurate and complete";

- Apollo "familiarized [it]self with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor;

- Apollo "provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision";

- The claim "complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment"; and

- The services claimed on the form were "medically necessary" and "medically indicated and necessary to the health of [the] patient and were personally furnished by me or my employee under my personal direction."[72]

---

[72] Apollo admitted under oath it knows that, each time it submits a claim to Medicare or Georgia Medicaid, it makes the certifications to Medicare and Georgia Medicaid that are identified on the back side of the CMS Form 1500. *See* Exhibit 65 (March 31, 2022 30(b)(6) Deposition Transcript of Tennille Lizarraga) at 124:19-25.

95.     Approximately 99.7 percent of all fee-for-service Medicare claims are processed and paid within 17 days without any medical record review."[73] CMS has also recently noted that "[c]urrently, we cannot identify through claims that a visit was performed as a split (or shared) visit, which means that we could know that a visit was performed as a split (or shared) visit only through medical record review."[74] This virtual honor system for claim submission has been known as the "pay-and-chase" system or "pass-through" claims for reimbursement—and it is the system of secrecy that Apollo relies on to operate its Scheme while evading scrutiny and review.

### The Medicaid Program and State Administration

96.     The Medicaid Program ("Medicaid") is a Health Insurance Program administered by the Government of the United States and state agencies that is funded by state and federal taxpayer revenue. The United States Health and Human Services Department oversees the administration of the program. Medicaid was

---

[73] See CMS SOURCES SOUGHT NOTICE – USING ADVANCED TECHNOLOGY IN MEDICAL REVIEW (Jan. 5, 2021), available at https://sam.gov/opp/cb630fc46d0f42fea069ce8a461957bc/view?keywords=&sort=-modifiedDate&index=opp&is_active=true&page=1&organization_id=100075508 (last visited Aug. 1, 2021).

[74] See CMS CY 2022 MEDICARE PHYSICIAN FEE SCHEDULE PROPOSED RULE (Jan. 5, 2021) at 254, available at https://public-inspection.federalregister.gov/2021-14973.pdf (last visited Aug. 1, 2021).

designed to assist participating states in providing medical services, durable medical equipment, and prescription drugs to financially-needy individuals that qualify for Medicaid.

97.      While the federal government sets basic guidelines and pays between 50% and 80% of the cost of Medicaid (depending on the state's per capita income), each state itself administers the program, decides provider qualifications, and reimburses providers.

98.      Under Title XIX of the Social Security Act, each state must establish an agency to administer its Medicaid program according to federal guidelines. The Georgia Department of Community Health is the agency that administers Georgia Medicaid.

### *The False Claims Act*

99.      The False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et. seq*, provides, in pertinent part, that any person who

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for
> payment or approval; [or]
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> <div align="center">*      *      *</div>
> is liable to the United States Government [for statutory damages and such penalties as are allowed by law].

31 U.S.C. § 3729(a)(l)(A)-(B).

The FCA further provides that "knowing" and "knowingly"

> (A) mean that a person, with respect to information--
> (i) has actual knowledge of the information;
> (ii) acts in deliberate ignorance of the truth or falsity of the information; or
> (iii) acts in reckless disregard of the truth or falsity of the information; and
> (B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(l); *see also Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1303 (11th Cir. 2021) ("Under the FCA, reckless disregard is tantamount to gross negligence. When Congress added reckless disregard to the FCA's scienter element in 1986, it intended to capture 'the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted.' So, a person acts with reckless disregard—and thus 'knowingly'—under the FCA when he 'knows or has reason to know of facts that would lead a reasonable person to realize that harm is the likely result of the relevant act.'"). Violations of the kind described herein—the upcoding of mid-level services—are material to the government's decision to reimburse for those services.[75]

---

[75] For example, Apollo's Vice President of Revenue Cycle Operations and corporate representative, Tennille Lizarraga, agreed under oath that Apollo knows that the identity of the provider it submits on claim forms (*i.e.*, whether that provider is a mid-level or physician)

# V.    **FACTUAL ALLEGATIONS**

100.   Relator alleges a fraudulent Scheme through which Apollo unlawfully pads its pockets with federal and state funds.

101.   In subsection A, Relator provides a detailed background on Apollo's business practices. Apollo's corporate culture—which is outlined in subsection A, *infra*—facilitates and fuels the Schemes; those Apollo providers who further the Scheme reap rewards, while those Apollo providers who challenge the fraud face threats and disciplinary action.

102.   In subsection B, Relator provides a detailed description of the Scheme through which Apollo has engaged in a fraudulent course of conduct of systematically submitting and/or causing the submission of false and fraudulent claims to CMS to unlawfully obtain payment from CMS for mid-level E/M services at the full physician rate.

## A.    BACKGROUND

103.   Apollo is among the nation's most profitable physician practice management companies ("PPMs"), which provide management and human-

---

"naturally influences Medicare's reimbursement decision." *See* Exhibit 65 (March 31, 2022 30(b)(6) Deposition Transcript of Tennille Lizarraga) at 113:21-114:10. Apollo's Director of Revenue Cycle Management and corporate representative, Tim Stowe, similarly agreed under oath Apollo knows that "[t]o Medicare the identity of the provider makes a difference as to the amount the they're going to reimburse Apollo." *See* Exhibit 66 (October 12, 2022 30(b)(6) Deposition Transcript of Tim Stowe) at 70:9-13.

resources services to hospitals and, in particular, to emergency departments. Apollo bases its business model not on quality of care but on reducing emergency department costs and increasing their revenues. Apollo's revenue-based business model is built on three primary aspects: (1) treat and bill more patients by increasing "patient throughput and allowing for volume growth"[76]; (2) implement uniform documentation, coding and billing policies and procedures to capture as much revenue as possible from CMS and private payers; and (3) align physicians' incentives with hospitals' incentives by compensating physicians based on the number of "patients they treat and the procedures they perform."[77]

104.   First, an integral part of Apollo's business model is moving patients through the emergency department as quickly as possible—*i.e.*, increasing "throughput." To accomplish this, Apollo uses a floor-management model that often physically segregates physicians and mid-levels in different areas of the emergency department. In fact, Apollo's corporate representative and Chief Quality Officer, Dr. Michael Lipscomb, admitted under oath that, within the emergency departments in which Relator worked, the mid-levels "were separated from the physicians" and

---

[76] http://apollomd.com/home/multispecialty-solutions/emergency-medicine/ (last visited Aug. 2, 2016).
[77] *Id.*

"operated more independently."[78] These floor-management models enable Apollo to increase revenue by: (1) increasing the volume of patients treated; and (2) using lower cost staffing, such as PAs and NPs, to treat more patients instead of expensive physicians.

105.   Second, Apollo's business model relies on the implementation of national, uniform documentation, coding[79] and billing policies and procedures aimed at capturing as much revenue as possible from third-party payers like CMS. For example, Apollo has stipulated to the following in this action:

> During all relevant times CMS's guidance and requirements related to the documentation, coding and billing of split/shared E/M visits were uniform across all states in which Defendants operated.

106.   And with respect to Medicare, Apollo has stipulated that:

> During all relevant times, Defendants' documentation, coding and billing policies, practices, procedures, instructions and processes relating to Defendants' submission of claims for reimbursement for Medicare beneficiaries for split/shared E/M visits were uniformly applied in each state in which Defendants operated, and did not vary by state or location of facility where such visit occurred or claimed services were rendered.

*See* Exhibit 8.

---

[78] *See* Exhibit 63 (December 13, 2022 30(b)(6) Deposition Transcript of Dr. Michael Lipscomb) at 110:7-11.

[79] Coding is the process by which a patient's medical chart is translated into billable services that are then submitted to CMS (or private insurers) for reimbursement.

107.   Further, in response to Relator's Requests for Admission in this action, Apollo has admitted that its documentation, coding and billing policies "relating to claims for reimbursement for split/shared E/M visits that [it] submitted to Medicare did not vary solely based on the State in which such services were rendered." Thus, the Medicare requirements and Apollo's policies and procedures related to Medicare documentation and billing were not different in Georgia than in other states. As Apollo has stipulated, they were the same in all states. And, as Relator alleges herein, Apollo's uniform policies and practices with respect to billing mid-level services under physician NPIs uniformly violated the uniform Medicare requirements.

108.   Additionally, Apollo deployed its executives across the country to effectuate its billing policies and procedures were uniformly applied, nationwide. Listed below are representative examples of Apollo's nationwide executives.

| Name | Title | Dates | State |
|---|---|---|---|
| Andres Callender | Vice President of Finance and Operational Controls / Director of Operations Finance | September 2017–October 2020 | South Carolina |
| Andrew Christman | Senior Vice President, Revenue Recycle Operations | July 2016–November 2016 | Florida |
| Elina Vartanyan Parekh | Vice President, Operations | March 2014–March 2016 | California |

| Name | Title | Dates | State |
|------|-------|-------|-------|
| Frances Meadows | Regional Director | March 2011–November 2012 | Tennessee |
| Heather Chappell | Senior Vice President, Strategy and Clinical Services / Vice President of Clinical Recruitment / Director of Physician Recruitment / Recruiter and Manager of North Carolina Operations | March 2007–November 2022 | North Carolina |
| Roger Murray | Chief Operating Officer / Executive Vice President of Operations | December 2007–December 2015 | Illinois |
| Preston Smith | Chief Revenue Officer & Chief Compliance Officer / President, Anesthesia Services | August 2008–October 2016 | Georgia |

109.  Apollo's internal documents and communications reveal the same regarding Apollo's split/shared documentation, coding, and billing policies with respect to *both* Medicare *and* Georgia Medicaid. For example, in an April 23, 2021 email, Apollo's then-President Michael Dolister confirmed that Apollo's

documentation, coding, and billing policies applicable to split/shared visits applied the same with respect to both Medicare and Medicaid. *See* Exhibit 7.

110.   As Exhibit 7 shows, Dolister sent an email to "all MDs at ApolloMD" regarding "Changes in Reimbursement for Medicare *and* Medicaid Patients Seen Primarily by Mid-Level Providers" informing all Apollo physicians—across all Apollo facilities, nationwide—about Apollo's May 2012 split/shared visit policy change. In explaining the policy change, Dolister confirmed that Apollo's former split/shared policy *and* the May 2012 policy change applied uniformly with respect to all "Medicare and Medicaid patients" (with the exception of the Medicaid system for the State of Louisiana, which is not a party here).

111.   As another example, the image below depicts Apollo's split/shared billing documentation, coding, and billing policy as of July 2012, which was apparently identical for Medicare and Georgia Medicaid.

**PA/NP/CRNA Claims Protocol:**

**\*\*This protocol only is for primary claims only\*\***

*Medicare:* PA/NP credentialed for all states.*(for all Medicare claims the MD/DO must document in the chart that he/she physically saw the patient and participated in the care in order to be billed out on the claim)*

- These claims are stopped by the front line edits if the PA does not have a legacy number in IDX. The biller reviews the patient chart to see if an MD/DO can be added to the charge. If not, then the claim is put on claim delay until the PA/NP legacy number is received. If yes, then the biller will add the MD/DO to the charge and bill out accordingly.

*Medicaid:*

| State | PA Credentialed | NP Credentialed | CRNA Credentialed |
|-------|-----------------|-----------------|-------------------|
| AR | NO | YES | N/A |
| AL | YES | YES | N/A |
| CO | N/A | N/A | NO |
| FL | YES | YES | YES |
| GA | YES | YES | YES |
| IL | NO | YES | N/A |
| IN | NO | YES | N/A |
| LA | YES | YES | N/A |
| MS | YES | YES | N/A |
| NC | YES | YES | YES |
| OH | NO | YES | N/A |
| PA | NO | YES | N/A |
| SC | YES (does not follow the Medicare rules for seeing a patient) | YES (does not follow the Medicare rules for seeing a patient) | YES |
| TN | YES | YES | N/A |
| TX | YES | YES | N/A |
| VA | YES | YES | N/A |

As shown, Apollo applied what it claimed to be *Medicare*'s uniform national requirements to claims it submitted to Georgia Medicaid.

112.    **Thus, during all relevant times, Apollo's (improper and violative) documentation, coding, and billing policies, practices, procedures and guidelines with respect to split/shared E/M visits: (a) applied uniformly to all claims for reimbursement for split/shared services that Apollo submitted to Medicare; and (b) were otherwise identical as actually implemented in each state in which Apollo operated emergency departments.**

113.   Apollo's uniform documentation, coding, and billing techniques are aimed at maximizing reimbursement at every opportunity. For example, as Apollo President, Yogin Patel, stated in a March 22, 2017 email: "**we try to bill under the MD whenever possible**." Exhibit 40. Because each Apollo provider assigns their billing numbers to Apollo to submit claims for reimbursement to CMS on their behalf, Apollo retains complete control of its Scheme, and, in the process, takes full advantage of its providers—especially its physicians, like Relator—who rely on Apollo to submit claims for reimbursement based on services they rendered in a compliant and truthful manner.

114.   Apollo uses its coders such as Pettigrew[80] to give the appearance of compliance and to attempt to remove itself from its own fraudulent billing Scheme.[81] For example, as Relator uncovered during discovery in this action, Apollo instructed such coding companies to fraudulently code Apollo's medical records pursuant to the Scheme to guarantee that it received the highest reimbursement amounts from CMS. For example, in a January 26, 2018 email from Adrian Soll, Pettigrew Assistant Director of International Coding, Soll summarized a conversation he had

---

[80] Pettigrew has offices in Texas, Florida and North and/or South Carolina.
[81] For example, Apollo represented to the Court that "Defendants utilize a professional third party, Pettegrew [*sic*] Medical Business Services, to review physician and APP charts and assign the appropriate billing codes, including whether to submit the claim under the physician's or APP's NPI." Doc. 88 at 6.

with Apollo executives, showing Apollo's complete control over its coding companies:

> Per our conversation this morning, we will instruct our coders to assign provider credit based on the disposition ***even if the documentation otherwise does not meet CMS criteria to give credit to the physician***. **This is done at Apollo's directive**

115.   Clearly, Apollo authorized, controlled, instructed, and/or required its coders to code its medical records pursuant to its own fraudulent Scheme, through which Apollo itself knowingly submits false and fraudulent claims for reimbursement to CMS.

116.   Although Apollo would like to pass the blame to its coders, Apollo knows that it is responsible for any false claims it submitted, especially considering that: (1) ***Apollo*** (not its vendor(s)) ultimately submits all claims for reimbursement to Medicare and Georgia Medicaid; and (2) Apollo admitted under oath that it ***never*** implemented any sort of compliance program to ensure that the split/shared claims it submitted to Medicare and Georgia Medicaid complied with all CMS requirements.[82] Apollo even agreed under oath through its corporate representative on coding that, "if something is done wrong with the coding or the reimbursement

---

[82] *See* Exhibit 62 (November 7, 2022 30(b)(6) Deposition Transcript of Casey Crane) at 86:11-18, 153:7-154:21, 160:17-161:4.

amounts, then the buck stops with ApolloMD."[83] Moreover, Apollo admitted under oath that (1) it instructs its coders how to code;[84] and (2) Pettigrew (Apollo's coding company) is Apollo's agent.[85] Ultimately, Apollo acknowledged that there were problems with its coders (Pettigrew) and began transitioning its emergency department coding to a new coding company in 2021.[86]

117.   Apollo thereby improperly codes and submits claims for reimbursement to CMS (*i.e.*, Medicare and Georgia Medicaid) under physician NPIs/billing numbers despite the fact that Apollo knows the underlying medical records do not meet CMS criteria to give credit to the physician. In doing so, Apollo obtains millions of dollars from CMS to which it knows it is not entitled.

118.   Finally, Apollo seeks to increase revenue by aligning physicians' incentives with hospitals' incentives. Apollo does this by compensating physicians based on the number of "patients they treat and the procedures they perform."[87] Apollo employs its emergency department physicians, like Dr. Sonyika, as

---

[83] *See* Exhibit 62 (November 7, 2022 30(b)(6) Deposition Transcript of Casey Crane) at 107:19-23.

[84] *See* Exhibit 65 (March 31, 2022 30(b)(6) Deposition Transcript of Tennille Lizarraga) at 172:16-24, 189:14-17.

[85] Exhibit 66 (October 12, 2022 30(b)(6) Deposition Transcript of Tim Stowe) at 36:18-20; *see also id.* at 38:4-9.

[86] *See* Exhibit 62 (November 7, 2022 30(b)(6) Deposition Transcript of Casey Crane) at 169:21-173:21.

[87] *Id.*

independent contractors and compensates these physicians based upon a fixed-rate fee schedule agreed to by contract. Apollo also pays its physicians kickbacks for misrepresenting their involvement with patients only treated and seen by mid-levels. Thus, physicians are financially incentivized to bring in as much revenue as possible—by treating patients *and* signing or attesting within mid-level charts (regardless of patient involvement), which in turn increases Apollo's revenues.

119.   In simple terms, Apollo carries out its Scheme by (1) requiring its healthcare providers to falsify, insufficiently document, and/or otherwise misrepresent involvement in patient encounters within medical records/charts (including EMRs), and (2) requiring its coders and billers to submit claims to CMS based on medical records that misrepresent physician involvement and/or do not contain the physician documentation required by CMS to bill for the services for which Apollo submits claims to CMS. Thus, Apollo uses the Scheme to bill for services that Apollo knows were not in fact provided, were not medically necessary, were not supported by the documentation required, did not comply with CMS' clear conditions and requirements for payment for such services, did not qualify for payment from CMS at the reimbursement level for which Apollo billed CMS, and/or were otherwise misrepresented to CMS.

## B.   APOLLO'S FRAUDULENT SCHEME

120.   Relator has witnessed first-hand (and now further confirmed through discovery) the unlawful practices that Apollo utilizes to fraudulently increase billing to and reimbursement from CMS. Through his personal knowledge, experience, and investigation, Relator has uncovered the unlawful scheme that Defendants systematically and purposely use to submit false and/or fraudulent claims to CMS (the "Scheme"). Under the Scheme, Apollo overbills for and upcodes services provided by mid-levels (*i.e.*, PAs and NPs) by fraudulently submitting claims for reimbursement for those services under a physician's NPI to be paid at the higher physician rate. That is, although Apollo submits claims to CMS for reimbursement for mid-level services, it falsely indicates that a physician, rather than a mid-level, performed the required services. Apollo does this because CMS reimburses for physician services at a higher rate than mid-levels' services.

121.   By statute, services provided by mid-levels are reimbursed at 85% of the physician billing rate for E/M services.[88] *See* 42 U.S.C. § 1395l(a)(1)(O); 42

---

[88] The Medicare statute specifically states, "with respect to services described in 1861(s)(2)(K) [42 U.S.C.S. § 1395x(s)(2)(K)] (relating to services furnished by physician assistants, nurse practitioners, or clinic nurse specialists), the amounts paid shall be equal to 80 percent of (i) the lesser of the actual charge or 85 percent of the fee schedule amount provided under section 1848 [42 U.S.C.S. § 1395w-4], or (ii) in the case of services as an assistant at surgery, the lesser of the actual charge or 85 percent of the amount that would otherwise be recognized if performed by a physician who is serving as an assistant at surgery[.]" 42 U.S.C. § 1395l(a)(1)(O).

C.F.R. §§ 405.520(a), 414.52(d), 414.56(c). To determine the allowable rate for a service provided by a mid-level, Medicare will select the proper amount based on the physician fee schedule and discount that amount by 15% to reach the appropriate 85% mid-level billing rate. Georgia Medicaid enacted similar reimbursement protocols. When a mid-level performs services alone, without physician involvement and sufficient physician documentation within the mid-level's medical record, the proper procedure is to submit a claim for those services under the mid-level's name and NPI so the claim will be paid at the appropriate mid-level rate.

122.   And Apollo admits that it knows "when a midlevel treats a patient entirely by themselves in the emergency room, that claim should be billed to Medicare under the midlevel's NPI" and that "the reimbursement rate for the midlevel is 85 percent of the physician rate."[89] Apollo also admits that it knows that "a physician's signature on a midlevel's chart is not enough to bill a claim as a split/shared visit."[90]

123.   In the vast majority of circumstances, mid-levels and physicians in Apollo's emergency departments treat patients separately. Under Apollo's business model—which is focused on maximizing efficiency and profits—physicians and

---

[89] Exhibit 62 (November 7, 2022 30(b)(6) Deposition Transcript of Casey Crane) at 30:2-15.
[90] Exhibit 62 (November 7, 2022 30(b)(6) Deposition Transcript of Casey Crane) at 31:20-32:3; *see also id.* at 62:9-25, 63:17-24.

mid-levels rarely, if ever, work alongside each other or treat the same patients in a true split/shared visit, as Apollo's President has even admitted. For example, in a March 22, 2017 email, Apollo President, Yogin Patel, pointed out that "[a]s both the APC and MD should mostly have their own patients, **we should have few shared encounters**." Exhibit 40. This is because Apollo mid-levels treat lower acuity patients, while physicians treat higher acuity patients. Accordingly, the vast majority of claims submitted by Apollo for services provided by its emergency department mid-levels should be submitted under the mid-levels' NPIs. However, that is not what Apollo does. In fact, Apollo President, Yogin Patel, has admitted this fact in a March 22, 2017 email: "<u>**we try to bill under the MD whenever possible**</u>." *Id.*

124.   Despite the fact that mid-levels perform the vast majority of their services alone, Apollo uniformly submits claims for mid-level services under physician NPIs, despite the fact that such physicians never performed and sufficiently documented a substantive E/M visit face-to-face with the same patient seen by the mid-level on the same date of service. As shown by the examples below (¶¶125-147, below), even before discovery in this action began, Relator knew that Apollo operated its fraudulent Scheme on a national basis based on his personal experience in Georgia.

### *Pre-Discovery Evidence Based on Relator's Personal Experience*

125.   **First**, even before discovery began, Relator had no doubt regarding Apollo's uniform fraudulent billing practice, as Apollo's Chief Operations Officer and Chief Quality and Patient Safety Officer admitted (perhaps unwittingly) this fraud in an internal email sent on December 2, 2016, to all emergency physicians working for Apollo. *See* Exhibit 1.

126.   In this nationwide mass email, the Apollo executives explain how Apollo measures certain data that it submits to CMS's Physician Quality Reporting System ("PQRS"). *Id.* The PQRS was a CMS program under which healthcare providers like Apollo provided Medicare beneficiary data and charts to CMS.[91] If the data was not submitted to CMS, then the healthcare provider would receive a penalty reduction in reimbursement. Unsurprisingly, then, the PQRS was a CMS program that profit-driven Apollo actually *did* follow.

127.   The data Apollo submitted to CMS for the PQRS was based on **actual claims submitted** by Apollo to CMS for services Apollo provided to Medicare beneficiaries under the fee-for-service schedule. After Apollo began participating in

---

[91]       *See*          https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/PQRS/Downloads/PQRS_OverviewFactSheet_2013_08_06.pdf (last visited Aug. 7, 2021).

the PQRS program, it produced reports to its physicians to show the results of the quality measures, as one of the goals of the PQRS program was to improve patient care. ***These reports were also based on actual claims data from Apollo's Medicare billing submissions***. After reviewing reports based on claims data, certain Apollo physicians had some questions about how the PQRS systems work and what was included in the reports, which allegedly reflected the quality of the care those physicians were providing. The physicians directed these questions to Apollo executives and at meetings, and Apollo's Chief Operations Officer and Chief Quality and Patient Safety Officer answered some of these questions in the December 2, 2016 email referenced above. *Id.* Specifically, after reviewing the reports, the physicians questioned why certain services had been attributed to them when they did not actually perform the services. Physicians questioned whether the reports included the mid-level or APC (advanced practice clinicians—another term for mid-level) charts that the physicians simply sign or attest to. In the relevant portion of the

email (depicted below), Apollo executives spell out the exact questions and then provide the answers:

> *Q: Do the PQRS measures include those patients that are <u>APC charts that I sign</u>, or are they my charts alone?*
> A: The charts are a combination of both "physician only" charts and "physician/APC charts". <u>As the charts are billed under the physician NPI number,</u> both will count equally for adjustments by CMS. For this reason, all charts attributed to the physician are included.
>
> *Q: Do the CT Reports include those patients that are <u>APC charts that I sign</u>, or are they my charts alone?*
> A: Same answer. The CT utilization data is a combination of both "physician only" charts and "physician/APC charts". <u>As the charts are billed under the physician NPI number,</u> we are accountable for the physician as well as the APC charts. As APCs tend to see less acute patients, this can actually make our CT utilization rate less. And as above, we are ultimately responsible for APC patients and the quality of the care they deliver to our patients.

Exhibit 1.

128.   The executives first answer the question "Do the PQRS measures indicate those patients that are APC [*i.e.*, mid-level] charts that I sign, or are they my charts alone?" In other words, the question asks which charts form the basis of the PQRS reports: either (1) mid-level charts that the physician merely signed, but for which the physician did not perform and sufficiently document their substantive face-to-face visit with the mid-level's patient, or (2) the charts of patients exclusively treated by the physician. Apollo's answer: "The charts are a combination of both 'physician only' charts and 'physician/[mid-level] charts.' As the charts are billed under the physician NPI number, both will count equally for adjustments by CMS. For this reason, all charts attributed to the physician are included." **This is more**

than a reliable indicia of fraud. **This is an *admission* of actual false claims submitted.** And this is consistent with the March 22, 2017 admission by Apollo President, Yogin Patel, that Apollo "**tr[ies] to bill under the MD whenever possible**." Exhibit 40.

129.   In its answer, Apollo admits two things. First, that it bills *all* APC/mid-level charts "under the physician NPI number," even when the only physician involvement was co-signing the mid-level's chart. Exhibit 1. This is fraudulent *unless* a true split/shared visit occurred. The question itself demonstrates that true split/shared visits are not at issue here, as it refers "APC charts that I *sign*," not for example, "charts within which I sufficiently documented a substantive portion of a face-to-face visit with the same patient seen by an APC." *Id.*  And, Apollo physicians *rarely if ever* actually treat the same patients as mid-levels. Indeed, the fact that the COO put the phrase "physician/APC charts" in quotations further confirms this point. *Id.* Thus, the answer admits fraud: that Apollo bills under a physician's NPI for "physician/APC charts," which in reality are the mid-level charts that Apollo requires physicians to merely sign ***despite the fact that the physicians never performed and sufficiently documented a substantive portion of a face-to-face***

***patient visit with the mid-level's patient***. *Id*.[92] Thus, it is fraudulent to bill under the physician's NPI in such cases. This is how Apollo receives reimbursement at the full physician rate when Apollo *should* only be receiving 85% of the physician rate.

130.   Apollo also admits in its answer that it *actually submitted* false claims to CMS. This is because the charts that Apollo admits to fraudulently billing under the physician's NPI referenced above represent charts for which Apollo *already submitted actual claims to CMS*—again, because the data that Apollo submits to CMS as required by the PQRS program is based on actual claims that Apollo submitted to CMS, including Medicare. And given the fact that Exhibit 1 is a national email from Apollo executives sent to **_all_** Apollo physicians, Relator knew Apollo was operating its fraudulent Scheme across all its emergency departments, nationwide.

131.   Relator also knew that the email shown at Exhibit 1 reveals Apollo's fraudulent billing practices on a national basis because Relator knew Apollo participated in the "PQRS" program (the CMS program discussed within Exhibit 1) on a nationwide basis. For example, Relator received an email from an Apollo executive (Dr. Boykin Robinson) on December 17, 2012 wherein Dr. Robinson

---

[92] Again, Relator did not treat patients with mid-levels, but still signed all of their charts as Apollo required and incentivized.

confirmed that Apollo facilities in North Carolina (Central Carolina Hospital) and Pennsylvania (Altoona Hospital) also participated in the PQRS program. *See* Exhibit 17 (excerpted below).

132.   To avoid any confusion about the meaning of the email in Exhibit 1, Relator emailed Apollo's Chief Operating Officer, Amy Katnik, and asked, "What does APC stand for?" Exhibit 2. Ms. Katnik responded that "APC" means "Advanced Clinician or midlevel." *Id.* Accordingly, Apollo's executives have confirmed Apollo's uniform billing practice for services provided exclusively by mid-levels is to bill for those services "under the physician NPI number." Exhibit 1.

133.   As noted above, the NPI that is used triggers the reimbursement rate CMS will apply. Thus, when Apollo uses a physician NPI to request reimbursement for mid-level services (as it admits it does in Exhibit 1), CMS applies 100% of the physician rate to the request and, therefore, reimburses Apollo for the services of a mid-level as if a physician had performed them. Exhibits 1, 2 & 17 are just a few examples of evidence Relator obtained while working at Apollo showing that Apollo operates its Scheme on a national basis. Additional examples of Relator's pre-discovery evidence are discussed below.

134.   __*Second*__, before discovery in this action began, Relator spoke to three different physicians that worked within Apollo's emergency departments across the

country on Apollo's national travel team (Dr. Dwayne Greene, Dr. Kyung Yoon and Dr. Steve Keehn). Physicians on Apollo's "travel team" are sent to Apollo's emergency departments "nationwide" "across the country." Exhibit 38. And Apollo's travel team corporate office is located in North Carolina. *See id.* (showing office phone number area code of "704," which is located in Charlotte, North Carolina). Drs. Greene, Yoon and Keehn all confirmed to Relator that Apollo also required them to co-sign all mid-level medical records assigned to them throughout Apollo's non-Georgia facilities across the country, even when they did not treat the mid-levels' patients—*i.e.*, so that Apollo could improperly bill Medicare at the physician rate for mid-level services. This included Apollo's emergency departments in **Texas** and **Florida**. *See, e.g.*, Exhibit 36, attached hereto and excerpted below (screenshot of the LinkedIn profile of Dr. Greene, showing Dr. Greene worked within Apollo's emergency department in Houston, Texas); *see also* Exhibit 37 (public article concerning Dr. Keehn showing that Dr. Keehn has lived in South Florida for the past 8 years).





Exhibit 36.

135. ***Third***, Apollo's executives (Drs. Michael Lipscomb and Brett Cannon)[93] confirmed to Relator and other physicians during an in-person meeting (at the Apollo facility where Relator worked) that Apollo bills at the physician rate when all the physician does is co-sign a mid-level's chart.[94] Notably, during the meeting, the executives pointed out to Relator and other physicians that: (1) "[i]f you sign a [mid-level] chart, you get credit for it" (which means Apollo fraudulently bills at the physician rate for mid-level charts that physicians only co-sign); (2) it's "good" "if people are billing more, then there's more collections, and there's more

---

[93] Each time Relator received emails and instructions from Apollo executives, he understood he was receiving company-wide instructions that were not different for any other Apollo facilities and that the instructions applied company-wide regardless of state lines.

[94] Relator took an audio recording of this meeting and produced a copy of the recording to Apollo during this litigation. A transcription of relevant portions of the meeting is attached hereto as Exhibit 39.

money out there;" (3) if a mid-level provider screens the patient (*i.e.*, even if the physician doesn't see the patient), "you [the physician] could potentially earn $13" (which again means Apollo bills at the physician rate for patient exclusively seen by mid-levels); and (4) CMS does not audit individual charts (which the executives pointed out to assuage physicians that Medicare would not discover Apollo's fraudulent practices). Relator understood that these admissions applied to Apollo's practices throughout all its emergency departments, nationwide.

136.  **_Fourth_**, when Relator began working for Apollo, he was instructed by an Apollo executive (Dr. Boykin Robinson) during an in-person orientation meeting that occurred in or around 2010 that Relator should sign all mid-level charts and attest to seeing patients in all cases even if all Relator did was walk by and wave at the patient, *i.e.*, so that Apollo could improperly bill Medicare at the physician rate for patients only seen by mid-levels. Relator understood that these same instructions applied to Apollo's billing practices across all Apollo's emergency departments, nationwide.

137.  **_Fifth_**, as another example, Relator and other Apollo physicians were regularly instructed by an Apollo medical director located in Texas (Dr. Robert L. Wright) to co-sign mid-level charts even for patients Relator and the other physicians never saw. Again, Relator understood that this co-signing requirement was

implemented by Apollo throughout all of Apollo's emergency departments, nationwide, so that Apollo could improperly bill Medicare at the physician rate. Exhibit 3 (excerpted below) shows Dr. Wright's instructions to mid-levels to assign their charts to physicians for co-signing *and that the failure to do so affects physician paychecks*.

**Midlevels**:

Please remember to reliably alternate back and forth for the doc to whom you assign pts. It affects their paycheck.

Exhibit 3. The only way physician co-signing could affect physician paychecks is if Apollo was fraudulent billing at the physician rate for mid-level services when all the physician did was co-sign the mid-level's medical record.

138. Further, Exhibit 11 (also excerpted below) confirms that Dr. Wright was located in Texas.

Robert L. Wright, MD FACEP
Regional Medical Director
ApolloMD
Plano, TX
469-500-6336
RLWQC@yahoo.com

Exhibit 11.

139. **_Sixth_**, as another example, Relator received an email from an Apollo executive (Dr. Boykin Robinson) on September 9, 2012, informing Relator and other

Apollo physicians that Apollo improperly bills at the physician rate for patients seen by mid-levels when all the physician does is "cruise by the patient's room and confirm the HPI and select 'CASE REVIEWED w/pt face-to-face'" (which is not sufficient to bill at the physician rate), as follows:



Exhibit 12. As shown in the excerpt above, the improper instructions sent to Relator within Exhibit 12 were originally compiled by Apollo physicians in North Carolina (NC). Further, the instructions were compiled using an electronic health record system within an Apollo facility located in Pennsylvania (Carlisle Regional). Here is a screenshot from the instruction guide that was given to Relator showing "Carlisle Regional" in the background.



Exhibit 12. Therefore, Relator understood that these instructions (and therefore, Apollo's fraudulent Scheme) applied to all Apollo's emergency departments, nationwide.

140. **_Seventh_**, on May 26, 2011, Relator received an email from Apollo's former Chief Medical Officer and current Chief Executive Officer, Dr. Mike Dolister. In the email, Dr. Dolister admitted that Apollo was changing its split/shared visit billing policy "across all facilities" to finally comply with Medicare's requirements relating to billing for mid-level services at the physician rate, as shown in Exhibit 4:



Exhibit 4. Relator understood Dr. Dolister's email to mean that Apollo's billing policy "across all facilities" was previously not compliant with Medicare's requirements, which was the reason for the policy change. This comported with Relator's experience in Georgia, as Relator knew that Apollo was billing under his billing number for services exclusively provided and documented by mid-level providers—a practice that Relator knew did not comply with Medicare's requirements for billing at the physician rate. *See* ¶141, below.

141. ***Eighth***, Relator's billing and payroll data (which Relator accessed through the ApolloMD.net employee portal) showed that Apollo submitted claims under Relator's billing number for patients that were solely treated by mid-level

providers (*i.e.*, Relator knew that Apollo was submitting actual false claims to Medicare under his billing number). *See* Exhibits 5 (excerpted below) & 6.

| Facility | Payroll Period | Pts Dr Only | Pts w/ MLP | Pts Total |
|---|---|---|---|---|
| Spalding Regional Medical Center | 7/1/16 | 321 | 274 | 595 |
| Spalding Regional Medical Center | 6/1/16 | 286 | 244 | 530 |
| Spalding Regional Medical Center | 5/1/16 | 305 | 237 | 542 |
| Spalding Regional Medical Center | 4/1/16 | 372 | 314 | 686 |
| Spalding Regional Medical Center | 3/1/16 | 381 | 351 | 732 |
| Spalding Regional Medical Center | 2/1/16 | 392 | 357 | 749 |
| Spalding Regional Medical Center | 1/1/16 | 382 | 429 | 811 |

As shown in Exhibit 5 (excerpted above), Apollo billed under Relator's billing number for 811 patients in the month of January 2016, including 429 patients supposedly treated by a mid-level and Relator ("Pts w/ MLP"). However, given that Relator worked approximately 15 days per month at Apollo, that would mean Relator would have to physically treat more than 54 patients each and every shift during that month to reach 811 patients. That is not physically possible, which confirms Apollo's national fraudulent Scheme.

142.    Relator knew that the data he reviewed in ApolloMD.net reflected how Apollo actually billed Medicare using his billing number because an Apollo executive (Dr. Boykin Robinson) previously confirmed this to be the case within a January 23, 2013 email sent to Relator. *See* Exhibit 18 (excerpted below).



Exhibit 18. Thus, based on Relator's personal experience working in Apollo's emergency departments in Georgia, where Apollo's national headquarters is located, Relator knew Apollo was operating its Scheme on a national basis—not just in Georgia. Additional examples of Relator's pre-discovery evidence confirming the national breadth of Apollo's Scheme are continued below.

143.    **_Ninth_**, as another example, Relator received an email from Apollo executive, Dr. Boykin Robinson, instructing Relator and other physicians that

Apollo bills at "100% of the charges" (*i.e.*, submits claims to Medicare under physician billing numbers) when all the physician does is "check the box" within mid-level medical records (to falsely indicate the physician's involvement with the mid-levels' patients). *See* Exhibit 13 (excerpted below).

When a ML presents a patient to you, you have 2 choices:
 1. You can see the patient and document a meaningful fa! ce to face encounter with them (ie check the box for many of you).   This will, as always, get you 100% of the charges.
 2. You can hear about the patient and sign the chart (without seeing them).  If the patient has Medicaid or Medicare you will receive 85% of your usual charge (this is what they pay ApolloMD in this situation).  Your charge will not be affected if the patient has any other payment source (or is self pay).
Let me know if you have any questions and thanks for bearing with us as we scrambled to come up with a plan for this.  Can't help the 15% loss for some patients, but we are otherwise back to a straightforward model that makes sense to everyone.
Thanks
Boykin

Boykin Robinson, MD
ApolloMD
boykin.r@gmail.com
678-596-9038 (cell)

This email was sent to you in regard to your sos.apollomd.net account, or on behalf of! a sos.apollomd.net user. If you think you have received this message in error, or if you do not want to receive any more messages from sos.apollomd.net or shiftadmin.com, please contact us at abuse@shiftadmin.com or call us at 888-744-3840.

Shift Administrators, LLC
2818 Canterbury Rd
Columbia, SC 29204

Exhibit 13. Relator understood that these admissions applied to all Apollo's emergency departments, nationwide, because (in addition Relator receiving the

email in Georgia from an Apollo executive) the email was sent from an Apollo affiliate located in South Carolina. *See id*.

144. **_Tenth_**, in a January 9, 2017 email from Apollo's Chief Financial Officer (Dave Afshar) to all Apollo physicians (including Relator), Mr. Afshar indicated that Apollo was implementing a new policy to punish its physicians for not participating in Apollo's Scheme (*e.g.*, for not co-signing mid-level medical records) at a rate of "$100 per chart from individual physician paychecks for every deficient chart when there are greater than 19 total charts incomplete for at least 30 days" as shown in Exhibit 14 (excerpted below).

ApolloMD Physicians,

Let me take this opportunity to thank you for all the great care you provide to our collective patients coast to coast, in 13 states and in over 80 different practices.  You are one of the main reasons that we have been so successful and have become one of the largest multi-specialty, physician-owned, physician-operated companies in the country.  We appreciate your commitment to providing high-quality care and good documentation.  This email is focused on chart completion, so if you always complete your charts in a timely manner, please accept our sincere thank you and stop reading here.  However, if you are one of the minority of physicians who does not always complete your charts in a timely manner, please read on.

I have been asked by our physician leadership team to develop a process to incentivize physicians to complete their charts timely, because as I was told, timely chart completion is so important to accurately reflecting the care that has been rendered and from my side also allowing us to appropriately bill for the care that has been provided.  While we certainly want to give physicians a reasonable opportunity to complete their charting, several physicians are currently failing to complete a significant number of their charts within a reasonable period of time.  What we have decided to do, in order to incentivize physicians to complete their charts timely, is to hold $100 per chart from individual physician paychecks for every deficient chart when there are greater than 19 total charts incomplete for



Exhibit 14. Relator understood that this new policy applied throughout all Apollo's emergency departments, nationwide, as it was sent to all Apollo physicians by the Chief Financial Officer and referred to Apollo's patients "coast to coast, in 13 states." *See id.*

145.   **_Eleventh_**, as another example, on January 6, 2017, Relator received an email from Apollo executive, Dr. Michael Lipscomb. The January 6, 2017 email was also sent to all other emergency department physicians "working at Cerner EMR sites." Exhibit 15. In the email, Dr. Lipscomb admitted that Apollo improperly bills at the physician rate for mid-level services when all the physicians does is document an "attestation" within a mid-level patient's medical record. *Id.* However, no single pre-written "attestation" statement by a physician is sufficient documentation to bill at the physician rate, and Apollo knows it.

| From: | Amy Katnik |
|---|---|
| Sent: | Friday, January 6, 2017 6:49 PM CST |
| To: | Amy Katnik; Mike Lipscomb |
| CC: | Boykin Robinson; Yogin Patel |
| Subject: | Cerner Updates - sent on behalf of Dr Michael Lipscomb, Chief Quality Officer |
| Attachments: | image003.jpg |

ED Physicians working at Cerner EMR sites,

As you are aware, unlike most other EMRs, Cerner/FirstNet Power Notes do not time stamp or place initials after documentation in the chart. Therefore, distinguishing between the initial author of the note and subsequent providers entering notes becomes challenging. There are a number of ramifications of this limitation of Cerner/FirstNet. These include proper identification of attestation statements so that the coders may properly identify the physician as the author of the note rather than an APC. Identification of this statement ensures billing will occur under the physician (rather than the APC), and giving the physician full (rather than 85% credit) for seeing the patient.

Sincerely,

Mike

**Michael Lipscomb, MD**
**Regional President**
**Chief Quality Officer**
**ApolloMD**

Exhibit 15. Relator understood that this admission applied to all Apollo's emergency departments, nationwide, that used the electronic medical record software "Cerner," which Relator believed to be most (if not all) of Apollo's emergency departments across the country.

146.   Finally, as yet another example, in a July 14, 2016 email from Apollo Practice Coordinator (Adrian Dawson)[95] to Relator, Ms. Dawson reminded Relator

---

[95] Apollo hires Practice Coordinators to work within Apollo's emergency departments, nationwide, to pressure Apollo physicians to co-sign mid-level medical records so that Apollo can improperly bill Medicare at the higher physician rate for patients only seen by mid-levels.

and other Apollo providers that they would "be on the naughty list" if they don't complete charts, *i.e.*, co-sign mid-level medical records. *See* Exhibit 16. Ms. Dawson also informed Relator that she was "instructed to send reports weekly to upper management detailing how many deficiencies each provider has" and that "[i]ncomplete charts directly and negatively affect revenue." *See id* (excerpted below).



This again confirmed for Relator that Apollo's Scheme was being carried out throughout Apollo's emergency departments, nationwide.

147.   As the foregoing demonstrates, even before discovery began in this case, Relator knew that the fraud he witnessed in Georgia was occurring uniformly throughout all Apollo's emergency departments across the country.

148.   In an attempt to cover up this fraud, Apollo manipulates patient medical charts to falsely reflect what is called a "split/shared visit."[96] In the emergency department, a sufficiently documented split/shared visit is the <u>only</u> circumstance under which mid-level services may be reimbursed at the full physician rate. When a true split/shared visit occurs, CMS reimburses for the mid-level services at the same rate as the physician's services, as if the mid-level were an extension of the physician. However, a true split/shared visit only occurs when  a physician personally performs and sufficiently documents a ***substantive portion*** of a face-to-face visit with the same patient as a mid-level on the same day, such that the services are split or shared between the mid-level and physician.[97] "A substantive portion of an E/M visit involves all, or some portion of, the history, exam, or medical decision making (all key components of an E/M visit)."[98] Complete documentation of a substantive portion of an E/M visit by the physician is a conditional prerequisite to billing and receiving payment for a split/shared visit at the 100% physician rate. As

---

[96] As discussed above, Apollo is also able to conceal its fraud because E/M services are "pass through" or "pay-and-chase" claims for billing purposes, meaning there is no front-end auditing of these charges.

[97] *See* MEDICARE CLAIMS PROCESSING MANUAL, Chapter 12 - Physicians/Nonphysician Practitioners, at §§ 30.6.1(B), 30.6.13(H) (2019), available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/clm104c12.pdf   (last visited July 29, 2021).

[98]      *See*    https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/MedQtrlyComp-Newsletter-ICN908625.pdf  (last visited July 29, 2021) at 4.

Apollo Chief Operations Officer and Executive Vice President of Operations, Roger Murray, recognized in an October 12, 2012 email, "Medicare has the most stringent guidelines regarding the physician's role in the care and associated documentation." And as CMS itself explained in a 2013 publication related to split/shared visits: "If it isn't documented, it hasn't been done[.]" *Id.*[99] Apollo wholly ignores these and other CMS requirements and guidelines and blatantly misrepresents physician involvement with patients treated by mid-levels.

149.   If in response to this Complaint Apollo questions whether Relator has pointed to *actual* claims that Apollo falsely submitted to CMS and wrongly received reimbursement for, the answer is "YES." Apollo is on specific notice and has an objective place to look for the fraudulent Scheme Relator alleges herein: As a starting place, Apollo should review all of the claims, data and charts it submitted under the Medicare PQRS program (a narrow program that no longer exists) and the related billing data.[100] This is an entirely doable and reasonable task. While Relator alleges the fraudulent Scheme is much broader than just those charts submitted as

---

[99] Apollo admitted under oath that it know that, if services aren't documented in the medical record, Medicare and Georgia Medicaid treat the services as if they were not done. *See* Exhibit 65 (March 31, 2022 30(b)(6) Deposition Transcript of Tennille Lizarraga) at 155:20-24; *see also* Exhibit 66 (October 12, 2022 30(b)(6) Deposition Transcript of Tim Stowe) at 67:22-68:3.

[100] The PQRS began in 2006 and ended in 2016. Under the PQRS, Apollo submitted a limited amount of Medicare beneficiary data and charts to CMS. This included data from the Atlanta Medical Center South and the Spalding Regional Medical Center in Griffin, Georgia—where Relator worked for Apollo from 2010 to 2018.

part of the PQRS program (as discovery will show) and the allegations herein should not be limited to the PQRS program, Relator has indeed pointed to specific charts and specific claims in Apollo's possession that Apollo can identify and analyze in response to this Complaint. There are additional allegations in this Complaint that also point Apollo to actual false claims submitted to and reimbursed by CMS, such as the MLP services associated with the kickbacks Relator received in the months and years shown on the screenshots from the ApolloMD.net paycheck portal. These also show actual kickbacks that Apollo paid to Relator.

150.  Additionally, as referenced in an April 5, 2012 email from Kim LeBlanc to Apollo Chief Executive Officer, Mike Dolister, and others, LeBlanc refers to unfavorable Medicare audit results received by Apollo in or around 2011 "at several facilities" in North Carolina. Importantly, the audit results apparently indicated that Apollo improperly submitted claims to CMS under physician NPIs when the underlying medical records did not contain "proof of MD seeing pt." Exhibit 42. This confirms that Apollo submitted actual false claims to CMS and employed its Scheme across all of its facilities in other states—not just Georgia.

151.  Further, below is a step-by-step explanation of Apollo's Scheme, including the who, what, when, where and how. Apollo carries out its national Scheme in at least five ways, as discussed below.

152.   *First*, the Scheme starts with the floor-management models Apollo employs to increase "throughput."[101] Again, in most Apollo facilities, physicians and mid-levels work in different "zones" of the emergency department. Patients are assigned to either a physician or a mid-level depending on the severity of the patient's condition or injury. Dividing the emergency department floor plan in this way all but eliminates direct interaction between physicians and mid-levels. This is intentional; the system prevents overlap and maximizes the number of patients each individual healthcare provider treats. However, the system also complicates communication between emergency department personnel and thereby facilitates Apollo's Scheme.

153.   Those patients that are assigned to mid-levels typically receive care from the mid-level alone without any physician involvement whatsoever. Under Apollo's floor-management models, it is extremely rare that mid-levels and physicians ever see the same patient or even discuss a patient's diagnosis or treatment plan. For example, in a March 22, 2017 email, Apollo President, Yogin

---

[101]   *See*  http://apollomd.com/home/multispecialty-solutions/emergency-medicine/  (last visited Aug. 5, 2021).

Patel, recognized that "[a]s *both the APC and MD should mostly have their own patients*, we should have few shared encounters."[102]

154.   During or immediately following treatment, the mid-level will create and complete an EMR (electronic medical record) for the patient, documenting all of the elements of treatment, which will be used for coding and billing later. These elements include a detailed or comprehensive medical history, physical examination, identification of medicines administered, tests ordered, images ordered, and a description of the medical decision making required.

155.   *Second*, Apollo requires all of its mid-levels across all of its facilities, nationwide, to indicate on their medical records that a physician was involved in their patient encounters *when, in fact, a physician never saw or sufficiently documented their involvement with the mid-levels' patients*. Apollo imposes this requirement regardless of whether such patients are beneficiaries of Medicare or Georgia Medicaid. The email depicted below exemplifies that Apollo imposed such requirement across all of its facilities nationwide—not only in its Georgia facilities. For example, the following August 8, 2013 email from Apollo North Carolinas

---

[102] As another example, in a June 15, 2017 email from Michael Lipscomb, Apollo Chief Quality and Patient Safety Officer, Lipscomb recognized that mid-levels "are more independently operating" (*i.e.*, do not treat patients together with physicians) at Atlanta Medical Center-South and Spalding Regional Medical Center—*i.e.*, the two Apollo facilities at which Relator worked.

Regional Manager, Brandi Raikes Paris, to Apollo Chief Operations Officer and Executive Vice President of Operations, Roger Murray, shows Apollo's uniform policy (in the context of a North Carolina facility) requiring that all Apollo mid-levels assign their charts to physicians for signing.

| | |
|---|---|
| **From:** | Brandi Paris [/O=OFFICE/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=BRAIKES] |
| **Sent:** | 8/8/2013 7:24:07 PM |
| **To:** | Roger Murray [rmurray@apollomd.com] |
| **CC:** | James Dale [jdale@apollomd.com] |
| **Subject:** | RE: Remaining 18 "problem" locations |

Anson- I have tried to reach Terri. Dr. Wynn has 92 deficient charts and is up for suspension because of this. I never know when she will be in the office since she works for the hospital as well. Melanie Lehman has also been trying to reach her because the hospital has called her about the deficient charts.

Betsy Johnson- Dr. Rana has the majority of my deficiencies, and I am meeting him at BJ tonight to get him to complete the charts so that I can process them in the morning.

Bluefield- ProMed is unable to send us the missing July charts. I have asked Dianna to go to Medical Records to get them printed so she can scan them in. I would assume we will probably get a lot more deficiencies from this.

Marion- 125 of the July deficiencies are unassigned in the deficiency list. I have asked Willette to go through them individually so we can list them under the provider's names. It seems that the midlevels are not assigning the charts under a supervising physician's name, so the co-signatures are not there. If we can get this corrected, July will be in much better shape. I am going to be on the phone with Willette tomorrow morning to see how far she got in the list of deficiencies. Medical Records has been printing the ProMed charts for her to scan in. The providers will need to complete these manually because ProMed has been taken off of the hospital computers.

Lenoir- Hannah cleared around 300 deficiencies yesterday. Most of her charts are just lacking a signature. She will be trying to clear more of them tomorrow.

Union/Waxhaw- Pam has been working with LightSpeed and hospital IT trying to resolve the issue with the 29th-31st of July.

**Brandi Raikes Paris**
**ApolloMD**
**Carolinas Emergency Group**
**Carolinas Regional Manager**
**Betsy Johnson Hospital**
braikes@apollomd.com
910-892-1000 Ext 4193
910-527-6174 Cell
www.apollomd.com

Exhibit 49.

156.   The next example shows Apollo imposed the same requirement on its mid-levels in the Georgia facility at which Relator worked (Spalding Regional Hospital). As the below December 4, 2012 email from Apollo Group Coordinator,

Adrian Dawson, to Relator and other Apollo providers shows, Apollo required its mid-levels to assign their charts to physicians for signing.



From: **Dawson, Adrian** ADRIAN.DAWSON@tenethealth.com
Subject: signatures
Date: December 4, 2012 at 5:24 PM
To: Alice Fray amfray@aol.com, Camille Miller cam79miller@gmail.com, Chionesu Sonyika drsonyika@yahoo.com, Denis Kim denisjkim@yahoo.com, Fun Fong fun.fong.jr@gmail.com, Jennifer Host jhostmd@gmail.com, Lynn Flowers lflowers@apollomd.com, Marlon Fisher mfisher6@hotmail.com, Mike Webb mwebbkay@aol.com, Raul Rodon rrodon@apollomd.com, Richisa Johnson-Hamilton richisa@aol.com, Robert Cox rjcox01@aol.com, Robert Hull rhullmd@yahoo.com, Shannon Howell showell727@yahoo.com, Swetang Desai spd4977@yahoo.com, Theltonia Howard thelhoward@yahoo.com, Tony Polk tonepolk@yahoo.com, Wesley Leigh wesleyleigh@aol.com, Chris Pitts chrispittspac@hotmail.com, Dawn Adams daadams66@comcast.net, Kacie Jones kacieleigh1@aol.com, Leimbach, Jennifer jennifer.leimbach@lmunet.edu, Pohl, Melanie unvmel12@hotmail.com, Pryor, Anita anitapryor@att.net, Scott Anderson seapac65@yahoo.com, Short, Dennis shrtdnns@aol.com, Stephanie Jackson stephanieb.jackson@yahoo.com, Tonya Ogletree tonyaogletree@gmail.com, Young, Daniel1 danyoungpac@gmail.com

Good evening, everyone. Please remember to SIGN (or for the midlevels, assign) all of your charts. One of the biggest issues I see on my deficient list is that the charts are not signed. Apparently, it is not enough that you "perform" "modify" or "verify" a chart, it must also be signed in order to push through. We currently have well over 500 deficient charts for the month of November, and yesterday was the deadline to have them all completed for coding. If I give you a list of deficient charts, please do your best to complete it that day. I know the new system makes this difficult, but this is a significant delay in coding that very negatively affects reimbursement and in turn, our paychecks. If you have technical questions, please contact the help desk at extension 5965.

Thank you,
Adrian Dawson
ApolloMD Group Coordinator
Spalding Regional Hospital
601 S. 8th St
Griffin, GA 30224
phone 770-228-2721, x2150
fax 770-467-6138
adrian.dawson@tenethealth.com

Exhibit 50.

157.   As another example, the following email from Apollo Vice President of Operations, Melanie Lehman, to Apollo Chief Information/Technology Officer, again shows that Apollo required its mid-levels to assign their charts to "the supervising physician for the day" so that such physicians could then "sign the

charts." This example relates to Apollo facilities in North Carolina and South Carolina (Aiken Regional and Scotland Memorial), which again shows that Apollo uniformly implemented identical requirements across all of its facilities, nationwide, regardless of payer.



**From:** Melanie Lehman
**Sent:** Tuesday, June 03, 2014 12:19 PM
**To:** James Dale
**Subject:** RE: Schedule Discrepancies_ May 2014 Aiken Regional, Scotland Memorial

Not 100% sure.  He couldn't really remember.  However, he said there have been issues with some of the providers not wanting to sign behind the MLPs, and in order to get charts completed by the end of the month, the GC will often ask them to assign the charts to another provider.  I told him I would talk with Katie about this and we must have the supervising physician for the day sign the charts.

**Melanie Lehman**
**Vice President of Operations**
3000 Aerial Center Parkway, suite 100
Morrisville, NC 27560
Office: 919-461-3846
Cell:   704-754-0466
 Fax:   404-645-7691
Email:  mlehman@apollomd.com
www.apollomd.com

ApolloMD
Emergency Medicine · Anesthesia · Radiology

Exhibit 51.

158.   Apollo even instructs its mid-levels to assign their charts to physicians at random and to alternate which physician they assign their chart to so that payment for the mid-level services is equally distributed to the physicians. For example, the December 5, 2012 email (below) from Mr. Dawson instructs mid-levels to "assign each chart to a doctor." *See also* Exhibit 3 ("Midlevels: Please remember to reliably alternate back and forth for the doc to whom you assign pts. It affects their

paycheck."). The result is that *every mid-level chart is assigned to a physician for signature* so that Apollo can, improperly, bill CMS for mid-level services at the full physician rate.

From: **Dawson, Adrian** ADRIAN.DAWSON@tenethealth.com
Subject: FirstNet
Date: December 5, 2012 at 3:38 PM
To: Alice Fray amfray@aol.com, **Camille Miller** cam79miller@gmail.com, **Chionesu Sonyika** drsonyika@yahoo.com, **Denis Kim** deniskim@yahoo.com, **Fun Fong** fun.fong.jr@gmail.com, **Jennifer Host** jhostmd@gmail.com, **Lynn Flowers** lflowers@apollomd.com, **Marlon Fisher** mfisher6@hotmail.com, **Mike Webb** mwebbkay@aol.com, **Raul Rodon** rrodon@apollomd.com, **Richisa Johnson-Hamilton** richisa@aol.com, **Robert Cox** rjcox01@aol.com, **Robert Hull** rhullmd@yahoo.com, **Shannon Howell** showell727@yahoo.com, **Swetang Desai** spd4977@yahoo.com, **Theltonia Howard** thelhoward@yahoo.com, **Tony Polk** fonepolk@yahoo.com, **Wesley Leigh** wesleyleigh@aol.com, **Chris Pitts** chrispittspac@hotmail.com, **Dawn Adams** daadams66@comcast.net, **Kacie Jones** kacieleigh1@aol.com, **Leimbach, Jennifer** jennifer.leimbach@lmunet.edu, **Pohl, Melanie** unvmel12@hotmail.com, **Pryor, Anita** anitapryor@att.net, **Scott Anderson** seapac65@yahoo.com, **Short, Dennis** shrtdnns@aol.com, **Stephanie Jackson** stephanieb.jackson@yahoo.com, **Tonya Ogletree** tonyaogletree@gmail.com, **Young, Daniel1** danyoungpac@gmail.com

This is a reminder to all of you who use scribes, that not only does the scribe have to put a note in the chart stating that he/she is acting as a scribe for you, but YOU must put a note in the chart that you agree with the scribe's documentation. Yours should read, "I, ___ ___, MD, agree with the scribe's documentation." This MUST be on each chart on which you've used a scribe, and the statement can be built as a macro.

Please also remember to SIGN every chart on which you document. To be safe, physicians can "verify" the mid-levels' charts, but still sign them as well. I know this is an extra step but the charts aren't flowing to Apollo otherwise. I think we are all getting the hang of the system, but if you aren't already aware, do NOT create a new note if you've taken over from your scribe or a midlevel; just modify their note.

For the mid-levels, please remember to assign each chart to a doctor. I may give you a list of charts asking you to assign a doctor, when you may have already done so—I can't see who you've assigned until they have signed the chart. If you get such a list and you've already assigned the doctor/s/, please just call or email me and say, "I assigned all of these to Dr. X" so I know to ask Dr. X to sign them. Please remember to document procedures thoroughly. Lastly, if you are working as the triage midlevel, you are responsible for documenting the ROS and Exam on any patients who leave before seeing another provider. These will also need a doctor assigned.

As always, if you have technical questions, please contact the help desk at x5965.

Thank you,
Adrian Dawson
ApolloMD Group Coordinator
Spalding Regional Hospital
601 S. 8th St
Griffin, GA  30224
phone 770-228-2721, x2150
fax 770-467-6138
adrian.dawson@tenethealth.com

Exhibit 52.

159.   ***Third***, Apollo then requires that all of its physicians across all of its facilities, nationwide, sign mid-level medical records to falsely suggest the physician treated the mid-level's patient so that Apollo can submit claims to CMS based on such medical records at the full physician rate. For example, Apollo President, Yogin Patel, admits in the March 12, 2017 email excerpt, below, that Apollo uniformly submits claims for split/shared visits to CMS under physician NPIs where the physician documentation contained within the mid-level's is not sufficient to bill under the physician's NPI.

<div style="border:1px solid">

(1) **APC Patients** - No physician involvement, typically billed at 85%, and paid for by salary to APC. No incremental cost.

(2) **MD Patients** - No APC involvement. MD does these encounters (typically H&PS or complex follow ups). These are billed under the MD and paid out as $50/encounter.

(3) **Shared visit with APC and MD work** - These are complex patients that the APC mostly manages but may require MD to help. Both would document on these cases. This should be rare and we would pay the MD for their consultative work. The APC still needs to see 12 patients outside of these shared visits per work day. The docs likely need to document that they were asked to "assume care of this patient".

(4) **Shared Visits with no MD work**- These are patients managed by APCs, but where the chart is signed off or billed under the MD. Since the signing MDs have little substantive work, these should not be credited to the MDs as shared visits. Currently, some of these get classified as shared visits and we have been paying these to the MD at $50/encounter.

</div>

Exhibit 40. Importantly, Patel admits in the above-referenced email excerpt that Apollo fraudulently ***submitted actual claims for reimbursement*** under physician NPIs even though Apollo knew that such claims "should not be credited to the MDs as shared visits," as the underlying medical records for such claims either contained "no MD work" or "little substantive work" by the physician.

117

160.   Apollo administrators also regularly required Relator to sign the charts of mid-levels for patients whom Relator did not treat. For example, in the following February 17, 2014 email from Adrian Dawson to Relator, Mr. Dawson instructs Relator to sign all of the mid-level charts assigned to him.

From: **Dawson, Adrian** ADRIAN.DAWSON@tenethealth.com
Subject: charts
Date: February 17, 2014 at 10:09 AM
To: doc drsonyika@yahoo.com

Hi, Dr. Sonyika. If you have remote access, please log in and sign all of the midlevel charts that are assigned to you; I think there are quite a few.

Thanks,
**Adrian Dawson**
ApolloMD Group Coordinator
Spalding Regional Hospital
601 S. 8th St
Griffin, Georgia  30224
Office: 770.228.2721, x2150
Fax: 770.467.6138
adrian.dawson@tenethealth.com

Exhibit 53.

161.   Moreover, as shown by the additional examples, below, it cannot be disputed that Apollo requires all of its physicians to sign all mid-level charts, and that Apollo imposes such requirement so that it can fraudulently submit claims to CMS at the full physician rate.

- In a March 21, 2014 email from Lisa Murray, Apollo Director of Credentialing, to Roger Murray, Apollo Chief Operations Officer and Executive Vice President of Operations, Lisa Murray made clear that "if you bill a government payor (Medicaid or Medicare) under an extender [*i.e.*, mid-level] only[,] you receive

85% rather than 100% of allowables. If a physician co-signs an extender chart then it can be billed at 100% of allowables. **_For financial reasons alone_**, **_I would insist on co-signing_**" (Exhibit 41).

- In a March 21, 2014 email from Apollo Chief Operations Officer and Executive Vice President of Operations, Roger Murray, to Apollo Chief Executive Officer, Mike Dolister, Murray stated that, regardless of the location of the specific facility or the payer at issue, "**_we've always required physician signatures on ED [emergency department] charts when working with mid-levels_**—maybe **_for billing_**, mostly" (_id._).[103]

- In a July 26, 2012 email from Apollo President, Yogin Patel, to Apollo Chief Executive Officer, Mike Dolister and others, in the context of an Apollo physician that was unable to "e-sign many of the [mid-level] charts," Patel noted that "**_unsigned charts may have to be billed out as 85%_**" (Exhibit 54).

- In a February 10, 2014 email from Apollo Chief Operations Officer and Executive Vice President of Operations, Roger Murray, to Apollo Senior Vice President of Hospital Medicine, Jackie Newman, Murray points out that "**_[i]n ER [emergency room], we universally require physician sign-off_**, where applicable" (Exhibit 55).

- In a November 6, 2013 email from John Snyder, Apollo Assistant Revenue Cycle Director, to David Afshar, Apollo Chief Financial Officer, Snyder discussed his understanding of

---

[103] Apollo's corporate representative and Executive Vice President of Clinical Support, Casey Crane, indicated under oath that she assumed Mr. Murray was "referring to **_billing out_** **_under the_** **_physician instead of the nurse practitioner_**." _See_ Exhibit 41 (November 7, 2022 30(b)(6) Deposition Transcript of Casey Crane) at 117:14-23 (emphasis added). **This is an admission of fraud**—_i.e._, Apollo has always required physician signatures on emergency department charts so that Apollo can fraudulently bill at the physician rate instead of the mid-level rate.

emergency room billing, "where **the doctor signs the chart and all services get billed with his credentials**" (Exhibit 56).

- Regarding an Apollo facility located in Alabama, Apollo Group Coordinator Manager, Conchita Fouts, instructed Apollo employee, Lauren Manuel, to "**[c]ontinue to educate the physicians on co-signing mid-level charts**. The more we educate them the less deficient charts we will have" (Exhibit 57).

162. Apollo employs individuals at most, if not all, of its facilities whose primary role is to obtain physician signatures and attestations on every mid-level chart. Apollo also ensures employee compliance with these requirements by admonishing its healthcare providers that physician countersignatures are required for the mid-level services to be billed, even though there is no such CMS requirement. Worse still, Apollo ensures that its providers comply with Apollo's charting requirements by threatening that failure to do so will affect both individual paychecks (for those who do have outstanding charts) and the entire department's timely pay. The following September 26, 2013 email from Mr. Dawson is an example of such threats:

From: **Dawson, Adrian** ADRIAN.DAWSON@tenethealth.com
Subject: Month end closing
Date: September 26, 2013 at 12:34 PM
To: Alice Fray amfray@aol.com, Boykin Robinson brobinson@apollomd.com, Camille Miller cam79miller@gmail.com,
Charles Chandler chrlschandler@gmail.com, Chionesu Sonyika drsonyika@yahoo.com, Denis Kim denisjkim@yahoo.com,
Fun Fong fun.fong.jr@gmail.com, Jennifer Host jhostmd@gmail.com, Lynn Flowers lflowers@apollomd.com, Marlon Fisher
mfisher6@hotmail.com, Mike Webb mwebbkay@aol.com, Richisa Johnson-Hamilton richisa@aol.com, Robert Cox
rjcox01@aol.com, Robert Hull rhullmd@yahoo.com, Shannon Howell showell727@yahoo.com, Swetang Desai
spd4977@yahoo.com, Theltonia Howard thelhoward@yahoo.com, Tony Polk tonepolk@yahoo.com, Trushnaa Patel
tpatel27@gmail.com, Wesley Leigh wesleyleigh@aol.com, Chris Pitts chrispittspac@hotmail.com, Dawn Adams
daadams66@comcast.net, Kacie Jones kacieleigh1@aol.com, Leimbach, Jennifer jennifer.leimbach@lmunet.edu, Pohl, Melanie
unvmel12@hotmail.com, Pryor, Anita anitapryor@att.net, Satchell, Tiffany tsatchellpac@gmail.com, Scott Anderson
seapac65@yahoo.com, Short, Dennis shrtdnns@aol.com, Stephanie Jackson stephanieb.jackson@yahoo.com, Tonya Ogletree
tonyaogletree@gmail.com, Young, Daniel1 danyoungpac@gmail.com

Good afternoon, everyone. I was on a conference call this morning with the Group Coordinator supervisors and Roger Murray, ApolloMD's COO. They all stressed that this month-end closing will be particularly tight due to the way the dates fall. Your paychecks as well as everyone else's in the company directly relate to how much money is brought in, which is directly tied to charting. Therefore, it is *extremely* important that we get all September charts completed and coded as soon as possible, and EVERY chart should be complete before next Wednesday, October 2nd, so the coders have time to code them. Please check your message center and saved documents before you leave each shift, and complete any lists I give you the day I give them to you. Most of you are very good about this, and I appreciate it! For those of you with longer lists, please work on completing them NOW so the coders are not deluged at the last minute, and work to keep your charts current between now and the end of the month.

Thank you,
**Adrian Dawson**
**ApolloMD Group Coordinator**
Spalding Regional Hospital
601 S. 8th St
Griffin, Georgia 30224
Office: 770.228.2721, x2150
Fax: 770.467.6138
adrian.dawson@tenethealth.com

Exhibit 40.

163. ***Fourth***, Apollo requires all of its physicians across all of its facilities, nationwide, to use its insufficient "attestations" or "macros" that misrepresent or otherwise wholly fail to sufficiently document physician involvement with the care of a mid-level's patient. "Attestations" are pre-written statements that providers quickly add to patient medical records by simply checking a box. Apollo required

Relator to use insufficient attestations at the two Apollo emergency departments at which he worked. And, through discovery in this action, Relator confirmed that Apollo fraudulently required its providers to use insufficient attestations so that it could submit split/shared claims to CMS under physician NPIs. Examples of such attestations Apollo uses are listed below:

- "Case reviewed w/pt face-to-face."

- "I have performed the medical decision making for this patient and have asked the MLP to document the results."

- "I have personally seen the patient, I have performed the mdm for this patient and have asked the PA to document the results."

- "I have personally seen and examined this patient. I have fully participated in the care of this patient. I have reviewed all pertinent clinical information, including history, physical exam and plan."

- "I have performed the medical decision making for this patient, including assessing all of the patient's diagnostic testing and I have instructed the mid-level provider to document the results. I have fully participated in the care of this patient. I have reviewed all pertinent clinical information, including history, physical exam and plan with the mid-level provider."

164. All of the above examples of Apollo's bare-bones attestations misrepresent physician involvement with patients treated by mid-levels. And none of the above attestation satisfy CMS's requirements that the physician document a "substantive portion of the E/M visit" in order to bill and obtain payment from CMS

at the 100% physician rate for a split/shared visit. Yet, Apollo required physicians to sign and attest within mid-level charts on a regular basis through the insufficient attestations quoted above or materially similar (and equally insufficient) versions thereof.

165. Apollo specifically intended that *every* mid-level chart include a physician signature and/or some form of deficient, check-the-box attestation. For example, the image below depicts an excerpt from a July 27, 2012 email from Apollo President, Yogin Patel, to Apollo physician, Todd Gardner. In the email, Patel improperly instructs Gardner to "[e]ncourage the docs to put their head into the MLP patient rooms and document/click the appropriate attestation that reflects that you have laid eyes on the patient." In the same email, Patel made clear that his instructions were easy ways to "ensure maximal reimbursement," "get you full reimbursement," "get max reimbursement on MLP charts," or otherwise "maximize [] billing." Exhibit 43.

> Roger is following up with Heidi to figure out what we can do to ensure maximal reimbursement. On the provider side, can you:
>
> (1) Encourage the docs to put their head into the MLP patient rooms and document/click the appropriate attestation that reflects that you have laid eyes on the patient. If you can add a physical exam element that may be also help show attending involvement in the case and get you full reimbursement. I am trying to get the exact language that needs to be there from Heidi.
>
> (2) Most of the downcodes are all related to insufficient physical exam. I would advise everyone (especially MLPs) to click through at least 8 PE elements to allow you to get up to a level 5 (if the diagnosis permits).
>
> I'll also talk to Mike about protecting your average more while we try to figure out ways to fix this. I've asked Heidi for the specific language that the coders need to see to be able to get max reimbursement on MLP charts. Finally, I'm attaching our new Guide to MedHOST. Send to all your docs/mlps and have them review (it's a short read but will help them maximize their billing).

*Id.*

166.    Additionally, in an attachment to the email referenced above, which Patel asked Gardner to "[s]end to ***all*** [his] docs/mlps and have them review," Patel again improperly instructed Apollo providers as follows with respect to using attestations:

> In practice, the most efficient thing may be to cruise by the patient's room and confirm the HPI and select [the attestation] "CASE REVIEWED w/pt face-to-face." If these selections are not made, then the encounter will be billed as a midlevel only encounter and we will be reimbursed at 85 percent of standard rates.

Exhibit 42; *see also* Exhibit 12.

167.    The following March 14, 2013 email from Apollo Credentialing Specialist, Liz Hawkins, is another example of emails that Apollo administrators regularly send to physicians and mid-levels—requiring and hounding physicians to sign and/or attest within mid-level charts—in furtherance of the Scheme:



Exhibit 58.

168.    However, Apollo admitted under oath that it hasn't done ***anything*** to make sure that any canned text or prewritten attestations are being used appropriately by physicians.[104] And in the words of Apollo Chief Quality and Patient Safety Officer, Dr. Michael Lipscomb, from a November 22, 2014 email sent by Dr. Lipscomb, **Apollo knew that "there is no single statement that could be a 'clickbox' on an EMR that will satisfy Medicare's guideline to bill in a physician name."** Exhibit 59.

---

[104] *See* Exhibit 62 (November 7, 2022 30(b)(6) Deposition Transcript of Casey Crane) at 164:4-9.

169. *Fifth*, Apollo requires its coders and billers to code and submit claims to CMS for payment for split/shared services at the 100% physician rate based on patient medical records that Apollo knows wholly fail to sufficiently document a physician's involvement with the patient and/or misrepresent a physician's involvement with the patient. As Apollo President, Yogin Patel, admits: "we try to bill under the MD whenever possible." Exhibit 40.

170. For years, Apollo required its coders and billers to code and submit claims to CMS for payment at the 100% physician rate for split/shared services based on patient medical records where the only physician documentation contained within the mid-level's medical record was a physician signature or a single-sentence, boilerplate physician attestation, as discussed above. Examples of Apollo's insufficient attestations are quoted in ¶163, above.

171. These attestations (or substantially similar versions thereof) are all that Apollo required a physician to document within a mid-level's medical record to bill the mid-level's services under the physician's NPI. Single conclusory sentences with no supporting physician documentation of patient-specific information. For example, as discussed above, Apollo instructed its physicians that, to "maximize their billing," the physicians must "cruise by the patient's room and confirm the HPI and select [the attestation] 'CASE REVIEWED w/pt face-to-face.' If these selections

are not made, then the encounter will be billed as a midlevel only encounter and we will be reimbursed at 85 percent of standard rates." Exhibit 43; *see also* Exhibit 12.

172.   By submitting claims for split/shared services to CMS when Apollo's wholly insufficient physician attestations (or physician signatures alone) were the only physician documentation contained within the mid-level's medical record, Apollo misrepresented the physician's involvement with the patient and the services provided and also knowingly violated CMS requirements that the physician perform and sufficiently document "all or some portion of the history, exam or medical decision making key components of an E/M service."[105]

173.   On each claim form it submitted to CMS pursuant to the Scheme, Apollo further misrepresents to CMS that:

- The "information on this form is true, accurate and complete";

- Apollo "familiarized [it]self with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor;

- Apollo "provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision";

---

[105] *See* MEDICARE CLAIMS PROCESSING MANUAL, Chapter 12 - Physicians/Nonphysician Practitioners, at § 30.6.13(H) (2019), available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/clm104c12.pdf (last visited July 29, 2021).

- The claim "complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment"; and

- The services claimed on the form were "medically necessary" and "medically indicated and necessary to the health of [the] patient and were personally furnished by me or my employee under my personal direction."

174. Through its policies, requirements, and instructions, Apollo systematically submits claims for payment to CMS that expressly misrepresent the identity of the provider of the services and expressly and impliedly misrepresent that CMS's clear requirements and conditions for payment for split/shared services at the 100% physician rate were satisfied by the associated and supposedly supporting documentation and medical records.

175. Apollo knew it received funds from CMS to which it was not entitled by submitting upcoded claims for reimbursement to CMS under physician NPIs and thereby misrepresenting to CMS that it was entitled to payment at physician rates for services performed by mid-levels.

176. If the CMS requirements were not clear enough, Apollo received express warnings that its split/shared visit policies did not comply with CMS requirements or otherwise misrepresented physician involvement—including express warnings that the physician attestations relied on by Apollo to submit

split/shared claims to CMS (referenced above) were inadequate to support CMS's payment of claims for split/shared services at the 100% physician rate.

177.   For example, in or around 2011, Apollo received unfavorable audit results at several Apollo facilities warning Apollo that it submitted claims for reimbursement for split/shared services under physician NPIs although the underlying medical records did not contain "proof of MD seeing pt." Exhibit 42. Upon information and belief, Apollo received additional unfavorable audit results before and after 2011 that similarly warned Apollo that its policies did not comply with CMS requirements or otherwise misrepresented physician involvement.

178.   As another example, Apollo was made aware in March of 2011 that to properly bill split/shared visits under a physician's NPI, the physician must perform and document "one of the three key components of the E&M service, *i.e.*, history, physical exam, and medical decision making." *See* Exhibit 4. Instead, Apollo's policies required the submission of claims for reimbursement to CMS under physician NPIs when the underlying medical records only contained a physician signature or insufficient attestation.

179.   As another example, the following email from Heidi Young to Apollo Chief Operations Officer and Executive Vice President of Operations, Roger Murray, shows that Apollo was expressly warned in or around February and April of

2012 that it split/shared policies did not comply with CMS requirements or otherwise misrepresented physician involvement—and, therefore, that Apollo was receiving funds from CMS to which it was not entitled. Specifically, Apollo was made aware that its split/shared policies did not comply with CMS requirements and that "[w]e run the risk of audits/fines for improper documentation the longer we keep coding these [charts] with the doctor as primary."

| To: | Roger Murray[rmurray@apollomd.com] |
| --- | --- |
| From: | Heidi Young |
| Sent: | Tue 4/17/2012 2:44:23 PM |
| Subject: | Re: Medicare documentation being implemented |

Hi Roger,

I never heard back from you on this.  We can't delay this too much longer as there is no CMS policy allowing a grace period.  We run the risk of audits/fines for improper documentation the longer we keep coding these with the doctor as primary.  Let me know when you're available to go over this.  Thanks.

On Mon, Apr 16, 2012 at 9:54 AM, Heidi Young <hyoung@pettigrewmedical.com> wrote:

   Sure.  What time is good for you?

On Mon, Apr 16, 2012 at 9:53 AM, Roger Murray <rmurray@apollomd.com> wrote:

   Heidi, before implementing, are you available for a call with Mike Dolister and me today?  I believe Mike may join me for lunch
   with Rick and Dave on Wed, as well.  I just want to make sure we fully understand the implications of this.  Thx.

   - RM

   From: Heidi Young [mailto:hyoung@pettigrewmedical.com]
   Sent: Monday, April 16, 2012 9:52 AM
   To: Roger Murray
   Subject: Medicare documentation being implemented

   Hi Roger,

   We are implementing the documentation criteria that CMS requires for the shared services starting today.  This was
      discussed at the annual ACEP conference this year that the doctor must personally document a portion of one of the
      sections of the chart: HPI, PE or MDM.  The doctor cannot use the MLP as the scribe to document his/her portion.  The
      current wording on the charts is "I have personally seen the patient, I have performed the mdm for this patient and have
      asked the PA to document the results".  That is no longer acceptable since the MLP should not be used in both a
      provider and a scribe role.  The doctor should be the one to document the portion of the service that he is doing himself,
      otherwise the chart will be billed to the MLP as primary.  We had discussed this with you back in February and we set
      April 1 as the go-live date to allow a grace period for the changes to be made.  We are just now putting this in effect so
      that it allowed us to get past month end.  I just want to let you know that we have not seen a significant change in any of
      the hospitals in terms of their documentation.  This means that you will see a shift in the provider assignments and the
      MLP's will be getting credit for the majority of these visits until the doctors can make a change in their documentation.
      A simple attestation will no longer be sufficient, they do need to actually document a portion of the chart themselves.

Exhibit 60.

180.    Despite receiving these clear warnings, Apollo made—and continues to

make—a collective business decision to consciously ignore and disregard these

warnings.  Apollo continues to submit split/shared claims to CMS when Apollo

knows the underlying medical records wholly fail to support submitting such claims under physician NPIs.

181.   Apollo began discussing changing its mid-level and split/shared visit documentation, coding, and billing policies on or around May 15, 2012. The new policy—which appears to have never been fully implemented or adopted—purported to require that physicians personally see the patient *and* perform and document a substantive part of the service, meaning the physician must perform and document a substantial portion of the history, physical examination, or medical decision making—which CMS required since 2002. Below is an email excerpt written by Apollo CEO, Mike Dolister, that was sent to all Apollo physicians on or around April 20, 2012. In the email, Dolister discusses Apollo's existing split/shared policies and the new split/shared policy that was being discussed on or around May 15, 2012.

We wanted to bring you up to date on some interpretative changes regarding how the Center for Medicare and Medicaid Services (CMS) is viewing specific components of how patient encounters seen primarily by mid-level providers (MLPs) are being coded and billed. Months ago we talked about how if a physician documented that they had "personally seen and examined this patient and agree with the care plan as documented" and "have performed the medical decision making for this patient, including assessing all of the patient's diagnostic testing and have instructed the mid-level provider to document the results" that this would be sufficient for us to code and bill the chart under the physician's billing number at 100% of the charge and we of course would reimburse the physician at 100% off the fixed fee schedule for practices where the physicians are paid on productivity (the majority of practices we work with). Whereas if a MLP saw and evaluated a patient and these elements were not documented, the chart would be coded and billed under the MLP's billing number at 85% of the charge and the supervising physician would be reimbursed at 85% off the fixed fee schedule.

CMS is now clearly stating that in order to be reimbursed at 100% of the charge for patients seen primary by a MLP, it must be documented that the physician personally saw the patient AND the supervising physician "has to perform AND document that he performed, a substantial part of the service" which has been interpreted to mean that the physician performed and documented a substantial portion of the history, the physical examination OR the medical decision making. The physician can no longer ask the MLP to document the results and still bill under the physician's billing number at 100% of the charge. Therefore, in order to be in compliance with the new CMS interpretive guidelines we will be changing the manner in which charts are coded starting on May 15, 2012. For everyone using paper templates, we will be changing the language on the paper templates immediately and getting the new templates in place.

Exhibit 7.

182. Although Dr. Dolister implies in his email that Apollo was changing its split/shared billing policy because CMS' requirements were previously unclear, that is simply not the case. As discussed above, CMS requirements on how to properly bill at the physician rate for mid-level services remained the same since 2002. In fact, Apollo could not point to anything suggesting that Medicare changed its documentation criteria for split/shared visits around 2011 before it implemented its policy change (Apollo just finally changed its policy in 2012 to bring its policies more in line with what Medicare had always required).[106] However, Apollo's change

---

[106] *See generally* Exhibit 62 (November 7, 2022 30(b)(6) Deposition Transcript of Casey Crane) at 80:23-81:7; *see also id.* at 91:3-7, 91:11-20.

in policy did not lead to a change in practice. The new policy simply paid lip service to the Medicare rules.

183.   Moreover, Apollo also admitted under oath that it knows Medicare's split/shared visit requirements "haven't changed for a very, very long time" and that "CMS is pretty clear, [so] there's not a lot of room for interpretation."[107] And in any event, Apollo admitted that it never reached out to CMS to seek clarification regarding CMS' split/shared visit billing requirements, although Apollo know it could have done so.[108] Apollo also admitted that when it perceives CMS rules to be unclear, it chooses the interpretation that allows Apollo to receive *more* government money rather than less.[109]

184.   Apollo's lip-service to a policy change is, in the very least, an implicit admission that its existing policies did not satisfy CMS requirements.[110] In fact, after Apollo tried out this policy change, Apollo President, Yogin Patel, noted in a July 30, 2012 email that the number of "MLP only billed charts increase[d] significantly"

---

[107] *See* Exhibit 65 (March 31, 2022 30(b)(6) Deposition Transcript of Tennille Lizarraga) at 179:3-180:22, 182:16-18.

[108] *See* Exhibit 66 (October 12, 2022 30(b)(6) Deposition Transcript of Tim Stowe) at 99:21-100:5.

[109] *See* Exhibit 66 (October 12, 2022 30(b)(6) Deposition Transcript of Tim Stowe) at 106:24-107:4.

[110] Apollo admitted under oath that it didn't refund Medicare after it changed its split/shared visit policy for any claims Apollo submitted to Medicare pursuant to its older (and noncompliant) billing policy. *See* Exhibit 66 (October 12, 2022 30(b)(6) Deposition Transcript of Tim Stowe) at 98:11-21.

at one facility, resulting in what Patel called a "15% paycut on those charts." Exhibit 44. That is, if Apollo were to keep its new policy, it could no longer bill "significant" numbers of mid-level charts at the physician rate because it was following its new more-compliant split/shared policy. It could not be clearer that, before implementing its split/shared visit policy change, Apollo was improperly reaping a 15% pay increase based on claims it fraudulently submitted to CMS under physician NPIs. But worse, Apollo then went back to its old ways, apparently unable to stomach the financial losses the came along with the straight and narrow path of compliance.

185.   Specifically, Apollo continues to submit false claims to CMS under the Scheme. In 2017, Apollo President, Yogin Patel—the same person who lamented the financial impact of doing things the right way—sent an email to Apollo Vice President of Operations, Pat Johnson, that blatantly admits Apollo still (in 2017) was uniformly submitting claims for split/shared visits to CMS under physician NPIs where the only physician documentation contained within the mid-level's chart is a physician signature or where the chart otherwise contained "no MD work."

> (1) **APC Patients** - No physician involvement, typically billed at 85%, and paid for by salary to APC. No incremental cost.
> (2) **MD Patients** - No APC involvement. MD does these encounters (typically H&PS or complex follow ups). These are billed under the MD and paid out as $50/encounter.
> (3) **Shared visit with APC and MD work** - These are complex patients that the APC mostly manages but may require MD to help. Both would document on these cases. This should be rare and we would pay the MD for their consultative work. The APC still needs to see 12 patients outside of these shared visits per work day. The docs likely need to document that they were asked to "assume care of this patient".
> (4) **Shared Visits with no MD work**- These are patients managed by APCs, but where the chart is signed off or billed under the MD. Since the signing MDs have little substantive work, these should not be credited to the MDs as shared visits. Currently, some of these get classified as shared visits and we have been paying these to the MD at $50/encounter.

Exhibit 40.

186.    As another example, the following October 30, 2014 email from Apollo Director of Revenue Cycle, Tennille Lizarraga, to Apollo Assistant Revenue Cycle Director, John Snyder, again shows that Apollo continued to implement its uniform fraudulent documentation, coding, and billing policies and practices even after its policy change. As shown in the email, a private payer audited claims Apollo submitted from its *Pennsylvania* facilities in or around October of 2014. Relevant here, Tennille noted that the private payer at issue "follows the Medicare guideline for billing under an MD or DO when an extender [*i.e.*, mid-level] is the true rendering provider." Exhibit 61. Applying the Medicare guidelines to the claims Apollo submitted, the private payer concluded in an audit that "the claims should have actually been billed under the PA not the MD/DO." *Id*. This clearly shows that, even after its 2012 policy change, Apollo continued to uniformly (and fraudulently) code and submit all claims for reimbursement—*regardless of payer*—under

physician NPIs even though the underlying medical record did not support billing at the physician rate.

| | |
|---|---|
| **To:** | Januarie Diehl[jdiehl@apollomd.com]; John Snyder[jsnyder@apollomd.com] |
| **Cc:** | David Afshar[dafshar@apollomd.com] |
| **From:** | Tennille Lizarraga |
| **Sent:** | Thur 10/30/2014 5:24:54 PM |
| **Subject:** | Pennsylvania- Capitol BCBS Call regarding billing under MDs instead of PAs |

I just received a call from Karen Gamble from Capitol BCBS in Pennsylvania. She stated that they are auditing our accounts and that they are sending us a list of claims that we have submitted to Capitol over the past 6 months to a year to confirm the actual rendering provider who should have been billed on the claim. She stated that they have already audited some of our claims that were billed, requested the medical records from the facility to see if the MD/DO or the PA rendered services and found that the claims should have actually been billed under the PA not the MD/DO. Karen stated that this was initiated because they saw such a low volume of claims coming through for the PA's that are credentialed to our groups, Carlise and Liberty. These are the only two she mentioned during our conversation.

Capitol follows the Medicare guideline for billing under an MD or DO when an extender is the true rendering provider. The MD or DO must have some face to face time with the patient during the visit. I have explained this to the Pennsylvania team as well as the people assisting with over time to ensure that they know how to properly bill extender claims.

Once I get the list of claims that Capitol is requiring us to self-audit I will inform everyone. Hopefully they only go back 6 months.

Thanks,
*Tennille M Lizarraga*
Tennille M Lizarraga
Director of Revenue Cycle
ApolloMD
5665 New Northside Drive
Atlanta, GA 30328
Desk 770-874-5403
Fax 678-235-6766
tlizarraga@apollomd.com

*Id.*

187. The fact the Apollo submitted false claims to Medicare from its facilities across the country cannot be disputed, as Relator uncovered that **Apollo submitted actual false claims to Medicare for services purportedly rendered in the States of Florida, North Carolina, Virginia, South Carolina, Pennsylvania, Tennessee, Alabama, California, Delaware and Georgia**. *See* Exhibits 19 through

35A (representative examples of false claims Apollo submitted to Medicare and the underlying medical records upon which the false claims were based).

188.   For example, Exhibit 19 is a medical record reflecting services rendered by an Apollo mid-level within an Apollo emergency department located in the State of North Carolina. Within the medical record, an Apollo physician co-signed hours after the mid-level and expressly noted within the medical record that he "was not specifically asked to see this patient." Exhibit 19 (excerpted below).

> Attestation signed by Jonathan K Tackett, MD at 3/15/2021 10:50 PM
> I was present in the ED as the supervising physician and am cosigning the note in this role. I was available for consult. I was not specifically asked to see this patient.

Exhibit 19. However, as Apollo's billing data shows (*see* Exhibit 19A, excerpted below), Apollo submitted a claim to North Carolina Medicare under the physician's billing number (the "Rendering Provider")[111] at the full physician rate—fraudulently charging Medicare $1,400.00 for *mid-level* services at the upcoded *physician* rate.

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NOVANT HEALTH THOMASVILLE MEDICAL CENTER (ER) | MEDICARE-NC (MEDICARE) | ▮ | 4▮ | 99285 | 1407203888 | MD | TACKETT, JONATHAN | 1477594554 | PA | WASHINGTON, GREGORY | 3/12/21 | 1400 | 140.92 |

---

[111] The provider listed as the "Rendering Provider" within Apollo's billing data is the billing provider.

Exhibit 19A. This is exactly the fraud Relator witnessed in Georgia. Apollo similarly billed Medicare under Relator's billing number for services exclusively provided by mid-level providers when all Relator did was co-sign the mid-levels' medical records. But Apollo's fraud wasn't limited to Georgia and North Carolina. It was national, as Relator knew all along and as further demonstrated by the additional false claim examples discussed below.

189.   As another example, Exhibit 20 is a medical record reflecting services rendered by an Apollo mid-level within an Apollo emergency department located in the State of Virginia. Within the medical record, an Apollo physician co-signed the day after the mid-level and expressly noted within the medical record that the mid-level saw the patient "alone." *See* Exhibit 20 (excerpted below).



Exhibit 20. However, as Apollo's billing data shows (*see* Exhibit 20A, excerpted below), Apollo submitted a claim to Virginia Medicare under the physician's billing

number at the full physician rate—fraudulently charging Medicare $505.00 for mid-level services at the upcoded physician rate.

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CHIPPENHAM HOSPITAL (ER) | MEDICARE-VA (MEDICARE) | ▨ | ▨ | 99283 | 1720185549 | MD | CHANG, NEVAN | 1770019523 | | GONZALEZ, MELISSA | 3/31/18 | 505 | 48.97 |

Exhibit 20A.

190.   As another example, Exhibit 21 is a medical record reflecting services rendered by an Apollo mid-level within an Apollo emergency department located in the State of Florida. Within the medical record, an Apollo physician co-signed after the mid-level and expressly noted within the medical record that his only involvement was reviewing the mid-level's medical record. *See* Exhibit 21 (excerpted below).

| ED Provider Notes by Tony Chan, PA | | 9/17/2017 11:08 AM |
|---|---|---|
| Author:  Tony Chan, PA | Service:  (none) | Author Type:  Physician Assistant |
| Filed:  9/17/2017 11:10 AM | Date of Service:  9/17/2017 11:08 AM | Status:  Attested |
| Editor:  Tony Chan, PA (Physician Assistant) | | Cosigner:  Alberto Marin, MD at 9/17/2017 12:15 PM |

Attestation signed by Alberto Marin, MD at 9/17/2017 12:15 PM
I was available for consultation in the emergency department. Chart was reviewed only

Exhibit 21. However, as Apollo's billing data shows (*see* Exhibit 21A, excerpted below), Apollo submitted a claim to Florida Medicare under the physician's billing number at the full physician rate—fraudulently charging Medicare $505.00 for mid-level services at the upcoded physician rate.

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LEHIGH REGIONAL MEDICAL CENTER (ER) | MEDICARE-FL (MEDICARE) | ▮▮ | ▮▮ | 99283 | 1063458214 | MD | MARIN, ALBERTO | 1689910036 | PA | CHAN, TONY | 9/17/17 | 505 | 51.96 |

Exhibit 21A.

191.   As another example, Exhibit 22 is a medical record reflecting services rendered by an Apollo mid-level within an Apollo emergency department located in the State of Tennessee. Within the medical record, an Apollo physician co-signed the day after the mid-level and noted within the medical record that the patient was seen exclusively by the mid-level (APP) and that "[a] physician was available in real-time to see this pt if desired by APP." *See* Exhibit 22 (excerpted below).

| | |
|---|---|
| Document Name: | ED Note-Physician  (Auth (Verified)) |
| Performed By: | BATES PA, RACHEL   05/06/2019 19:35:38 CDT |
| Signed By: | per contribution   per contribution |
| Authenticated By: | MAY MD, WILLIAM B   05/07/2019 15:40:11 CDT |

Signed By:     MAY MD, WILLIAM B (05/07/2019 15:40:11 CDT); BATES PA, RACHEL (05/06/2019 19:35:38 CDT)

Pt seen by APP. A physician was available in real-time to see this pt if desired by APP.

Electronically Signed On 05.06.19 19:35 CDT

_____

BATES PA, RACHEL

Electronically Signed On 05/07/19 15:40 CDT

_____

MAY MD, WILLIAM B

Exhibit 22. However, as Apollo's billing data shows (*see* Exhibit 22A, excerpted below), Apollo submitted a claim to Tennessee Medicare under the physician's

billing number at the full physician rate—fraudulently charging Medicare $505.00 for mid-level services at the upcoded physician rate.

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SAINT FRANCIS HOSPITAL - BARTLETT (ER) | MEDICARE-TN (MEDICARE) | | | 99283 | 1528382199 | MD | MAY, WILLIAM | 1992121834 | PA | BATES, RACHEL | 5/6/19 | 505 | 47.02 |

Exhibit 22A.

192.   As another example, Exhibit 23 is a medical record reflecting services rendered by an Apollo mid-level within an Apollo emergency department located in the State of Georgia. Within the medical record, an Apollo physician co-signed after the patient was discharged and expressly noted within the medical record that the "patient was not seen or evaluated by me." *See* Exhibit 23 (excerpted below).

**Disposition:**
04/22
08:36 Attestation: I have reviewed the documentation by the NP/PA and agree with the sr4
   diagnosis and plan. This patient was not seen or evaluated by me.
**Disposition:**
04/21/17 14:16 Discharged to Home. Impression: LATERAL TALAR AVULSION FRACTURE, Knee and Leg

Exhibit 23. However, as Apollo's billing data shows (*see* Exhibit 23A, excerpted below), Apollo submitted a claim to Georgia Medicare under the physician's billing number at the full physician rate—fraudulently charging Medicare $505.00 for mid-level services at the upcoded physician rate.

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CORNERSTONE MEDICAL CENTER (ED) | MEDICARE-GA (MEDICARE) | H⬛ | W⬛ | 99283 | 1134480866 | MD | RACKERS, SARAH | 1245535715 | PA | RAY, JULIANNE | 4/21/17 | 505 | 48.38 |

Exhibit 23A.

193.   As the foregoing examples make clear, Apollo submitted actual false claims to Medicare for services purportedly rendered within Apollo's emergency departments in the States of North Carolina, Virginia, Florida, Tennessee, and Georgia. But Apollo's fraud was even broader than that—below are *even more* examples of false claims that Apollo submitted to Medicare for services purportedly rendered in the States of Pennsylvania, California, Delaware, South Carolina, Alabama, Florida, North Carolina and Georgia.

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EASTON HOSPITAL (ER) | MEDICARE-PA (MEDICARE) | A⬛ | B⬛ | 99285 | 1376761163 | MD | ELLIOVICH, MATIAS | 1710930144 | PA | HARRIMAN, WILLIAM | 1/9/18 | 1180 | 136.97 |

Exhibit 24A (showing how Apollo billed Pennsylvania Medicare for the mid-level services reflected within the medical record in Exhibit 24).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JFK MEMORIAL HOSPITAL (ER) | MEDICARE-CA NORTHERN (MEDICARE) | A⬛ | G⬛ | 99285 | 1669578357 | MD | JOHNSON, MARK | 1447355474 | PA | DERUM, JAMES | 2/28/18 | 1180 | 138.75 |

Exhibit 25A (showing how Apollo billed California Medicare for the mid-level services reflected within the medical record in Exhibit 25).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NANTICOKE MEMORIAL HOSPITAL (ER) | MEDICARE B-DE: NOVITAS SOLUTIONS MEDICARE DELAWARE | A███ | H███ | 99284 | 1639932236 | DO | FINNERTY, SEAN | 1518975929 | PA | DAVIDSON, MICHAEL | 3/17/19 | 790 | 95.33 |

Exhibit 26A (showing how Apollo billed Delaware Medicare for the mid-level services reflected within the medical record in Exhibit 26).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PROVIDENCE HEALTH NORTHEAST (ER) | MEDICARE B-SC: PALMETTO GBA | L███ | G███ | 99284 | 1235354010 | MD | SHAW, KATHRYN | 1265434088 | NP | ROWLAND, MELISSA | 7/29/18 | 790 | 89.48 |

Exhibit 27A (showing how Apollo billed South Carolina Medicare for the mid-level services reflected within the medical record in Exhibit 27).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SOUTH BALDWIN REGIONAL MEDICAL CENTER (ER) | MEDICARE-AL (MEDICARE) | J███ | W███ | 99285 | 1093769648 | DO | BEAZLEY, WILLIAM | 1942200290 | NP | OUZTS, KATHLEEN | 6/11/20 | 1400 | 136.1 |

Exhibit 28A (showing how Apollo billed Alabama Medicare for the mid-level services reflected within the medical record in Exhibit 28).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LEHIGH REGIONAL MEDICAL CENTER (ER) | MEDICARE-FL (MEDICARE) | C███ | S███ | 99282 | 1265454920 | MD | OBREGON, ALAN | 1184055121 | PA | RAMOS, PEDRO | 12/26/18 | 336 | 34.2 |

Exhibit 29A (showing how Apollo billed Florida Medicare for the mid-level services reflected within the medical record in Exhibit 29).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CAROMONT REG MED CTR - MOUNT HOLLY (ER) | MEDICARE-NC (MEDICARE) | S███ | ███ | 99284 | 1003037359 | MD | COLE, IAN | 1538340641 | | HENDERSON, KIMBERLY | 12/30/19 | 935 | 90.78 |

Exhibit 30A (showing how Apollo billed North Carolina Medicare for the mid-level services reflected within the medical record in Exhibit 30).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LENOIR MEMORIAL HOSPITAL (ER) | MEDICARE-NC (MEDICARE) | | | 99282 | 1134269020 | MD | COTTEN, AARON | 1861931180 | PA | SLONOPAS, ALEXANDER | 2/23/18 | 336 | 31.93 |

Exhibit 31A (showing how Apollo billed North Carolina Medicare for the mid-level services reflected within the medical record in Exhibit 31).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SCOTLAND MEMORIAL HOSPITAL (ER) | MEDICARE-NC (MEDICARE) | | | 99284 | 1053343293 | DO | DUPLER, RONALD | 1750685244 | PA | MCBRYDE, JAMES | 5/7/18 | 790 | 64.09 |

Exhibit 32A (showing how Apollo billed North Carolina Medicare for the mid-level services reflected within the medical record in Exhibit 32).

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SPALDING REGIONAL MEDICAL CENTER (ER) | MEDICARE-GA (MEDICARE) | | | 99282 | 1073633057 | MD | SONYIKA, CHIONESU | 1679839500 | PA | DUFFY, ANDREW | 6/20/18 | 336 | 32.59 |

Exhibit 33A (showing how Apollo billed Georgia Medicare for the mid-level services reflected within the medical record in Exhibit 33). Apollo's corporate representative and Vice President of Revenue Cycle Operations, Tennille Lizarraga, **admitted** under oath that Apollo improperly submitted this claim (Exhibit 33A)

under Relator's billing number because the claim should have been submitted under the mid-level's billing number.[112]

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SPALDING REGIONAL MEDICAL CENTER (ER) | MEDICARE-GA (MEDICARE) | L■■ | W■■ | 99283 | 1073633657 | MD | SONYIKA, CHIONESU | 1285157883 | UNDEFINED | MAKIN, SHANNON | 8/24/18 | 505 | 48.81 |

Exhibit 34A (showing how Apollo billed Georgia Medicare for the mid-level services reflected within the medical record in Exhibit 34). Apollo's Director of International Coding, Heidi Young, **<u>admitted</u>** under oath that this claim (Exhibit 34A) should have been billed under the mid-level's billing number instead of Relator's billing number.[113] Apollo's Director of Revenue Cycle Management and corporate representative, Tim Stowe, also agreed that this claim (Exhibit 34A) was improperly submitted to Medicare under Relator's billing number.[114]

| Facility | Primary Insurance Name | Pat Name First | Pat Name Last | CPT Code | Rendering Provider NPI | Rendering Provider Credential | Rendering Provider Name | Supervising Provider NPI | Supervising Provider Credential | Supervising Provider Name | DOS | Charges | Payments Primary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SPALDING REGIONAL MEDICAL CENTER (ER) | MEDICARE-GA (MEDICARE) | L■■ | C■■ | 99282 | 1073633657 | MD | SONYIKA, CHIONESU | 1679839500 | PA | DUFFY, ANDREW | 3/12/18 | 336 | 0 |

Exhibit 35A (showing how Apollo billed Georgia Medicare for the mid-level services reflected within the medical record in Exhibit 35). Notably, this is another claim that Apollo improperly submitted under Relator's billing number when all

---

[112] *See* Exhibit 65 (March 31, 2022 30(b)(6) Deposition Transcript of Tennille Lizarraga) at 158:16-159:20.
[113] *See* Exhibit 64 (August 10, 2022 Deposition Transcript of Heidi Young) at 154:9-155:1.
[114] *See* Exhibit 66 (October 12, 2022 30(b)(6) Deposition Transcript of Tim Stowe) at 83:6-12.

Relator did was co-sign the mid-level's medical record—***which he did over ten days after the patient was discharged from the emergency department***. *See* Exhibit 35. Apollo's corporate representative and Executive Vice President of Clinical Support, Casey Crane, **admitted** under oath that this claim (Exhibit 35A) should have been submitted under the mid-level's billing number and *not* Relator's billing number.[115]

194.   Apollo submitted all the foregoing claims to Medicare under *physician* billing numbers. However, Apollo *should* have submitted all those claims under *mid-level* billing numbers (**for 15% less money**) because the underlying medical records relating to each of the foregoing claims show that a mid-level—**not a physician**—performed the substantive portion of the visit with the patient.

195.   And it's no surprise that, pursuant to the Scheme, Apollo knowingly submits false claims to Medicare across the country, especially considering the fact that Apollo ***admits*** that it has never had a compliance program to ensure that the claims it submits to CMS for mid-level services under physician billing numbers were properly submitted and complied with all CMS requirements. For example, Apollo admitted under oath that "we need to make sure that we have policies and procedures…in place to accurately bill for the patients that physicians see at the

---

[115] *See* Exhibit 62 (November 7, 2022 30(b)(6) Deposition Transcript of Casey Crane) at 148:9-16.

facilities that we staff."[116] However, Apollo's corporate representative and Executive Vice President of Clinical Support, Casey Crane, admitted under oath that: (1) Apollo has ***never*** had a "compliance program aimed at ensuring compliance with split/shared visit documentation;" (2) Apollo knows that if it decided to conduct regular chart reviews or audits, it would be made aware of any improperly submitted claims; and (3) Apollo has never performed any regular chart reviews or audits to ensure that it is properly submitting claims under physician billing numbers as opposed to mid-level billing numbers.[117] **This is an admission that Apollo *knowingly* submitted false claims to Medicare, nationwide**. *See Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1303 (11th Cir. 2021) ("Under the FCA, reckless disregard is tantamount to gross negligence. When Congress added reckless disregard to the FCA's scienter element in 1986, it intended to capture 'the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted.' So, a person acts with reckless disregard—and thus 'knowingly'—under the FCA when he 'knows or has reason to know of facts that would lead a reasonable

---

[116] *See* Exhibit 63 (December 13, 2022 30(b)(6) Deposition of Michael Lipscomb) at 144:6-10.

[117] *See* Exhibit 62 (November 7, 2022 30(b)(6) Deposition Transcript of Casey Crane) at 46:21-24, 86:11-18, 153:7-154:21, 160:17-161:4. Apollo's corporate representative and Chief Quality Officer, Dr. Michael Lipscomb—***who is also a member of Apollo's "Compliance Committee"***— also could not point to anything that Apollo does to ensure the accuracy of its coding. *See* Exhibit 63 (December 13, 2022 30(b)(6) Deposition of Michael Lipscomb) at 151:10-17.

person to realize that harm is the likely result of the relevant act.'"). Instead of maintaining any sort of compliance program, Apollo instructed its coders, and once Apollo receives the coded medical records from its coders, it simply (and fraudulently) presses the "proverbial go button"[118] to submit those claims to Medicare and Georgia Medicaid without ever ensuring those claims were properly coded.

196. Therefore, Relator has confirmed what he knew based on his personal experience and the extensive the pre-discovery evidence he obtained during his time at Apollo: Apollo operated its fraudulent Scheme on a national basis and submitted actual false claims to Medicare throughout its emergency departments across the country.[119]

197. **_Lastly_**, Apollo pays kickbacks to its all if its physicians across all of its facilities, nationwide, to further the Scheme. Apollo perpetrates its Scheme in part by offering and paying its physicians kickbacks to falsely indicate within mid-level charts that they were involved in the care of the mid-levels' patients so that Apollo can overbill CMS for the mid-levels' services at the full physician rate. Indeed,

---

[118] *See* Exhibit 66 (October 12, 2022 30(b)(6) Deposition Transcript of Tim Stowe) at 33:15-20, 34:9-36:2.

[119] Apollo admitted under oath that "Apollo should **_never_** overcharge Medicare." *See* Exhibit 63 (December 13, 2022 30(b)(6) Deposition Transcript of Dr. Michael Lipscomb) at 66:20-22 (emphasis added).

Apollo clearly states that each physician's pay is directly tied to the number of mid-level charts signed and attested to by each physician.

198.   For example, Apollo President, Dr. Yogin Patel, admitted in the March 12, 2017 email (also excerpted below) that Apollo uniformly pays all Apollo physicians "$50" for each mid-level chart they sign, even though such physicians either did "no [] work" or "little substantive work" on the mid-level's patient. These payments clearly induce Apollo physicians to participate in the Scheme so that Apollo can fraudulently bill for mid-level services at the physician rate even though such physicians never saw the mid-level patients at issue.

<div style="border:1px solid black; padding:10px;">

(1) **APC Patients** - No physician involvement, typically billed at 85%, and paid for by salary to APC. No incremental cost.

(2) **MD Patients** - No APC involvement. MD does these encounters (typically H&PS or complex follow ups). These are billed under the MD and paid out as $50/encounter.

(3) **Shared visit with APC and MD work** - These are complex patients that the APC mostly manages but may require MD to help. Both would document on these cases. This should be rare and we would pay the MD for their consultative work. The APC still needs to see 12 patients outside of these shared visits per work day. The docs likely need to document that they were asked to "assume care of this patient".

(4) **Shared Visits with no MD work**- These are patients managed by APCs, but where the chart is signed off or billed under the MD. Since the signing MDs have little substantive work, these should not be credited to the MDs as shared visits. Currently, some of these get classified as shared visits and we have been paying these to the MD at $50/encounter.

</div>

Exhibit 40.

199.   The   internal   employee   payment   portal   at   ApolloMD.net   also demonstrates that physicians are paid kickbacks for the mid-level charts they sign and/or attest within, which are billed at the physician rate (as ApolloMD.net reflects how Apollo actually billed claims for reimbursement submitted to Medicare and

Georgia Medicaid). Relator's own payment history directly reflects payments for mid-level encounters that he had no involvement in. *See* Exhibit 5. Though Apollo labels these payments as being for patient visits involving both the physician and a mid-level (MLP or PA), in reality, the physician had no involvement in the encounter at all or otherwise did not sufficiently document their patient involvement to properly bill at the physician rate. In fact, Relator estimates that 99% of the time, Apollo physicians sign or attest within mid-level charts at the end of their shifts, long after most of the patients have already been discharged. Thus, it would be impossible for the physician to have seen the patient with the mid-level provider.

200.   Yet, each month, Apollo physicians are paid for every mid-level chart they sign and/or attest within. That has been the case since Relator started working for Apollo in 2010. Indeed, Relator has been compensated for 429 mid-level encounters in a single month for simply signing the mid-level charts assigned to him—a kickback that totaled $18,463. In the chart below (from Relator's internal employee payment portal for Apollo's Spalding Regional Medical Center), this is shown in the column labeled "Pts w/ MLP," which means "Patients with Mid-Level Provider," and in the column labeled "$ Generated MLP Patients," which accounts for the money Apollo paid Relator for signing mid-level charts (though Relator did not actually see any of the patients with a mid-level):

| Facility | Payroll Period | Pts Dr Only | Pts w/ MLP | Pts Total | % Current MOS Pts | Current MOS Pts/Hour | Dr Hours Worked | Pts/Dr Hour, Dr Only | Pts/Dr Hour, Total (Incl MLP) | $ Generated Dr Only Pts | $ Generated MLP Patients | $ Generated Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Spalding Regional Medical Center | 7/1/16 | 321 | 274 | 595 | 97.8% | 4.23 | 137.50 | 2.33 | 4.33 | $22,158 | $12,632 | $34,790 |
| Spalding Regional Medical Center | 6/1/16 | 286 | 244 | 530 | 99.8% | 4.11 | 128.50 | 2.23 | 4.12 | $18,778 | $10,603 | $29,381 |
| Spalding Regional Medical Center | 5/1/16 | 305 | 237 | 542 | 96.5% | 4.32 | 121.00 | 2.52 | 4.48 | $20,330 | $10,052 | $30,381 |
| Spalding Regional Medical Center | 4/1/16 | 372 | 314 | 686 | 99.0% | 4.28 | 158.50 | 2.35 | 4.33 | $25,673 | $13,926 | $39,599 |
| Spalding Regional Medical Center | 3/1/16 | 381 | 351 | 732 | 99.9% | 4.40 | 166.00 | 2.30 | 4.41 | $26,141 | $15,979 | $42,120 |
| Spalding Regional Medical Center | 2/1/16 | 392 | 357 | 749 | 99.3% | 4.65 | 160.00 | 2.45 | 4.68 | $26,230 | $15,723 | $41,953 |
| Spalding Regional Medical Center | 1/1/16 | 382 | 429 | 811 | 97.2% | 4.92 | 160.00 | 2.39 | 5.07 | $26,288 | $18,463 | $44,752 |

*See* Exhibit 5. Each month, Relator is credited with treating patients that were actually seen by a mid-level. Relator did not see, nor simultaneously consult with the mid-levels regarding, nor sufficiently document his involvement with, any of these patients.

201. The same is true for the graphical depiction below, which falsely shows that Relator treated patients with mid-levels at Apollo's Atlanta Medical Center-South:



*See* Exhibit 6. In reality, Relator did not treat or see or sufficiently document his involvement with these patients—all of which patients were treated by mid-levels; instead, Apollo simply required Relator to sign and/or attest within the charts prepared by mid-levels.

202.   As Relator's payment history demonstrates, Relator was paid a portion of the revenue Apollo fraudulently received from CMS, and Apollo directly ties its independent contractor physicians' compensation to the volume of mid-level charts the physicians sign and/or attest within. This *quid pro quo* is a textbook kickback, which shows Apollo knew exactly what it was doing pursuant to the Scheme.

## VI.   CAUSES OF ACTION

### Count One: Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

203.   The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

204.   The FCA, 31 U.S.C. § 3729(a)(1)(A) imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval to the United States government. *See also Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1303 (11th Cir. 2021) ("Under the FCA, reckless disregard is tantamount to gross negligence. When Congress added reckless disregard to the FCA's scienter element in 1986, it intended to capture 'the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted.' So, a person acts with reckless disregard—and thus 'knowingly'—under the FCA when he 'knows or has reason to know of facts that would lead a reasonable person to realize that harm is the likely result of the relevant act.'").

205.   When submission of such false claims are discovered by private citizens, the FCA allows those citizens to bring an action on behalf of the United States against the perpetrators. 31 U.S.C. § 3730(b)(1).

206. Through their conduct, Defendants have knowingly submitted, or caused to be submitted, false claims for payment, as set forth above, in violation of 31 U.S.C. § 3729(a)(1). Defendants have engaged in a systemic and fraudulent course of conduct as alleged herein.

207. Specifically, as alleged herein, Defendants have submitted false claims for reimbursement to CMS for evaluation and management ("E/M") services performed and sufficiently documented solely by non-physician practitioners (mid-levels) in Apollo emergency departments as if they were performed by or in conjunction with a physician. In doing so, Apollo receives money to which it is not entitled. That is, Apollo knowingly and systematically presents and causes to be presented (for example, through its uniform documentation, coding, and billing policies, practices, procedures and guidelines) to CMS claims for split/shared services (under physician NPIs) based on patient medical records wherein Apollo physicians misrepresented and/or failed to sufficiently document (as CMS requires) their involvement with the care of patients actually treated by Apollo mid-levels. In simple terms, Apollo fraudulently overbills for mid-level services by submitting claims to CMS for E/M services performed by a mid-level under a physician's NPI. Though CMS rules only allow for reimbursement of mid-level services at 85% of the standard physician rate, by submitting claims for mid-level E/M services under

a physician's NPI, Apollo improperly obtains 100% of the physician rate (*i.e.*, Apollo improperly obtains funds to which it knows it is not entitled).

208.   In particular, Apollo submitted and/or caused to be submitted false and/or fraudulent claims to CMS under its Scheme by, among other things: (i) expressly misrepresenting the identity of the provider who rendered the services for which Apollo claimed reimbursement by submitting claims for mid-levels' services under a physician's NPI; (ii) expressly misrepresenting and falsely certifying that a split/shared E/M visit, as defined by Medicare Part B payment policy, had occurred when Apollo knew that the documentation and medical record underlying the claim did not comply with CMS regulations and requirements; (iii) expressly, but falsely and fraudulently, certifying that each such claim "complie[d] with all applicable Medicare . . . laws, regulations, and program instructions for payment[,]" when Apollo knew that the documentation upon which it relied to claim the services were split/shared services did not satisfy or comply with CMS' requirements; (iv) at a minimum, impliedly certifying that necessary conditions to CMS' payment of a claim for a split/shared visit at the physician rate—including that the documentation and medical records underlying the claim sufficiently established and documented that a split/shared E/M visit, as defined by Medicare Part B payment policy and according to all CMS requirements—were satisfied, when in reality, Apollo knew

that such conditions were not satisfied and that the underlying documentation did not comply with CMS requirements; and (v) failing to implement a compliance program relating to billing at the physician rate for services rendered by mid-level providers.

209.  Relator has brought this action pursuant to 31 U.S.C. § 3730(b)(1) and provided a Disclosure Statement to the United States in compliance with § 3730(b)(2).

210.  Defendants' fraudulent conduct described herein is material to the government's decision to reimburse Defendants for services billed (*i.e.*, CMS would not authorize reimbursements of claimed services if it was aware of Defendants' fraud).[120] And each of the CMS requirements and regulations described herein for the documentation and billing of E/M services were a critical and necessary condition for CMS to pay reimbursement at the rate and level for which Apollo submitted its false and fraudulent claims under its Scheme.

---

[120] For example, Apollo's Vice President of Revenue Cycle Operations and corporate representative agreed under oath that Apollo knows that the identity of the provider it submits on claim forms (*i.e.*, whether that provider is a mid-level or physician) "naturally influences Medicare's reimbursement decision." *See* Exhibit 65 (March 31, 2022 30(b)(6) Deposition Transcript of Tennille Lizarraga) at 113:21-114:10. Apollo's Director of Revenue Cycle Management and corporate representative, Tim Stowe, similarly agreed under oath Apollo knows that "[t]o Medicare the identity of the provider makes a difference as to the amount the they're going to reimburse Apollo." *See* Exhibit 66 (October 12, 2022 30(b)(6) Deposition Transcript of Tim Stowe) at 70:9-13.

211.  By reason of Defendants' actions, the United States has incurred and continues to incur damages.

### Count Two: Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

212.  The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

213.  Section 3729(a)(1)(B) of the FCA imposes liability upon those who make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim to the United States government. *See* 31 U.S.C. § 3729(a)(1)(B).

214.  Through their conduct, Defendants have made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as set forth above, in violation of 31 U.S.C. § 3729(a)(1)(B). Defendants have engaged in a systemic and fraudulent course of conduct as alleged herein.

215.  Specifically, as alleged herein, Defendants have submitted false claims for reimbursement to CMS for evaluation and management ("E/M") services performed and sufficiently documented solely by non-physician practitioners (mid-levels) in Apollo emergency departments as if they were performed by or in conjunction with a physician. In doing so, Apollo receives money to which it is not entitled. And as discussed herein, Apollo submits claims to CMS for split/shared services (under physician NPIs) based on patient medical records wherein Apollo

physicians—as required by Apollo—misrepresented and/or failed to sufficiently document (as CMS regulations require) their involvement with the care of patients actually treated by Apollo mid-levels. Thus, Apollo knowingly and systematically makes, uses, and causes to be made and used, false records and statements material to false and fraudulent claims it submits to CMS. In simple terms, Apollo fraudulently overbills for mid-level services by submitting claims to CMS for E/M services performed by a mid-level under a physician's NPI. Though CMS rules only allow for reimbursement of mid-level services at 85% of the standard physician rate, by submitting claims for mid-level E/M services under a physician's NPI, Apollo improperly obtains 100% of the physician rate (*i.e.*, Apollo improperly obtains funds to which it knows it is not entitled).

216.   In particular, Apollo made, used, or caused to made or used, false records or statements material to its false and/or fraudulent claims under its Scheme by, among other things: (i) expressly misrepresenting the identity of the provider who rendered the services for which Apollo claimed reimbursement by submitting claims for mid-levels' services under a physician's NPI; (ii) expressly misrepresenting and falsely certifying that a split/shared E/M visit, as defined by Medicare Part B payment policy, had occurred when Apollo knew that the documentation and medical record underlying the claim did not comply with CMS

regulations and requirements; (iii) expressly, but falsely and fraudulently, certifying that each such claim "complie[d] with all applicable Medicare . . . laws, regulations, and program instructions for payment[,]" when Apollo knew and had previously been notified on numerous occasions that the documentation upon which it relied to claim the services were split/shared services did not satisfy or comply with CMS' requirements; (iv) at a minimum, impliedly certifying that necessary conditions to CMS' payment of a claim for a split/shared visit at the physician rate—including that the documentation and medical records underlying the claim sufficiently established and documented that a split/shared E/M visit, as defined by Medicare Part B payment policy and according to all CMS requirements—were satisfied, when in reality, Apollo knew that such conditions were not satisfied and that the underlying documentation did not comply with CMS requirements; and (v) failing to implement a compliance program relating to billing at the physician rate for services rendered by mid-level providers.

217.   Defendants' fraudulent conduct described herein is material to the government's decision to reimburse Defendants for services billed (*i.e.*, CMS would not authorize reimbursements of claimed services if it was aware of Defendants'

fraud).[121] And each of the CMS requirements and regulations described herein for the documentation and billing of E/M services were a critical and necessary condition for CMS to pay reimbursement at the rate and level for which Apollo submitted its false and fraudulent claims under its Scheme.

218.   By reason of Defendants' actions, the United States has incurred and continues to incur damages.

## Count Three: Violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b 90[122]

219.   The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

220.   Section 1320a-7b(b) of the Social Security Act (the "Anti-Kickback Statute") makes it illegal to knowingly and willfully offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a

---

[121] For example, Apollo's Vice President of Revenue Cycle Operations and corporate representative agreed under oath that Apollo knows that the identity of the provider it submits on claim forms (*i.e.*, whether that provider is a mid-level or physician) "naturally influences Medicare's reimbursement decision." *See* Exhibit 65 (March 31, 2022 30(b)(6) Deposition Transcript of Tennille Lizarraga) at 113:21-114:10. Apollo's Director of Revenue Cycle Management and corporate representative, Tim Stowe, similarly agreed under oath Apollo knows that "[t]o Medicare the identity of the provider makes a difference as to the amount the they're going to reimburse Apollo." *See* Exhibit 66 (October 12, 2022 30(b)(6) Deposition Transcript of Tim Stowe) at 70:9-13.
[122] Relator acknowledges that the Court dismissed Count Three and is not reasserting Count Three: Violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b 90.

person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program. Violation of the AKS is a felony punishable by fines and imprisonment, and can also result in exclusion from participation in federal health care programs. 42 U.S.C. §§ 1320a-7(b)(2), 1320a-7(b)(7).

221.   Relevant here, "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for the purposes" of the FCA." 42 U.S.C. § 1320a-7b(g).

222.   Through their conduct, Defendants have knowingly and willfully offered and paid kickbacks to contracted physicians and mid-level providers to induce their ordering and/or documenting of nonexistent and/or medically unnecessary emergency department services and procedures by directly tying physicians' compensation to the volume of mid-level charts that physicians sign and/or attest within each month.

223.   As set forth above, Defendants offer and pay these kickbacks in exchange for physician signatures and attestations on mid-level charts in violation

of the AKS. Defendants submit such false charts to CMS for reimbursement under the physician's—rather than the midlevel's—NPI so that Defendants may fraudulently obtain reimbursement for the mid-level services provided at the full physician reimbursement rate.

224.   None of the statutory or regulatory safe harbors apply to Defendants' conduct.

225.   Because this violation of the Anti-Kickback Statute involves a claim for reimbursement to a federal health care program, and that violation is material to the government's reimbursement decision, Defendants' have submitted false claims for reimbursement that include items or services resulting from a violation of the AKS, which constitute false claims under the FCA. *See* 42 U.S.C. § 1320a-7b(g).

226.   By reason of Defendants' actions, the United States has incurred and continues to incur damages.

**Count Four: Georgia State False Medicaid Claims Act,
GA. CODE § 49-4-168**

227.   The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

228.   Similar to Medicare, Georgia Medicaid rules limit reimbursement for services provided by a PA to no more than 90% of the maximum allowable amount

paid to a physician. *See* Georgia Department of Community Health, Division of Medicaid, Policies and Procedures for Physician Services Handbook Ch. 1001.

229.  The Georgia State False Medicaid Claims Act imposes liability upon those who knowingly present or cause to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval and those who knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim to the Georgia Medicaid program. Ga. Code § 49-4-168.

230.  Through their conduct, Defendants have knowingly presented or caused to be presented to the Georgia Medicaid program false or fraudulent claims for payment or approval, as set forth above, in violation of Georgia Code § 49-4-168.

231.  Through their conduct, Defendants have also knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to the Georgia Medicaid program, as set forth above, in violation of Georgia Code § 49-4-168.

232.  Relator asserts this claim in accordance with the civil action provision in Georgia Code § 49-4-168.2 and has complied with all requirements therein.

233.   By reason of the Defendants' actions, the State of Georgia has incurred and continues to incur damages.

## VII.   <u>DEMAND FOR JURY TRIAL</u>

234.   Relator expressly demands a trial by jury.

## VIII.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Relator, on behalf of himself, the United States and the State of Georgia, request that this Court:

(a)    Enter judgment that Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims or otherwise violating <u>31 U.S.C. §§ 3729-3733</u>;

(b)    Enter judgment against each Defendant in an amount equal to three times the damages the United States has sustained as a result of each and all of Defendants' actions, as well as a civil penalty against each Defendant of $11,000 for each violation of <u>31 U.S.C. § 3729</u>;

(c)    Find joint and several liability against Defendants pursuant to <u>31 U.S.C. § 3729</u>;

(d)    Enter judgment that Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims violating the statutes of the State of Georgia as pled herein;

(e)     Enter judgment against each Defendant in an amount equal to three times the damages the State of Georgia has sustained as a result of each and all Defendants' actions, as well as a civil penalty against each Defendant in the maximum amount allowable under the statute of the State of Georgia for each and every false record, statement, certification and claim submitted to the State of Georgia;

(f)     Award Relator the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and the relevant provisions of the statutes of the State of Georgia;

(g)     Award Relator all costs and expenses of this action, including court costs, expert fees, and all attorneys' fees incurred by Relator in prosecution of this action; and

(h) Grant the United States, the State of Georgia and Relator each any further relief as the Court deems just and proper.

Dated: January 3, 2023                           Respectfully submitted,

                                                 */s/ Nicholas W. Shodrok*
                                                 Trey Duck, *Pro Hac Vice*
                                                 Drew Pate, *Pro Hac Vice*
                                                 Cody Hill, *Pro Hac Vice*
                                                 Nicholas W. Shodrok, *Pro Hac Vice*
                                                 **NIX PATTERSON, LLP**
                                                 8701 Bee Cave Rd.
                                                 Building 1, Suite 500

Austin, Texas 78746
Tel: (512) 328-5333
tduck@nixlaw.com
dpate@nixlaw.com
codyhill@nixlaw.com
nshodrok@nixlaw.com

Michael A. Caplan
Georgia Bar No. 601039
Julia Blackburn Stone
Georgia Bar No. 200070
T. Brandon Waddell
Georgia Bar No. 252639
Ashley C. Brown
Georgia Bar No. 287373
**CAPLAN COBB LLP**
75 Fourteenth Street NE, Suite 2700
Atlanta, Georgia 30309
Tel: (404) 596-5600
Fax: (404) 596-5604
mcaplan@caplancobb.com
jstone@caplancobb.com
bwaddell@caplancobb.com
abrown@caplancobb.com

*Counsel for Relator*